UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO. |
| v. | ) | |
| | ) | **FACTUAL BASIS** |
| DEVON RAMBERT-HAIRSTON | ) | |
| | ) | |

NOW COMES the United States of America, by and through R. Andrew Murray, United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

### Individuals and Entities

1.    DEVON RAMBERT-HAIRSTON, also known as "Devon Marshalle Rambert" during times relevant to this Information, was a resident of Huntersville, North Carolina. From September 2010 until at least August 2018, RAMBERT-HAIRSTON was licensed as a nurse practitioner through the North Carolina Board of Nursing. Beginning in at least October 2011, RAMBERT-HAIRSTON was enrolled as a rendering provider with the North Carolina Medicaid Program ("Medicaid").

2.    T.G.T. and J.T. were brothers that owned and operated a series of entities that claimed to provide mental and behavioral health services to at-risk youth in North Carolina and elsewhere.

3. Taylor Behavioral Health Center, LLC ("TBHC"), owned by T.G.T and operated by T.G.T and J.T. during the relevant time period, was a business located in Monroe, North Carolina. T.G.T. and J.T. held TBHC out as a provider of mental and behavioral health services and after school programs. TBHC was enrolled as a Medicaid provider on or about June 9, 2015.

### The Medicaid Program

4. The North Carolina Medicaid Program is a state-administered program aided by federal funds.

a. Medicaid helps pay for reasonable and medically necessary services for qualifying, enrolled individuals and their families, referred to herein as "beneficiaries." Covered services include mental and behavioral health services. The North Carolina Medicaid Program is administered by the Division of Health Benefits, North Carolina Department of Health and Human Services (referred to herein as "DHB"), also known as the Division of Medical Assistance ("DMA") during times relevant to this Information, which oversees mental health providers through the state who receive payments from Medicaid. The North Carolina Medicaid Program and DHB are collectively referred to herein as "Medicaid."

b. If qualified, an individual can enroll as a Medicaid beneficiary. Medicaid beneficiaries receive services from medical practitioners (referred to herein as "rendering providers") and companies (referred to herein as "billing provider"). Once a rendering or billing provider enrolls with Medicaid, the program issues a unique number to the provider, known as the "provider number." Rendering and billing providers must also obtain a federal identification number, known as a National Provider Identifier or "NPI" number. All Medicaid rendering and billing providers must certify that they will only bill the government for services that they actually render.

c. After a rendering provider renders a covered medical service to a Medicaid beneficiary, the billing provider may bill Medicaid for the reasonable and necessary costs of the service.

d. Medicaid billing providers are permitted to bill for outpatient behavioral health services only where certain objective criteria have been met. Medicaid requires billing providers to adhere to Current Procedural Terminology ("CPT") codes to determine whether these objective criteria have been met prior to billing Medicaid for those services. Under Medicaid regulations, certain procedures, such as evaluation and management medical services (for example, CPT codes 99205 and 99215, among others) can only be provided by a qualified medical professional, such as a physician, nurse practitioner, or physician's assistant.

e. While Medicaid may reject a claim if, for example, the provider or beneficiary is not enrolled, Medicaid typically presumes the truth of each claim and

2

generally pays providers for the services that they bill. In other words, Medicaid entrusts its providers to submit claims for the services that are actually performed.

5. Medicaid is a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

## The Fraud Scheme and Money Laundering

6. Beginning in or about July 2015, and continuing until at least in or about December 2017, T.G.T. and J.T. conspired with each other and with other persons known and unknown to the United States Attorney to engage in a scheme to defraud Medicaid of millions of dollars by submitting false and fraudulent reimbursement claims for non-existent services, as well as false and fraudulent claims that misrepresented the services actually provided in order to earn greater reimbursement than was owed.

7. In furtherance of the fraudulent scheme, T.G.T. recruited RAMBERT-HAIRSTON to serve as the medical director of TBHC beginning at least as early as July 2015. T.G.T. asked RAMBERT-HAIRSTON to review and sign off on progress notes reflecting behavioral health services ostensibly provided by TBHC to juvenile Medicaid beneficiaries. RAMBERT-HAIRSTON did not, herself, provide any medical services to the beneficiaries and only rarely interacted with any beneficiaries at all.

8. The progress notes RAMBERT-HAIRSTON reviewed and signed purported the beneficiaries had been seen by a licensed marriage and family therapist, the identity of whom is known to the United States Attorney.

9. Although RAMBERT-HAIRSTON had provided no services to the beneficiaries, T.G.T. and J.T. caused the submission of claims to Medicaid that falsely and fraudulently listed RAMBERT-HAIRSTON as the rendering provider for services billed by TBHC.

a. T.G.T. and J.T. specifically caused the submission of claims for lucrative evaluation and management services to Medicaid, falsely claiming the services had been provided by RAMBERT-HAIRSTON. In reality, many of the beneficiaries never received services of any kind from RAMBERT-HAIRSTON, TBHC, or anyone else working for TBHC. To the extent some beneficiaries did receive services, they were provided by the licensed marriage and family therapist, who was precluded by Medicaid regulations from rendering the evaluation and management services claimed.

b. For example, T.G.T. and J.T. caused the submission of false claims to Medicaid for evaluation and management services they purported were provided by RAMBERT-HAIRSTON to more than 50 beneficiaries, all occurring on September 1, 2015. The claims asserted that each of the 50 beneficiaries received one-on-one evaluation and management services lasting 50 minutes or more. No services were ever provided in connection with the submitted claims. Moreover, the submitted claims were fraudulent on their face, and represented services that could not possibly have been provided by any

3

single individual in a given day. As a result of the fraudulent claims submission, Medicaid paid TBHC approximately $33,350.

10.  TBHC was placed on pre-payment review by DHB on or about August 17, 2016, following an evaluation of claims submitted by TBHC. Thereafter, T.G.T, J.T., and others continued the fraudulent scheme by submitting false and fraudulent claims through a series of successive entities. In or around August 2016, RAMBERT-HAIRSTON agreed to allow T.G.T and J.T. to submit Medicaid claims using her NPI number as the billing provider until other entities owned and operated by T.G.T. and J.T. could be enrolled as Medicaid providers.

11.  Between at least in or about September 2016 and continuing to at least in or about February 2017, T.G.T. and J.T. submitted and caused to be submitted approximately $1.3 million in fraudulent claims to Medicaid under RAMBERT-HAIRSTON's NPI number as both the rendering and billing provider.

12.  As a result of the fraudulent claims submitted using RAMBERT-HAIRSTON's NPI number as both the rendering and billing provider, Medicaid wired at least $813,726 directly into RAMBERT-HAIRSTON's State Employees' Credit Union ("SECU") account *1005. RAMBERT-HAIRSTON knew these funds were not derived from any legitimate services she had provided to Medicaid beneficiaries during the relevant time period and reasonably should have known the services were not provided by anyone else.

13.  RAMBERT-HAIRSTON arranged for the distribution of the Medicaid funds deposited in her SECU account to T.G.T. and J.T. through a series of monetary transactions of a value greater than $10,000, including cash withdrawals and cashiers' checks, often occurring the same day as the Medicaid deposit. On several occasions, RAMBERT-HAIRSTON accompanied T.G.T. to a SECU branch in order to arrange cash withdrawals from RAMBERT-HAIRSTON's SECU account *1005 and simultaneous cash deposits into T.G.T.'s SECU account *0925.

14.  The amount of loss known to or reasonably foreseeable by RAMBERT-HAIRSTON was $813,726. Between at least in or about September 2016 and continuing through at least in or about February 2017, RAMBERT-HAIRSTON transferred more than $751,000 in fraudulent proceeds to T.G.T. and J.T,. and RAMBERT-HAIRSTON kept the remainder.

R. ANDREW MURRAY
UNITED STATES ATTORNEY

DALLAS J. KAPLAN
ASSISTANT UNITED STATES ATTORNEY

Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis, the Bill of Information, and the plea agreement in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis, the Bill of Information, and the plea agreement. I hereby certify that the defendant does not dispute this Factual Basis.

C. Melissa Owen, Attorney for Defendant

DATED: 3-19-19

5