United States District Court of Western North Carolina

Devon Marshalle Rambert-Hairston                    Docket#: 3:19-cr-00107-RJC-DCK-1

Lexington Federal Medical Center, Lexington KY       Prisoner#: 34858-058

RECEIVED

Charlotte, NC

MAR 3 0 2021

Clerk, US District Court
Western District NC

United States of America v. Devon Marshalle Rambert-Hairston

United States District Court of Western North Carolina

Attn: Judge Robert J. Conrad Jr.

1. This is a humble request for you to review my case of wrongful prosecution, ineffective counsel, and prosecution abuse with breach of plea agreement.


## Statement of Facts:


I am currently serving a sentence of 12-months and 1 day for one count of money laundering conspiracy that began on October 14,2020. A guilty plea was entered on April 14, 2019. Sentencing date: April 14,2020. During my sentencing, I pleaded to review my evidence regarding my innocence and the evidence that I had of my defense attorney coercing and intimidating me to accept responsibility of the crime and to plead guilty. You refused. Just because I came before you with a signed plea agreement, you automatically put judgement on me that I was guilty not even considering the other circumstances. I didn't even get the chance to provide any other evidence of this whole situation occurred. I didn't get a fair hearing due to one-sided views. It shouldn't be if you come to Judge Conrad's courtroom, you're guilty. I have sought numerous efforts to review my case including an appeal to the United States Court of Appeals for the 4th District, No. 20-4281 that was denied on October 6, 2020. There was also consultation of over 10 defense attorneys that represented the Western district of North Carolina to determine my innocence. Mostly every attorney that I consulted with didn't want to take my case because of the harsh reputation that the judge has in the Western District. It was basically stated of "Ma'am/Devon, you have a legitimate case but, this judge or Judge Conrad is known or notorious for his harsh sentencing and high conviction rates. He will not be fair to you when you go before him with your case. The chance of winning your case is very slim but, the choice is yours." Justice is supposed to be blind and unbiased but, we have all seen that throughout times, it has failed many of us. Regularly, we have prosecution committing constitutional violations and getting rewarded because they know how to use the legal system to win cases. They rarely get caught for their actions and questioned by judges. If, they are caught, there are no consequences for their conduct. This leads to defendants punished by imprisonment, felonies, criminal records, loss of employment, etc. that can affect them long term. If defendants challenge their cases and are successful with their conviction, some prosecutors find ways to

retaliate with additional charges. "Currently, I am in incarcerated at Federal Medical Center Lexington Satellite Camp, KY. During this time, I contracted COVID19 on December 19, 2020 where I exhibited moderate to mild symptoms for 5 weeks. There is a great need for change.

Despite numerous text messages and emails including apologizing after informing my attorney of severe consequences I suffered after the day I signed the plea agreement in my court hearing (i.e. loss of security clearance, pending loss of nursing license, threats and slander from the media and public, discharge from the military after 21 years of service), it wasn't enough for the ineffective counsel. I was immediately shut down justifying the conviction and government's actions. The Supreme Court in *United Sates v. Ruiz, 36 U.S. 622 (2002)* **stressed that a defendant should be aware of the "relevant and likely consequences" of the waiver.** James v. Cain, 56F. 3d 662 (5th Cir. 1995) **Proof of ineffective assistance of counsel is by the preponderance of evidence.** Woodard v. Collins, 898 F. 2d 1027 (5th Cir. 1990) **required to determine whether the petitioner was prejudiced by his counsel's failure to investigate a crime and advice to plead guilty.** Scott v. Wainwright, 698 F. 2d 427, 429-30 (11th Cir 1983) **Trial counsel's failure to learn the facts and failures to familiarize himself with the law in relation to plea constitutes IAC and renders the guilty plea invalid.** *Boykins v Alabama 295 U.S. 238, 23L. Ed. 2d 274, 89 S. ct. 1709 (1969).* **States that a guilty plea shall not be accepted unless made voluntarily after proper advice and full consequences of plea.** *U.S. v. Borders, 992 F. 2d 563 (5th Cir 1993); U.S. v. Shorter, 54 F. 3d 1248 (7th Cir.1995); Moore v. U.S. 950F. 2d 656 (10th Cir. 1991); United States v. Sanderson, 595 F.2d 1021 (5th Cir. 1979); United States v. Rumery, 698 F. 2d 764 (5th Cir. 1983)* **summarizes coercion or inducing a defendant to plead guilty to a plea agreement by trial counsel or prosecutor constitutes ineffective counsel and renders the guilty plea invalid.**

In sentencing, the government actually spoke up in court the he couldn't say for sure that I knew of the fraud scheme of the company I worked for but, I should receive at least 5 years for the crime! Then my defense attorney stated that the only reason she and the government agreed to a minor role was because of what the other co-defendants in the scheme hid from me. Much of what the government stated of my case is that he believe/assumed instead of showing evidence that without a doubt in any reasonable person's mind that I committed a crime. I am aware that I should have been more careful in getting myself involved in a crime as serious as this. But honestly, I went off supposedly specialist or experts' "word" such as the biller of the company to provide information of the policies and/or rules as I did at any other clinic or hospital I have worked for. *Francis v. Franklin 471 U.S 307, 309, 105 S. ct. 1965, 85 L. Ed. 2d. 344 (1985)* **states the due process requires government to prove every element of a criminal offense beyond a reasonable doubt;** In *Re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d. 368 (1970).* **The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged;** *U.S. v. Martinez (5th Circuit Court of Appeals. 2013) 531 Fed. Appx. U.S. App. Lexis 9351, 407,* **acceptance of plea was plain error under Fed. R. Crim. P 11(b)(3)**

**because the factual basis to which the defendant agreed in his plea to conspiracy to possess, with intent to distribute, did not establish existence of an agreement between him and another person to violate narcotic laws.** On February 25, 2021, Supreme Court Justice Neil Gorsuch revealed refreshing skepticism of the criminal justice system when pushing for 4th Amendment Protections. He quoted, "We live in a world in which everything has been criminalized." And some professors have even opined that there's not an American alive who hasn't committed a felony in under some state law.

The Government also stated that I was willfully blind to the scheme and I should have known that fraud was going on in the clinic as the Clinical Director. In reviewing the money laundering and money laundering conspiracy statutes, the major element that there is proof beyond a reasonable doubt that the individuals knew of a crime NOT "reasonably should have known" which, is considered negligence not willfully blind. Both statutes and jury instructions also stat that just because an individual was there during the crime or carelessly and unknowingly committed an offense, doesn't mean they are involved. It was shown that you continued to agree at sentencing that I was too educated and trained to not know what was going on after little to no evidence that I did. My education and training should never be a factor to an element that I knew of a crime was being committed by someone especially, when you have never been in any situations to notice wrong doing. The only focus was a conviction at all cost. I felt disappointed and disgraced because my education and training led to a conviction that I knew of a crime with out little to no evidence besides money that came into my account within the 6 months that was billed to Medicaid. All funds were reported to IRS along with Tony Taylor was provided a 1099 in 2018 by me after learning of his scheme. However, this was not considered at part of the statutes to determine whether a crime was committed on my behalf. In the 5th Circuit, in *U.S. v. Nora 18-31078, (2-24-21),* **the court vacated a medical health care fraud conspiracy conviction, finding insufficient evidence, and turned on the definition of what was a willful violation of anti-kickback laws, stating that "evidence of (defendant's) knowledge was lacking."**

In spite of providing substantial assistance to the government, they decided to remove the 5K1.1 due to professing my innocence at sentencing and not taking responsibility for this crime. "In the process of determining whether disputed plea agreements have been formed or performed, courts have necessarily drawn on the most relevant body of developed rules and principles of private law, those pertaining to the formation and interpretation of commercial contracts. The defendants underlying "contract" rights is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those commercial contract law. Second, with respect of federal prosecutions, the court's concerns run even wider than protection of the defendant's individual constitutional rights, to concerns for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government. "Whether a written agreement is ambiguous or unambiguous on its face should ordinarily be decided by the courts as a matter of

law. If it is unambiguous as a matter of law, and there is no suggestion of government overreaching of any kind, the agreement should be interpreted and enforced accordingly. Neither side should be able, any more the private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind."

In *U.S. v. De la Fuente, 8 F. 3d 1333 (9th Cir. 1993)* **states that trial counsel failure contest the government breach of plea where the government failed to move for a downward departure below the mandatory minimum, pursuant to the U.S.S.G 5K1 Constitutes ineffective counsel and established cause for procedural default;** *Santobello v. New York, 40 U.S. 257 (1957)*, **the Supreme Court found that the government's breach of a plea agreement allowed a defendant to seek a remedy despite a waiver. They also ruled that holding that the government's breach of the plea agreement is a due process violation;** *U.S. v. Graninetti, 564 F. 2d 723, 727 n.1 (5th Cir. 1977)*, **the government is charged with knowing the law, and the government's ignorance of it should not work to the defendant's detriment,** *U.S. v. Runck, 601 F2d. 968 970 (8th Cir. 1997), cert denied, 444 U>S>S 1015, 62 L. Ed. 2d 644, 100 S. Ct. 665 (1980)*. **The law is settled that breach of a plea bargain requires permitting the defendant to plead a new or demand a specific performance,** *U.S. v. McGovern, 822, F 2d. 739 743 (8th Cir.), cert denied, 484 U>S> 956, 108 S. Ct. 352, 98 L. Ed 377 (1987)*, **a plea agreement is not simply a contract between two parties for the reason a plea agreement necessarily implicates the integrity of the criminal justice system and requires the courts to exercise judicial authority in considering the plea agreement; and** *U.S v. Harvey 791, F. 2d 294, 300 (4th Cir. 1986)*, **both constitutional and supervisory concerns require holding the Government to a greater degree of responsibility that the defendant...for imprecisions or ambiguities in my case of money laundering conspiracy or even healthcare conspiracy due to based on circumstantial evidence and opinions to secure a conviction.** Still, I was convicted of a crime.

I could only attack my plea agreement if it is shown of prosecution misconduct or ineffective counsel. Given the evidence of ineffective counsel (ex. emails, text messages, court transcript) and prosecution misconduct (ex. court transcript, false statement on Dept. of Justice website, government breach of plea agreement), it wasn't enough to warrant a vacated result "for the withheld evidence to favorable. *Kyles v. Whitley, 514 U>S> 419 (1995)*. **Some courts apply an erroneously high burden on the defendant to prove Brady claims.** *Velez Scott v. United States 890 F. 3rd 1239 (11th Cir. 2018)*, **judges stated concerns that making prisoners Brady violation crimes prove by clear and convincing evidence that they are actually innocent violates the constitution.**

**<u>Legal Statistics Factual Support:</u>**

Over the last 50-plus years, prosecutors have devised ways around *Brady vs. Maryland, 373 U.S. 83 (1963)* and courts have done away at the rule as well. It is known that prosecutorial misconduct in white-collar crimes beat out all other crimes, with more than half of the cases infected by misconduct. Those white-collar cases were also entirely federal cases. Federal cases made up only 5 percent of all exonerations, but 41 percent of federal exonerations were white-collar crimes. And, the misconduct in those cases was all by the prosecutors. "white-collar cases are "big ticket prosecutions" for federal prosecutors," the NRE report states. Federal prosecutors often use white-collar cases as platforms to push their career and position themselves for federal life-long judgeships. Perjury was the main misconduct by prosecutors in those cases. Lies by prosecutors themselves often came during closing arguments, trying to convince the jury or judge to convict the defendant. In exoneration cases federal prosecutors lied in white-collar cases two times more often than state prosecutors lied in murder cases. Jayson Hawkins quoted in Prison Legal News, "Prosecutors are by far the most obscure variable in the criminal justice equation. They enjoy enormous discretion in their decision making, and much of what they do occurs in private meetings." We have all heard that of some public defendants rushing into pleas due to excessive workload, not willing to take the time to investigate, etc. That can result in wrongful convictions or incarceration. However, there are a few retained defense attorneys that plea bargain rather than take the risk of going to trial because it is less stressful, limited work time and more time with families where they negotiate with the prosecutor for a lesser sentence for their client. Some defense attorneys use coercion and/or intimidation to force defendants in plea agreements. "Their errors are usually "sins of omission" (such as failing to investigate)." In the bargaining stage between the prosecutor and defense, both sides win because the prosecutor gets a conviction and the defense attorney gets to claim the fame that their client received a lesser sentence due to successful negotiations. The defendant is the only loser in this game.

## **Suggested Remedy:**

Due to the insufficient evidence, ineffective assistance of counsel, and prosecution abuse in breach of plea agreement, I am requesting a motion to vacate my conviction and sentence of money laundering conspiracy.

I swear under the penalty of perjury under the laws of the State of North Carolina and Kentucky that the forgoing is true and correct.

Date and Place: 3/23/2021, Lexington, KY

Attachment:

1. Rambert-Hairston_CaseReview

X _Devon M. Rambert-Hairston_ signature

Devon M. Rambert-Hairston

# Table of Contents

2. Court Transcript
3. Bill of Information (filed)
4. Plea Agreement
5. Money Laundering Statute
6. Willful Blindness Instruction
7. Email of Suspected Discovery of Fraud- Ameera Ali (biller)
8. Email from Melissa Owen (attorney); Robert Heroy (attorney for second opinion)
9. Text Messages (Melissa Owen)
10. Text Message  (Colonel Chuck Scronce-Commander)
11. Description of billing provider and rendering provider
12. Media-Defamation of Character
13. National Practitioner Data Bank Report (Provided by US Attorney's Office)
14. Prosecution Misconduct Information

## 2. Court Transcript

42

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>vs.<br><br>DEVON RAMBERT-HAIRSTON,<br><br>Defendant. | ) DOCKET NO. 3:19-cr-107<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
APRIL 14, 2020


APPEARANCES:

On Behalf of the Government:

   MICHAEL E. SAVAGE, ESQ.,
   WILLIAM BOZIN, ESQ.,
   Assistant United States Attorneys
   227 West Trade Street, Suite 1700
   Charlotte, North Carolina 28202


On Behalf of the Defendant:

   C. MELISSA OWEN, ESQ.,
   Tin, Fulton, Walker & Owen, PPLC
   301 East Park Avenue
   Charlotte, North Carolina 28203


   Proceedings stenographically reported through Skype and
                transcribed by:


               LAURA ANDERSEN, RMR
              Official Court Reporter
            United States District Court
             Charlotte, North Carolina

P R O C E E D I N G S

TUESDAY, APRIL 14, 2020 at 1:11:

(Proceedings stenographically reported through Skype and transcribed to the best of my ability as follows:)

THE COURT: Good afternoon, everyone.

We are here in the matter of United States v Devon Rambert-Hairston for sentencing. Are the parties ready to proceed?

MS. OWEN: We are, Your Honor.

MR. SAVAGE: Yes, Your Honor.

THE COURT: Would each of the attorneys identify themselves and tell me who you are representing.

I ask that so that the record will be clear, and that we make sure that our Court Reporter who is working remotely is able to hear both of you.

MR. SAVAGE: Your Honor, Michael Savage and William Bozin for the United States.

MS. OWEN: Melissa Owen on behalf of Mr. Rambert-Hairston.

THE COURT: Thank you.

Ms. Andersen, were you able to hear both attorneys?

MS. ANDERSEN: Yes, Your Honor.

THE COURT: Very well. Then we will proceed.

Ms. Rambert-Hairston pled guilty before a Magistrate Judge on April 16th of last year at a hearing in which she

answered questions under oath.

Based upon her answers the Magistrate Judge found that her plea was knowingly and voluntarily made. There were no objections to this finding. The Court will adopt it here today.

Do the parties stipulate that there is a factual basis to support the entry of a plea of guilty, and that the Court may rely upon the offense conduct set forth in the Presentence Report to establish the factual basis?

MS. OWEN: We do, Your Honor.

MR. SAVAGE: Yes, Your Honor.

THE COURT: Based upon that stipulation, the Court finds that there is a factual basis to support the entry of a plea of guilty.

Ms. Rambert-Hairston, your case was referred to the Federal Probation Department for the purpose of preparing a Presentence Report. I have received and reviewed that report. Have you had a chance to read the Presentence Report?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you believe you understand it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you had enough time to go over the Presentence Report with your attorney?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Very well. You may sit down at this

time.

Ms. Owen, were there any objections to the Presentence Report?

MS. OWEN: No, Your Honor.

THE COURT: So for purposes of consulting the advisory Guidelines, before any consideration of departure or variance, it appears that the correct Offense Level is a 16, a Criminal History Category of I, with the resulting advisory range of 21 to 27 months.

Do the parties agree those are the correct Guidelines to consult?

MS. OWEN: We do.

MR. SAVAGE: Yes, Your Honor.

THE COURT: All right. Mr. Savage, I will be glad to hear from you on the government's 5K motion.

MR. SAVAGE: Yes, Your Honor. I think the motion speaks for itself.

I would draw the Court's attention -- ordinarily, I would approach, but I would ask the Court to draw the Court's attention to page 5 of the government's memorandum. There is a second paragraph on that page that describes the defendant's help in a particular investigative opportunity that the government was previously unaware of.

I could tell the Court that while we don't plan to come back with a Rule 35, that Ms. Hairston's lead in that

# Summary of Comments on CaseReview_RambertHairston_041420.pdf

## Page: 9

| | | | |
|---|---|---|---|
| ، Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:35:35 PM |
| ، Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:35:40 PM |
| ، Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:36:11 PM |
| ، Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:36:34 PM |
| ، Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:36:17 PM |
| ، Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:36:28 PM |
| ، Number: 7 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:36:45 PM |
| ، Number: 8 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:37:03 PM |

case has resulted in several interviews, and that working with the North Carolina Attorney General's office we hope to identify a person that is referenced in the -- or the subject of paragraph 5 -- the paragraph on page 5 in that she was particularly helpful in that regard.

Your Honor, we would also say that we took into consideration that the defendant was granted a minor role reduction in the overall scope of the conduct, and that we will address the aggravating parts later on, but we think that a 3-level departure to Zone Level C is most appropriate given the balance of all the 3553 factors, the significance of the cooperation, and the additional matters that appear on page 5 of the government's motion.

THE COURT: Thank you.

I will grant the government's 5K motion. Having done that, Ms. Owen, be glad to hear from you on behalf of Ms. Rambert-Hairston as to the ultimate sentence.

MS. OWEN: Thank you, Your Honor.

We have filed two documents with the Court, a sentencing memorandum that was filed on January 8th, and then last week we filed a supplement to that motion. I don't mean to belabor what has been stated in those -- in each of those filings, but in this case there are a number of themes that start to come together when you look at a variety of factors in Ms. Rambert-Hairston's life.

# Page: 10

| | | | |
|---|---|---|---|
| ⸰ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:37:23 PM |
| ⸰ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:37:33 PM |
| ⸰ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:37:43 PM |
| ⸰ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:37:52 PM |
| ⸰ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:37:59 PM |
| ⸰ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:38:40 PM |

6

Before I get into those themes, I would like to call to the Court's attention the family members and the friends who have come here today to show their support for her.

Sara and Marshall Rambert her parents, William Hairston her husband, her Pastor Otis Smith, and her son Devin, who have all been here today. They have supported her through this extraordinarily difficult time in her life.

This -- as noted in the Government's motion, Ms. Rambert-Hairston, before knowing that law enforcement was involved, before any of that, in February of 2017 she voluntarily said, "No more. I need to be -- I'm getting away from all of you people. I'm done."

#7
Discovered if they were billing me fraudently by email.

Then it was a series of months later that law enforcement came to her door and she immediately began helping them.

THE COURT: That was not quite clear to me. So she had withdrawn her efforts from the conspiratorial activity. She had not reported that group to law enforcement, law enforcement came to her.

MS. OWEN: Correct, Your Honor. So that occurred a few months -- a number of months later in the late spring, early summer.

But, Your Honor, when I look at -- there's a series of factors that are unique here, and one is the cooperation which the Court sees pretty routinely. That isn't in and of

# Page: 11

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:41:13 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:40:53 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:40:53 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:40:50 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:40:49 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:41:25 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:41:34 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:41:41 PM |

itself unique, but the factors of the person that Ms. Rambert-Hairston is, who she has been since she was a teenager into adulthood are pretty remarkable and something that she has continued to demonstrate up until the day that she has come before this Court for sentencing, and that theme is doing good things despite great adversity.

Obviously we are here for the sentencing in this case, and representations have been made to the Court through the plea agreement and otherwise about that conduct.

What is remarkable is all the other things that aren't showing up in that -- in the Bill of Information, in the Factual Basis, and that's who she was every other day of her life.

One factor that is central to her life has been her service to our country. When she was in college she enlisted in the National Guard where she served for two years, and upon her honorable discharge, immediately, she felt so compelled by what it meant to her to serve her country, she then enlisted in the Air Force where she continued to serve honorably for 20 years.

Included in our initial filing is her service record -- is her service record through the Air Force, including the honors that she was given.

I specifically noted what her commanding officer had written in her final officer performance report prior to being

discharged. That she was a dynamic leader, she has a strong worth ethic, she was task oriented, she possesses skills for a challenging job, she was a stellar flight nurse.

He specifically noted that in that period of time that he was evaluating she recognized abnormal findings of a patient during a flight that resulted in saving the patient's life.

She has technically and purposely built rapport with external agencies to command leadership, to enhance mission capabilities. This is the part that I see coming across uniformly in her life. She is highly motivated, always willing to assist me in any task, demonstrates leadership, flexibility, and a positive attitude. It is those characteristics that had led her life in so many different directions to success.

The other component outside of her service to the country was her dedication to being a nurse, and then increasing her education until she had her Ph.D.

When I talk about these periods of adversity, I look at when she was in the Army National Guard, and when she was in the Air Force, and when she was choosing to go get her Ph.D. what was happening during these periods of her life, and she was juggling a lot. She was making tremendous sacrifices. Her son Devin was a young child when she was pursuing her Ph.D. in nursing. And it meant being away from her family for

long periods of time. It meant long nights of study. It meant trying to get her school work for Ph.D. done while she is also nursing a baby and completing her service to the Air Force. So all of these good things that she is continually doing.

It is also reflected in the letters from her service to her own family, in terms of the weight that she bears at home, financial impact she has had, and the resource that she has been on her family. The care that she has, not only has she raised a fine young man in her son Devin, she has two young children that she is still raising at home.

The letters that were submitted to the Court. And it's funny, you know, sometimes there's a lot that we know about our clients, and then sometimes we get these letters and we find out things we had no idea that were going on in our client's life. And during all of this, during the stress of the case and the proceedings, her grandmother had become very ill, and she took her grandmother into her own home to care for her.

So in addition to working and trying to be a good mother, she is also being a good granddaughter and taking her grandmother to treatment every week while she's receiving cancer treatments and accepting the financial implications that come with taking in a parent or a grandparent.

While she was a nurse, there were letters from her

friends and mentors that talked about the kind of nurse she was, and how there's several letters that were submitted from young women also in the field who looked up to her as a role model and sought guidance from her. She always made time for them.

But, Your Honor, this doing the right thing despite her adversity has continued into this case. The cooperation -- one thing that even factored into the cooperation is the life stages that we saw Ms. Rambert-Hairston go through during this period of cooperation.

During her cooperation, whenever the government needed anything, whenever agents needed anything she was always able at the ready for them.

During that time she was pregnant, she had a child, she had a premature child who required great care for the initial months of their life. During that period of time never did she complain, never did she say, "I can't do this. I don't have time." She always said, "Let me know whatever you need of me I'm here."

In the most recent filing that I made with the court last week addressed the unique circumstance that we are in presently. The disparity between what I am asking for on behalf of my client, and that is a sentence of home confinement in Zone B, and what the government is asking for is the effectively whether or not the Court will send Ms.

# Page: 15

, Number: 1        Author: Devon        Subject: Highlight        Date: 6/12/2020 7:42:25 PM

, Number: 2        Author: Devon        Subject: Highlight        Date: 6/12/2020 7:42:32 PM

, Number: 3        Author: Devon        Subject: Highlight        Date: 6/12/2020 7:42:46 PM

, Number: 4        Author: Devon        Subject: Highlight        Date: 6/12/2020 7:42:54 PM

Rambert-Hairston to six months in prison in the custody of the Bureau of Prisons.

In the last month things have changed greatly in the Bureau of Prisons. As stated in my filing, issues from Attorney General Barr, memos to the Bureau of Prisons, and the Director of the Bureau of Prisons have been reviewing files for non-violent offenders to determine who should be released on home confinement to reduce the population in our prisons due to the highly infectious nature of COVID-19.

Since that memo that was issued in late March, to date 1,019 inmates have been sent home on home confinement. At the time of my filing last week, 259 infected individuals, inmates, and employees had tested positive for COVID-19 in the Bureau of Prisons. And as of yesterday's count today, 589 inmates and employees have tested positive for COVID-19. In one week it has more than doubled.

So, Your Honor, we ask that great consideration be given to this seemingly narrow window of time. But what adds to that, not just the concerning circumstances at the Bureau of Prisons that may help tip the scales slightly in the direction of home confinement, is what Ms. Rambert-Hairston has continued to do knowing that the sentencing was coming up, knowing that she may be separated from her family. She has continued to take care of and treat the sick.

It is somewhat ironic that we are seeing so much

fanfare and celebration by those of us who can't care for -- those that are risking their lives, risking their safety, leaving their homes every day to put themselves in dangerous situations to make sure that our community is cared for. And Ms. Rambert-Hairston has been doing exactly that. This circumstance in her life has not changed that. It is who she is. It is who she wants to be.

So Your Honor, I ask all of those factors to be considered. I ask this Court to impose a sentence of home confinement for Ms. Rambert-Hairston. Thank you.

THE COURT: So with the government's 5K motion she is in a Zone C which the Court could impose a split sentence. You're asking me to go all the way to a Zone A.

MS. OWEN: No. I'm asking for a Zone B where she can get a sentence of home confinement.

THE COURT: Would that --

MS. OWEN: So a 2-level variance.

THE COURT: I would have to impose at least a one month sentence of imprisonment.

MS. OWEN: Your Honor, I've had courts impose straight home confinement.

THE COURT: I guess I could do a probation sentence with home confinement.

Thank you.

MS. OWEN: Would you like to address the Court?

THE COURT: Ms. Rambert-Hairston, I will be glad to hear from you. You don't have to say anything at all, but if you wish to tell me something I will be glad to hear from you.

THE DEFENDANT: Thank you, Your Honor.

I heard everything that my attorney said about me, and I do greatly regret that I made an innocent mistake of letting these individuals --

THE COURT: Did you say "innocent mistake"?

THE DEFENDANT: I did say "innocent mistake." let them use my NPI number. I normally give to any -- any employment. And I'm thinking that they were doing something legitimate, didn't even know what they were doing.

And so I did my job. I saw progress notes. I signed them off. And when the individual, the owner, told me that he needed to get all his providers enrolled in Medicaid, I said, "Yes, I can be the bill provider." Which I will be the responsible provider for the payments. And so I didn't know they were billing me as the regular provider which they billed me like I would bill the services, and this is where I am today. I thought I was doing something to help him with his employment and that didn't happen.

And I deeply understand that now everything that's gone on. And the fact that I tried, and I tried to explain. And when I found out what was going on, I told Ameera Ali to remove my name from that. sent an email to her, and she

# Page: 18

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:43:16 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:43:18 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:43:32 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:43:20 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:43:42 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:43:51 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:44:18 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:44:20 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:44:23 PM |
| › Number: 10 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:44:35 PM |
| › Number: 11 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:44:45 PM |
| › Number: 12 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:44:58 PM |
| › Number: 13 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:44:54 PM |
| › Number: 14 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:45:09 PM |
| › Number: 15 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:45:06 PM |
| › Number: 16 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:45:17 PM |
| › Number: 17 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:45:30 PM |
| › Number: 18 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:45:20 PM |
| › Number: 19 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:46:09 PM |
| › Number: 20 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:45:55 PM |
| › Number: 21 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:46:15 PM |
| › Number: 22 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:46:17 PM |
| › Number: 23 | Author: Devon | Subject: Highlight | Date: 6/12/2020 7:46:25 PM |

told me exactly what Tony Taylor was doing. After that when I confided in someone, that's when the FBI came and asked me the questions. And I totally didn't feel like I was having anything to hide. I provided the information to them not knowing that what I did was money laundering until my attorney told me. And I really apologize for that. But I don't have any ill intent. I did not say or be suspicious or have any idea what was going on with their scheme. But I do regret the fact that what I done I tried to withdraw my plea, but I got a letter from one of the attorneys that's known to my counsel said if I withdraw my plea you would punish me harshly, in an email. I was defrauded in the media, that was justified, even the government said that I admittedly falsified records on the justice.Gov website which I did not do, and it is still there today.

I have been threatened by people saying that I was a fraud because of what the media said. I have been dis -- administratively discharged from the military after 20 years of service, stripped from my security clearance because of this. And now my nursing license will be taken away from me because of the felony, and I deeply regret that. And all somebody can tell me is that I had to know what was going on because of the money that was coming into my account.

THE COURT: That's my first reaction to the facts as I understand them was close to $1 million went into your

| | | | |
|---|---|---|---|
| Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:07:33 PM |
| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:08:23 PM |
| Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:07:40 PM |
| Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:08:25 PM |
| Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:08:34 PM |
| Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:08:51 PM |
| Number: 7 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:08:59 PM |
| Number: 8 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:09:15 PM |
| Number: 9 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:09:22 PM |
| Number: 10 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:09:29 PM |
| Number: 11 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:09:36 PM |
| Number: 12 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:10:17 PM |
| Number: 13 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:09:43 PM |
| Number: 14 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:10:20 PM |
| Number: 15 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:10:06 PM |
| Number: 16 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:09:51 PM |
| Number: 17 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:09:45 PM |
| Number: 18 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:10:31 PM |
| Number: 19 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:10:34 PM |
| Number: 20 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:10:48 PM |
| Number: 21 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:11:06 PM |
| Number: 22 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:10:49 PM |
| Number: 23 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:11:16 PM |
| Number: 24 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:11:19 PM |

Comments from page 19 continued on next page

told me exactly what Tony Taylor was doing. After that when I confided in someone, that's when the FBI came and asked me the questions. And I totally didn't feel like I was having anything to hide. I provided the information to them not knowing that what I did was money laundering until my attorney told me. And I really apologize for that. But I don't have any ill intent. I did not say or be suspicious or have any idea what was going on with their scheme. But I do regret the fact that what I done I tried to withdraw my plea, but I got a letter from one of the attorneys that's known to my counsel said if I withdraw my plea you would punish me harshly, in an email. I was defrauded in the media, that was justified, even the government said that I admittedly falsified records on the Justice.Gov website which I did not do, and it is still there to today.

I have been threatened by people saying that I was a fraud because of what the media said. I have been dis -- administratively discharged from the military after 20 years of service, stripped from my security clearance because of this. And now my nursing license will be taken away from me because of the felony, and I deeply regret that. And all somebody can tell me is that I had to know what was going on because of the money that was coming into my account.

THE COURT: That's my first reaction to the facts as I understand them was close to $1 million went into your

· Number: 25     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:11:56 PM

· Number: 26     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:12:02 PM

· Number: 27     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:12:13 PM

· Number: 28     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:12:21 PM

· Number: 29     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:12:38 PM

· Number: 30     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:12:23 PM

· Number: 31     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:12:46 PM

· Number: 32     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:13:36 PM

· Number: 33     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:13:25 PM

· Number: 34     Author: Devon     Subject: Highlight     Date: 6/12/2020 8:13:44 PM

account, and then some of the money was siphoned off to Taylor and others, and some of it went directly to you. I'm having a hard time understanding how that could be innocent.

THE DEFENDANT: Well, sir, I didn't -- honestly, that is my mistake. That I should have known what was the billing rate. And honestly that I should have known what was the fact that -- I didn't know exactly who he was billing -- that he was billing my name. I didn't know that as the medical provider which he would get more reimbursement. I did do that. And I didn't know about the money. I did transfer because I would be the responsible provider.

I paid a sanction to Medicaid of $4,000 because I was the responsible, I was just the billing provider and that's how. I didn't conceal anything. Even the IRS came behind me and took away money because of that, because I was the responsible billing provider.

THE COURT: All right. Thank you.

If you are here in the courtroom to support Ms. Rambert-Hairston would you raise your hand?

Thank you all for coming at a time like this to give Ms. Rambert-Hairston support that will be taken into consideration in fashioning a sentence.

Mr. Savage.

MR. SAVAGE: Your Honor, I'm a little bit taken aback here. You know, the defendant comes in here and

# Page: 20

| | | | |
|---|---|---|---|
| , Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:14:27 PM |
| , Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:14:36 PM |
| , Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:14:44 PM |
| , Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:14:49 PM |
| , Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:02 PM |
| , Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:10 PM |
| , Number: 7 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:08 PM |
| , Number: 8 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:18 PM |
| , Number: 9 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:12 PM |
| , Number: 10 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:30 PM |
| , Number: 11 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:38 PM |
| , Number: 12 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:45 PM |
| , Number: 13 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:54 PM |
| , Number: 14 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:15:48 PM |
| , Number: 15 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:16:02 PM |
| , Number: 16 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:16:07 PM |
| , Number: 17 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:16:24 PM |
| , Number: 18 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:16:32 PM |

16

basically repudiates essential elements of the offense in this case. She pled guilty to money laundering. Money laundering requires an intentional act. It's that she knows that the proceeds were the proceeds of a specified unlawful activity. They are laid out in the plea agreement. They're laid out in the factual basis that she acknowledged during the time of the plea.

*#5*

*#3 There's nothing stated in the plea that I co-signed BC it's true knew unlawful an activity.*

*It stated that "I knew I didn't provide any services" because I signed progress/co-signed notes after reviewing documents*

She cannot commit fraud by accident. It has to be intentional act.

*#5*

With regards to this, I'm looking over the statement that Rambert -- Ms. Hairston gave to the agents back in July *#3* of 2017 where she was reviewing records. But more than that she was also going to where Jerry Taylor was running his clinic, supposed clinic, in Union County and saw that they were just simply after school people.

*The therapist were going into the family's home's and providing counseling as well.*

Unlike a lot of other people, including Ameera Ali, Christine Knight, and other people involved in this, she was not the -- she may not have been involved personally, but she knew that she was reviewing the work of various medical professionals but there aren't any patients. I mean, she saw herself that there were 15 to 20 patients, but they were billing millions and millions of dollars, and she had to know that because they went into her account.

*#3*

*There were at the youth center and homes, nothing stated in BOI or evidence that I knew there were not any patients*

*Had to Know or Knew??? Patients or No patients ???*

Your Honor, if you look at paragraphs 31 -- 30 through 33 of the presentence report they simply didn't line

# Page: 21

| | | | |
|---|---|---|---|
| • Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:17:06 PM |
| • Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:16:51 PM |
| • Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:17:16 PM |
| • Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:17:07 PM |
| • Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:17:25 PM |
| • Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:17:33 PM |
| • Number: 7 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:17:40 PM |
| • Number: 8 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:17:50 PM |
| • Number: 9 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:17:53 PM |
| • Number: 10 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:18:00 PM |
| • Number: 11 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:18:18 PM |
| • Number: 12 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:18:26 PM |
| • Number: 13 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:18:21 PM |
| • Number: 14 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:18:53 PM |
| • Number: 15 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:19:01 PM |
| • Number: 16 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:19:10 PM |
| • Number: 17 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:19:18 PM |
| • Number: 18 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:19:25 PM |
| • Number: 19 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:19:42 PM |
| • Number: 20 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:19:49 PM |
| • Number: 21 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:19:57 PM |
| • Number: 22 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:20:04 PM |
| • Number: 23 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:20:14 PM |
| • Number: 24 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:20:11 PM |

Comments from page 21 continued on next page

basically repudiates essential elements of the offense in this case. She pled guilty to money laundering. Money laundering requires an intentional act. It's that she knows that the proceeds were the proceeds of a specified unlawful activity. They are laid out in the plea agreement. They're laid out in the factual basis that she acknowledged during the time of the plea.

*It stated that "I knew I didn't provide any services" because I signed progress/co-signed notes after reviewing documents*

*There's nothing stated in the plea + that I knew Bo's $ its from an unlawful activity.*

One cannot commit fraud by accident. It has to be an intentional act.

With regards to this, I'm looking over the statement that Rambert — Ms. Hairston gave to the agents back in July of 2017 where she was reviewing records. But more than that she was also going to where Jerry Taylor was running his clinic, supposed clinic, in Union County and saw that they were just simply after school people.

*The therapist were going into the family's homes and providing counseling as well.*

Unlike a lot of other people, including Ameera Ali, Christine Knight, and other people involved in this, she was not the -- she may not have been involved personally, but she knew that she was reviewing the work of various medical professionals but there aren't any patients. I mean, she saw herself that there were 15 to 20 patients, but they were killing millions and millions of dollars, and she had to know that because they went into her account.

*Had to know or knew??? Patients or No patients ???*

*There were youth center and homes, nothing stated in BO's or evidence that I knew were there any patients*

Your Honor, if you look at paragraphs 31 — 30 through 33 of the presentence report they simply didn't line

| | | | |
|---|---|---|---|
| › Number: 25 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:20:23 PM |
| › Number: 26 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:20:28 PM |
| › Number: 27 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:20:32 PM |
| › Number: 28 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:20:38 PM |
| › Number: 29 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:20:42 PM |

up with Mrs -- with the defendant's profession of innocence. $1.3 million in fraudulent claims went through her bank account, her personal bank account, between September 2016 and February of 2017.

She then wired $813,726 from her State Employees Credit account and quote, "Knew these funds were not derived from any legitimate service she provided to Medicaid beneficiaries during the relevant time period, and reasonably should have known that the services were not provided."

Most charitably under these facts you could say that the defendant was willfully blind, but she cannot not know what is in front of her. Willful blindness is a state of knowledge just as anything else.

It goes on to say that of those she kept the balance. She made transactions of a volume greater than $10,000 committing felony violations of the law. Those felony violations incorporate by reference the underlying specified unlawful activity which in this case is Medicaid fraud, and she benefited from that, and it was foreseeable to her by her own admission and that of her attorneys that at least $813,726 was stolen, and that she transferred more than $751,000 of those proceeds herself. Nobody else did this. She did this on her own.

Quite frankly, it was a gift in this case that the government charged and agreed to a money laundering charge and

# Page: 22

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:41:52 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:42:00 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:42:08 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:42:05 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:42:13 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:42:22 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:42:28 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:42:41 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:42:50 PM |
| › Number: 10 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:43:09 PM |
| › Number: 11 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:43:22 PM |
| › Number: 12 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:43:37 PM |
| › Number: 13 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:43:47 PM |
| ‹ Number: 14 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:43:56 PM |
| › Number: 15 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:44:31 PM |
| › Number: 16 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:44:20 PM |
| › Number: 17 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:44:21 PM |
| › Number: 18 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:44:51 PM |
| › Number: 19 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:45:02 PM |
| › Number: 20 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:45:14 PM |
| › Number: 21 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:45:25 PM |
| › Number: 22 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:45:54 PM |

...t a fraud charge. *what fraud?*

And then she talks about her military service, Your Honor. How much did it cost the Air Force to train her all these years? And then the degree of leadership that her commander acknowledges for her, and the fact that she has an advanced degree. If all of this, all of this education doesn't tell her that what she was doing is wrong then there is a need for specific deterrence, as well as general deterrence.

Your Honor, despite this, I mean, I think that we would have been shocked if we called Ms. Hairston, as we planned, to testify in trial to find out that she was not in fact remorseful or sad about what she had done wrong. But here we are. We will stand by our 5K in this, Your Honor.

But, Your Honor, this case needs punishment. It needs punishment. It needs a criminal level of punishment for a crime. If someone stays at home and gets probation that certainly is a punishment. But the crime in this case, a criminal punishment, the time in prison is to show this defendant and the world and those other people in this case that what occurred here wasn't an innocent mistake. She wasn't slandered. She committed a felony, repeatedly, a felony.

So for those reasons, Your Honor, we're asking that you stay within the Zone C and impose some level of punishment

# Page: 23

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:46:06 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:46:47 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:46:52 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:47:03 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:47:14 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:47:23 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:47:18 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:47:34 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:47:44 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/12/2020 8:47:48 PM |
| · Number: 11 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:44:43 PM |
| · Number: 12 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:44:47 PM |
| · Number: 13 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:44:52 PM |
| · Number: 14 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:44:59 PM |
| · Number: 15 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:45:20 PM |
| · Number: 16 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:45:28 PM |
| · Number: 17 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:45:31 PM |
| · Number: 18 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:45:48 PM |
| · Number: 19 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:45:52 PM |
| · Number: 20 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:46:03 PM |
| · Number: 21 | Author: Devon | Subject: Highlight | Date: 6/12/2020 10:46:04 PM |

19

because there is nothing like hearing a prison door shut behind you to understand that, oh no, I wasn't just mistaken. What I did was intentional. It was wrong. It was felonious.

With regard to the COVID situation, Your Honor, in this particular case we would point out that we're not asking anybody be sentenced at this point in this particular thing. That you can defer this punishment for as long as it is necessary until the Bureau of Prisons has recovered from the current COVID pandemic.

So, Your Honor, we have no objection in this case if you defer reporting of this for as long as necessary.

And I would also point out that of all the different transfers in this case there are -- the agent is with me, I would have to count them, but there are at least 30 something individual transfers of money of more than ten -- transfers of money more than $10,000, and the billing occurred on a monthly basis for -- between 2015 and 2017.

I think we're very clear on when she withdrew, and the fact that they used her electronic signature without her permission after she withdrew. But I think Your Honor points out a very --

THE COURT: And when was that?

MR. SAVAGE: The date would have been the date of the email, February 2017. Other conspirators continued to use her billing, NPI billing code or her -- more importantly her

# Page: 24

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:20:02 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:20:16 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:20:30 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:20:35 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:20:46 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:20:53 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:20:58 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:21:05 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:21:11 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:21:15 PM |

electronic signature on medical notes. *cont'd*

THE COURT: July of '15 to February of '17 she was active participant --

MR. SAVAGE: In the conspiracy, right.

THE COURT: Then afterwards without any report to law enforcement what she had engaged in and helped move forward kept going.

MR. SAVAGE: Right. And to be clear, Your Honor, we're saying it's from February of 2016. So we believe there was a period of time where she was -- Terry Taylor and Tony Taylor promoted her to be the medical director. She was doing medical director things trying to build a company with them. But certainly we estimate by February of 2016, this is the time where she goes and she -- September, I'm sorry, September of 2016 she absolutely knew. And I think that's a date that we have stipulated with the defense on.

I want to be careful that we abide by our agreements.

You know, it is very difficult to say, like, I can't slice her head open and say at this point she knew, at this point she knew. But in September of 2016 there is no doubt that she would have had all the information that was available to her to know that what she was doing was wrong, and she continued to do it for a significant period of time until they created a series of companies.

# Page: 25

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:21:41 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:21:47 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:21:49 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:21:55 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:22:11 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:22:22 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:22:25 PM |
| ‹ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:22:32 PM |
| ‹ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:22:40 PM |
| ‹ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:22:48 PM |
| ‹ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:22:53 PM |
| ‹ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:22:57 PM |
| ‹ Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:23:17 PM |
| ‹ Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:23:21 PM |
| ‹ Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:23:24 PM |
| ‹ Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:23:39 PM |
| ‹ Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:23:43 PM |
| ‹ Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:23:47 PM |
| ‹ Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:23:56 PM |
| ‹ Number: 20 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:24:00 PM |

I think what is important to note, Your Honor, that the company she signed up to be medical director for, which was Taylor Behavioral Health Systems, was basically closed down by Medicaid at one point and was placed on paid review. It was only after that company was placed on paid review and could no longer bill that they started billing her as if she was the provider, and the money went into her account until they could create yet a third company -- or another company to receive it, and then it went on from there.

Now, I would say to Your Honor that I want to keep the framework of the people involved in this. I would have Ameera Ali who was the biller certainly an important factor. Jerry Louis Taylor, if you see the presentence report from Tony Garrett Taylor, certainly I would consider them the leaders. I think another lesser player in this regard would be Christine Knight, and then there is a fifth player that is under investigation in the Eastern District.

Of all of those people, I want to be clear, we think based on all of the facts in this case Ms. Rambert-Hairston was one of the lesser players or one of the more minor players in the conspiracy. But an important player nonetheless, and one with whom the conspiracy would not have worked because you cannot bill without an NPI number. She was well aware of that. Well aware of that.

THE COURT: Is there any consideration given to an

# Page: 26

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:24:23 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:24:29 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:24:41 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:24:44 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:24:48 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:25:01 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:25:22 PM |
| ‹ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:25:36 PM |
| ‹ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:26:03 PM |
| ‹ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:26:07 PM |
| ‹ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:26:15 PM |
| ‹ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:26:20 PM |

abuse of trust enhancement with respect to the provision of the pin number?

MR. SAVAGE: Your Honor, I think that in looking at -- I did look at abuse of trust, I looked at it with respect to some of the others.

With respect to the abuse of trust I think there are a number of factors -- I would have to get it out -- we didn't think it quite fit only because of the special skill that would have been used was actually Medicaid coding and Medicaid billing.

So I can't say that just because you're a medical -- in other words, it would be one thing if this were a opioid case, you are a medical doctor, you are using your prescribing authority in order to prescribe opioids. I think that depending on how involved an NPI person is in the billing, which she wasn't involved at all, then I think that's where the special skill comes from.

THE COURT: It is either/or. It's special skill or abuse of trust.

MR. SAVAGE: Well --

THE COURT: She could not have one but have --

MR. SAVAGE: True.

THE COURT: -- the other one.

MR. SAVAGE: That's absolutely true, Your Honor. I think there is certainly a licensing -- there is certainly an

# Page: 27

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:26:37 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:26:56 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:04 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:14 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:17 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:21 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:30 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:32 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:47 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:52 PM |
| · Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:27:57 PM |
| · Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:28:01 PM |

issue with the licensing board. I think that is something beyond the scope of this Court. It is something the North Carolina Licensing Board would take up. I think Your Honor could see that from her own statement that the Air Force thought -- did not think highly of this, terminated her role as officer, despite the fact that she had been highly trained at great expense to the government over a period of time.

THE COURT: So one of the things that strikes me from the review of the presentence report is paragraph 28b talks about an incident in September of 2015 in which there were 50 patients in a single day that were -- claims were filed, which seems like an impossibility on its face. But I hear you saying that there's a later date in time where Ms. Rambert-Hairston would have been clearly aware of the illegal nature of the activity.

MR. SAVAGE: Yes, Your Honor. Your question is why wasn't she aware at that point?

THE COURT: Yeah, I mean, if someone is using your pin number to submit claims for 50 people, indicating that you had provided treatment to them, that would be pretty -- seems like it would be on its face fraudulent.

MR. SAVAGE: Your Honor, I think it has to do -- and I'm not going to make excuses. She may very well have known every single time he did that.

But I think the way it works is this, and my

# Page: 28

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:28:21 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:28:25 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:28:29 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:28:33 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:28:37 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:28:48 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:28:57 PM |
| ‹ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:29:02 PM |
| ‹ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:29:06 PM |
| ‹ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:29:26 PM |
| ‹ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:29:32 PM |
| ‹ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:29:37 PM |
| ‹ Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:29:41 PM |
| ‹ Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:30:01 PM |
| ‹ Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:30:05 PM |
| ‹ Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:30:12 PM |

understanding may be wrong, but what happened is that Ameera Ali was the fill in. So what would happen, she would get a spreadsheet. The spreadsheet had separate codes on top. Depending on what diagnostic service was provided, those codes would define what happened. Those billing sheets, those spreadsheets did not go through Ms. Rambert-Hairston. Her number would have been on them, and once she authorized the use of her NPI --

THE COURT: They could have done anything.

MR. SAVAGE: They could have done anything and indeed they did. So I cannot say with certainty with respect to this defendant that she would have known unless she had had the 50 that there was a remittance that comes out and literally -- these are hard cases to do. I think agent you can probably explain it better than I.

Medicaid puts out a remittance sheet which is 3- or 40 pages of different codes that align with each one of them. unless you peruse those and analyze those and get a separate report on them you wouldn't know that say 50 people were billed on the same day. It is certainly a flaw in the system. One of the reasons that after they do the analysis after the fact they shut it down.

In fact, I think one of the issues in these cases are is, well, why doesn't Medicaid prevent people from billing more than 24 hours in a single day under codes that require an

# Page: 29

| | | | |
|---|---|---|---|
| Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:30:23 PM |
| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:30:29 PM |
| Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:30:34 PM |
| Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:30:56 PM |
| Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:31:03 PM |
| Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:31:07 PM |
| Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:31:12 PM |
| Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:31:22 PM |
| Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:31:47 PM |
| Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 1:31:50 PM |
| Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:15:17 PM |
| Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:15:30 PM |
| Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:15:49 PM |
| Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:15:58 PM |
| Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:16:04 PM |
| Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:16:16 PM |
| Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:17:00 PM |
| Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:17:12 PM |
| Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:17:20 PM |
| Number: 20 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:17:26 PM |
| Number: 21 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:17:30 PM |

hour? The answer is, that is much like the mortgage fraud. Medicaid is trying to pay for providers so they can provide a service. It really is an honor and trust service. We pay the money and investigate afterwards. Same as with IRS and same with I think mortgage fraud. Does that answer the Court's question?

THE COURT: It does.

Ms. Owen, I will give you an opportunity if you wish to say anything in rebuttal. It does --
Ms. Rambert-Hairston's allocution does call into question in the Court's mind an acceptance of responsibility for criminal conduct. I will hear from you as to why the Court shouldn't have that reaction to --

MS. OWEN: Your Honor, I think this has been an emotional roller coaster for Ms. Rambert-Hairston. I think it has been important to her to speak to the Court. This has been a long involved process that involved coming to terms with some of this conduct and along the way there has been acceptance. That is not where Ms. Rambert-Hairston appears to be at this moment.

She sat down with the government on multiple occasions. We've been over this, but I think she has struggled with coming to terms with this in her heart. And I don't -- out of fairness to her, if she wants the Court to understand where she is, I think that that's where she is

right now.

THE COURT: When was the plea taken in this case?

MS. OWEN: A year ago.

THE COURT: So she has gone through a pretty elaborate questioning and answer period a year ago --

MS. OWEN: Yeah.

THE COURT: -- with respect to -- she would have had to admit at that time --

MS. OWEN: That's correct.

THE COURT: -- intentional.

We're in an awkward situation because she claims I would have been harsher on her if she attempted to withdraw her plea. But there are, as everybody who practices in this court knows, there are mechanistic hardships that occur when someone -- there are benefits that don't occur if someone doesn't plead guilty, you don't get acceptance of responsibility.

The lawyers know the trial penalty that sometimes kicks in when somebody asserts their innocence and goes to trial.

Although, none of that would keep the Court from considering the whole person, as the Court will do here today, after trial just as I would after plea. I would never penalize someone for withdrawing a plea or even attempting to withdraw a plea, but I do have to analyze what is done and

# Page: 31

| | | | |
|---|---|---|---|
| ⋅ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:18:20 PM |
| ⋅ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:18:29 PM |
| ⋅ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:18:34 PM |
| ⋅ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:18:47 PM |
| ⋅ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:18:52 PM |

said in terms of whether there's a clear acceptance of responsibility. Maybe it's where you sit how you see it, but I don't see it as a penalty. I see it as a duty to examine the totality of the circumstances.

Ms. Rambert-Hairston's position in allocution is markedly in contrast to the criminal conduct that is set forth in the presentence report.

Certainly after August of 2016 when the company is placed on prepayment review and they are looking for another way around it, it seems to me that a person as educated as Ms. Rambert-Hairston, as trained as she is, would know almost to a point of certainty that this was fraud. → opinion!

It seems that from that point forward there was a transfer of more than $751,000 out of her account to the co-conspirators, and a hefty portion retained by Ms. Rambert-Hairston.

MS. OWEN: Your Honor --

THE COURT: Yes.

MS. OWEN: -- just to clarify for the record in terms of that window of time and what was happening.

Part of the reason for the minor role reduction in this case is that much of what Tony and Jerry Taylor were doing, they isolated what information was being shared. And the -- up until the point where they said -- when they got put on prepayment review was when they could no longer use their

# Page: 32

| | | | |
|---|---|---|---|
| ‣ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:19:16 PM |
| ‣ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:19:23 PM |
| ‣ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:19:29 PM |
| ‣ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:19:36 PM |
| ‣ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:19:40 PM |
| ‣ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:19:49 PM |
| ‣ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:19:52 PM |
| ‣ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:19:59 PM |
| ‣ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:20:04 PM |
| ‣ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:20:09 PM |
| ‣ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:20:14 PM |
| ‣ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:20:20 PM |
| ‣ Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:20:25 PM |

own bank account and their own — the same business name. It was at that point they went to Ms. Hairston and said, "We need to use your bank account." At that point they had made her medical director of Taylor Behavioral Health. And that is the beginning date of September 2016 that takes us to February where the money instead of being deposited elsewhere during the prior period in terms of being on prepayment review and the billing she was unaware of that but that that was happening without her knowledge.

The period of time that the money came into her account, the significant date of September 2016 until February is that the money was being deposited at that point into her account. So I wanted to clarify that.

I also wanted to clarify the substantial amount of money to her. They were using her bank account at that point like a corporate account. Certain amount went to them, certain amount went to her. The amount that went to her, I think, was $66,000. So $66,000 went to her.

THE COURT: I had 62,728 —

MS. OWEN: Yeah, I'm sorry. That's correct, Your Honor, the 62 number. To the extent there was a disconnect of money going elsewhere, I think it was either to pay other individuals or for expenses.

THE COURT: But, I mean, her account was a credit union account, right, a typical —

# Page: 33

› Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:20:45 PM

› Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:20:51 PM

› Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:20:55 PM

› Number: 4     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:03 PM

› Number: 5     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:07 PM

› Number: 6     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:12 PM

› Number: 7     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:16 PM

› Number: 8     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:21 PM

› Number: 9     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:24 PM

› Number: 10     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:36 PM

› Number: 11     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:41 PM

› Number: 12     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:45 PM

› Number: 13     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:21:51 PM

› Number: 14     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:22:12 PM

› Number: 15     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:23:07 PM

› Number: 16     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:23:13 PM

› Number: 17     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:23:20 PM

› Number: 18     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:23:26 PM

› Number: 19     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:23:32 PM

› Number: 20     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:23:42 PM

› Number: 21     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:23:47 PM

MS. OWEN:  Correct.

THE COURT:  All right.  Thank you.

THE DEFENDANT:  Your Honor, can I say something, please?  Can I say something?

THE COURT:  Yes.  You can stand up and say something.

THE DEFENDANT:  Okay.  To clarify the situation, Mr. Taylor, he came to me.  Since I was already enrolled in Medicaid, my NPI number and my information and my bank account is already attached to Medicaid.  It wasn't that we -- that it went to my bank account.  It always has been since 2011.  So he said, "Devon, can we use your information since you already enrolled in Medicaid as a Medicaid provider, until all the other entities --" which he had other entities "-- get enrolled in Medicaid?"  Which I did do that.  I said, "Oh, you can bill me as the billing provider."  Which I will be the responsible provider taking in the payments and giving the money to Jerry and Tony and taking care of payments.

The 62,000 -- that $62,000 were from -- not just from -- it was overall from 2015 to 2017.  I looked it up in my bank account.  And that I only got $44,000 from the window of time, and that was just for my salary as the medical director.  It was from September 2016 to February 2017 I got $44,000.  Then $1,800 that he was paying me prior to that were just for the whole year.  That's what the total sum is.

# Page: 34

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:09 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:13 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:17 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:21 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:25 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:28 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:33 PM |
| ‹ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:37 PM |
| ‹ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:24:41 PM |
| ‹ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:26:47 PM |
| ‹ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:27:03 PM |
| ‹ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:26:53 PM |
| ‹ Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:27:08 PM |
| ‹ Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:27:15 PM |
| ‹ Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:27:20 PM |
| ‹ Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:27:36 PM |
| ‹ Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:27:44 PM |
| ‹ Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:27:51 PM |
| ‹ Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:28:01 PM |
| ‹ Number: 20 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:28:09 PM |
| ‹ Number: 21 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:28:04 PM |
| ‹ Number: 22 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:28:12 PM |
| ‹ Number: 23 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:28:17 PM |
| ‹ Number: 24 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:28:23 PM |

Comments from page 34 continued on next page

MS. OWEN: Correct.

THE COURT: All right. Thank you.

THE DEFENDANT: Your Honor, can I say something, please? Can I say something?

THE COURT: Yes. You can stand up and say something.

THE DEFENDANT: Okay. To clarify the situation, Mr. Taylor, he came to me. Since I was already enrolled in Medicaid, my NPI number and my information and my bank account is already attached to Medicaid. It wasn't that we — that it went to my bank account. It always has been since 2011. So he said, "Devon, can we use your information since you already enrolled in Medicaid as a Medicaid provider, until all the other entities --" which he had other entities "-- get enrolled in Medicaid?" Which I did do that. I said, "Oh, you can bill me as the billing provider." Which I will be the responsible provider taking in the payments and giving the money to Jerry and Tony and taking care of payments.

The 62,000 -- that $62,000 were from -- not just from -- it was overall from 2015 to 2017. I looked it up in my bank account. And that I only got $44,000 from the window of time, and that was just for my salary as the medical director. It was from September 2016 to February 2017 I got $44,000. Then $1,800 that he was paying me prior to that were just for the whole year. That's what the total sum is.

And honestly, I really, really thought that this man was doing something that I didn't know he was billing my name to the whole time. I did it as a favor. I didn't know what this man was doing. I kept telling them, and they kept telling me I should have known because of the money that was coming into the account, and I did not know.

And I -- the reason I should have known, is not a known thing in law. It is not a reason, should have known. Is not willful blindness. Willful blindness is knowingly. And I didn't know. I did my job as the medical director, and I kept saying that. But it was like, no. This money was coming to your account you had to know. And I'm getting this -- and I didn't.

And the military, they administratively discharged me because I signed that plea agreement. When I signed that plea agreement the security forces got a hold to it and said that, oh, she committed a felony, and it raised a red flag.

If I knew all this was going on, and if I knew that I had security clearance -- they took my security clearance, ain't no way in the world I know that something like this would happen to me. I have lived my life with integrity the whole time. I really thought that I was helping these people. I really thought so.

But all they kept telling me, "Oh, you had to know." They're going to try to convict me and say I knew what was

Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:28:40 PM

Number: 2    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:28:54 PM

Number: 3    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:29:05 PM

Number: 4    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:28:58 PM

Number: 5    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:29:11 PM

Number: 6    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:29:16 PM

Number: 7    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:29:35 PM

Number: 8    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:29:46 PM

Number: 9    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:29:51 PM

Number: 10    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:29:57 PM

Number: 11    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:29:59 PM

Number: 12    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:04 PM

Number: 13    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:07 PM

Number: 14    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:15 PM

Number: 15    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:20 PM

Number: 16    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:23 PM

Number: 17    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:37 PM

Number: 18    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:45 PM

Number: 19    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:41 PM

Number: 20    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:50 PM

Number: 21    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:30:55 PM

Number: 22    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:31:00 PM

Number: 23    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:31:04 PM

Number: 24    Author: Devon    Subject: Highlight    Date: 6/14/2020 2:31:30 PM

Comments from page 35 continued on next page

And honestly, I really, really thought that this man was doing something that I didn't know he was billing my name to the whole time. I did it as a favor. I didn't know what this man was doing. I kept telling them, and they kept telling me I should have known because of the money that was coming into the account, and I did not know.

And I -- the reason I should have known, is not a known thing in law. It is not a reason, should have known. It's not willful blindness. Willful blindness is knowingly. And I didn't know. I did my job as the medical director, and I kept saying that. But it was like, no. This money was coming to your account you had to know. And I'm getting this -- and I didn't.

And the military, they administratively discharged me because I signed that plea agreement. When I signed that plea agreement the security forces got a hold to it and said that, oh, she committed a felony, and it raised a red flag.

If I knew all this was going on, and if I knew that I had security clearance -- they took my security clearance, ain't no way in the world I know that something like this would happen to me. have lived my life with integrity the whole time. really thought that I was helping these people. really thought so.

all they kept telling me, "Oh, you had to know." They're going to try to convict me and say I knew what was

· Number: 25     Author: Devon     Subject: Highlight    Date: 6/14/2020 2:31:38 PM

· Number: 26     Author: Devon     Subject: Highlight    Date: 6/14/2020 2:31:35 PM

· Number: 27     Author: Devon     Subject: Highlight    Date: 6/14/2020 2:31:47 PM

· Number: 28     Author: Devon     Subject: Highlight    Date: 6/14/2020 2:31:41 PM

· Number: 29     Author: Devon     Subject: Highlight    Date: 6/14/2020 2:31:50 PM

· Number: 30     Author: Devon     Subject: Highlight    Date: 6/14/2020 2:32:00 PM

· Number: 31     Author: Devon     Subject: Highlight    Date: 6/14/2020 2:32:07 PM

-ping on, and I did not know. I did not know.

They were doing this prior to, and they tried to keep up with the fraud scheme, and they kept up the fraud scheme after me. And when I found out I sent an email to Ameera Ali, told her remove my name from that. She said, "You never were on SSG. You had something with Tony's projects." It specifically said in the email.

It didn't -- and I didn't know that Christine Knight -- I heard her through my attorney -- that she was falsifying records in my name. I didn't even know that. And the whole time -- and then, again, I'm getting penalized, and I'm getting scrutinized because they said I falsified records. I did not falsify records and nothing in that billing information said I falsified records. I signed off on records according to the patient care plan from what he did from the progress notes. That's what I did.

And, I mean, I don't get it. I really don't get it. I have really tried to explain that. And because of the law and because of what they're telling me, oh yeah, that's -- you wrong. You wrong. It is not right for me. I did -- I did make a mistake. I did trusted these men. But still, this is where I am.

THE COURT: This is where you are because in paragraph 1 of your plea agreement you said when you signed that plea agreement, you enter a voluntary plea of guilty to

# Page: 36

Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:32:26 PM

Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:32:32 PM

Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:32:41 PM

Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:32:44 PM

Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:32:48 PM

Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:32:55 PM

Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:32:52 PM

Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:00 PM

Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:03 PM

Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:09 PM

Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:19 PM

Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:28 PM

Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:38 PM

Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:33 PM

Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:42 PM

Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:33:49 PM

Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:34:09 PM

Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:34:20 PM

Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:34:28 PM

Number: 20 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:34:32 PM

Number: 21 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:34:50 PM

Number: 22 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:35:16 PM

Number: 23 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:35:27 PM

Number: 24 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:35:23 PM

Comments from page 36 continued on next page

going on, and I did not know. I did not know.

They were doing this prior to, and they tried to keep up with the fraud scheme, and they kept up the fraud scheme after me. And when I found out I sent an email to Ameera Ali, told her remove my name from that. She said, "You never were on SSG. You had something with Tony's projects." It specifically said in the email.

It didn't -- and I didn't know that Christine Knight -- I heard her through my attorney -- that she was falsifying records in my name. I didn't even know that. And the whole time -- and then, again, I'm getting penalized, and I'm getting scrutinized because they said I falsified records. I did not falsify records and nothing in that billing information said I falsified records. I signed off on records according to the patient care plan from what he did from the progress notes. That's what I did.

And, I mean, I don't get it. I really don't get it. I have really tried to explain that. And because of the law and because of what they're telling me, oh yeah, that's -- you wrong. You wrong. It is not right for me. I did -- I did make a mistake. I did trusted these men. But still, this is where I am.

THE COURT: This is where you are because in paragraph 1 of your plea agreement you said when you signed that plea agreement, you enter a voluntary plea of guilty to

Number: 25          Author: Devon          Subject: Highlight    Date: 6/14/2020 2:35:32 PM

Count One and admits to being in fact guilty as charged in Count One. That's -- nobody did that but you.

THE DEFENDANT: That's right, Your Honor. Because I was told if I did not sign the plea agreement that I will go to prison, and I kept thinking about that. If I didn't sign the plea agreement I had to know what was going on because --

THE COURT: You would have gone into court -- you would have gone into court and a magistrate judge would have asked you whether you were in fact guilty of the crime charged and you would have told him that you were.

THE DEFENDANT: That is right, Your Honor. Because I was told -- I'm thinking about me and my life, and I did not know that what all the penalties and stuff were.

And I'm sorry that you don't believe exactly what I'm saying to you. I'm sorry. But I was told that by my attorney if I did not sign that plea agreement that I will go to prison. I will go to prison. I took that chance.

Didn't even know -- because I didn't know the military piece where I would go get out of the military. I didn't know my license would be in jeopardy. I would not even sign that. I wouldn't even knew.

But again, that's because what I did, I'm getting penalized again. Because, honestly, that's what happened. And I had to contemplate that. That's why I went to have second opinions all over again, all over again. And then when

# Page: 37

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:35:57 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:36:03 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:36:08 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:36:19 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:36:26 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:36:34 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:37:08 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:37:15 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:37:38 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:37:52 PM |
| · Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:37:57 PM |
| · Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:42:58 PM |
| · Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:42:55 PM |
| · Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:43:06 PM |
| · Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:43:13 PM |
| · Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:43:23 PM |
| · Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:43:31 PM |

I got that email from that attorney stating that if I withdraw my plea that you will punish me harshly, and I got it right here if you don't believe me. So what am I supposed to do?

MR. SAVAGE: Your Honor, we have to object to acceptance at this point. I think we could have said it was willful blindness, but the defendant even rejects that.

I would note that in her factual basis and in the -- in the information it says that she knew the funds were not derived from any legitimate service she provided to Medicaid beneficiaries during the relevant time period and recently should have known that services were not provided by anyone else. That is the fact that she stipulated to.

And I would note, Your Honor, as the Court pointed out, she would have taken an oath. So if indeed she signed that plea agreement, she also perjured herself when she entered that plea on the 16th of -- and I don't know what the date -- let me see.

On the 16th of April of last year is when she went into magistrate court in this very building, she would have taken an oath, she swore she was going to tell the truth, and now she is saying she lied.

THE COURT: What would have been the government's position had Ms. Rambert-Hairston moved to withdraw her plea?

MR. SAVAGE: I think we would have opposed. The reason we would have opposed is that based on the facts I

# Page: 38

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:43:54 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:44:00 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:44:05 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:44:11 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:44:18 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:44:24 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:44:45 PM |
| ‹ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:44:52 PM |
| ‹ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:44:59 PM |
| ‹ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:08 PM |
| ‹ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:12 PM |
| ‹ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:18 PM |
| ‹ Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:23 PM |
| ‹ Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:25 PM |
| ‹ Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:36 PM |
| ‹ Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:46 PM |
| ‹ Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:51 PM |
| ‹ Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 2:45:57 PM |

think that the facts supported the plea, as far as money laundering is concerned. We had debriefed her. We had attorney proffers. We certainly rely extensively, and we still do, on the, I think, the fact that she was represented by Ms. Owen was a big factor in this case. We had planned to call her. I think we're going to reach a disposition in the Christine Knight case, but we had planned to call her to say that she didn't authorize the use of her signature.

I got to say that I think that the basis of the 5K motion would have been generally the same except we would not have used her as a witness if she was going to admit perjury in the magistrate court.

Obviously, we would have to now disclose all this. I think the fact that she could never be a witness at this point in any case is a damage beyond repair.

Nevertheless, I think the things we said in the 5K motion, with the exception of calling her as a witness in trial, were generally true. We didn't know at this point, however, if she had come to us saying all the things she was saying now and repudiated acceptance, then I think we would have been in a different posture.

to gear up to trial at this point, I mean, we would have to look at all the facts. I mean certainly we could try a case. We have guilty pleas from Tony and Jerry Taylor and Ameera Ali. We certainly will have the pleas

# Page: 39

› Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:47:38 PM

› Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:47:44 PM

› Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:47:52 PM

› Number: 4     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:48:02 PM

› Number: 5     Author: Devon     Subject: Highlight     Date: 6/14/2020 2:48:09 PM

› Number: 6     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:28:34 PM

› Number: 7     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:28:41 PM

› Number: 8     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:28:49 PM

› Number: 9     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:28:52 PM

› Number: 10     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:29:09 PM

› Number: 11     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:29:17 PM

› Number: 12     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:29:22 PM

› Number: 13     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:29:29 PM

› Number: 14     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:29:52 PM

› Number: 15     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:30:05 PM

› Number: 16     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:29:58 PM

› Number: 17     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:30:12 PM

› Number: 18     Author: Devon     Subject: Highlight     Date: 6/14/2020 3:30:20 PM

before from Christine Knight. All of those people have pled guilty and given statements to us in various ways that are consistent with this plea, but inconsistent with her statements here today.

One more thing, Your Honor, I think if Ms. Owen had come to us and said she wants to withdraw her plea, I think there would have been a discussion about — we would have engaged, I think, in depth, about some of the things that would occur, the reasons why, what happened, what was going on, what exactly people were saying.

So to say what we would have done at that point, I mean, we never had the discussion. At some point we certainly would.

THE COURT: Ms. Rambert-Hairston, if you would please stand.

I have considered the information in the presentence report. I have consulted the advisory Guidelines. I reviewed the information in the pleadings in the case, and the requests for downward departure and variance. I reviewed the sentencing memorandum, the supplement, granted the government's 5K motion, listened to the arguments of the attorneys, the allocution of Ms. Hairston, recognize the presence of family members and clergy here in support, taken into consideration that family support, the caretaker role described to the Court, both in terms of not only her

# Page: 40

| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:30:42 PM |
|---|---|---|---|
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:30:49 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:30:57 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:01 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:09 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:14 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:20 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:25 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:29 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:32 PM |
| · Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:40 PM |
| · Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:31:43 PM |

grandmother and young children, taken into consideration the service to the country through the National Guard and the Air Force.

As I said, I granted the cooperation motion, considered the -- I do consider the strange times we live in with the pandemic concerns both in and out of prison.

Take into consideration the educational history, the employment history, the very serious nature of the instant offense, Ms. Rambert-Hairston's involvement in that offense.

I have considered the government's position with respect to acceptance of responsibility, and by and large I believe that the government has the better argument with respect to acceptance of responsibility. I don't see that here at all.

I have looked carefully at this case for some time and find Ms. Rambert-Hairston's protestations of innocence inconsistent with the facts before this Court, with Ms. Rambert-Hairston's sworn statement before the magistrate judge, and her execution of the plea agreement in which she does admit guilty knowledge.

A woman as educated as Ms. Hairston could not but understand that her number, her bank account, were being used in an illicit way, and the facts just fly in the face of her protests of innocence.

This is very serious criminal wrongdoing. It is an

# Page: 41

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:33:13 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:33:26 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:33:35 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:33:42 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:33:57 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:03 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:11 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:21 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:29 PM |
| › Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:32 PM |
| › Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:41 PM |
| › Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:46 PM |
| › Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:50 PM |
| › Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:34:55 PM |

abuse of the system. The system relies upon healthcare providers acting in an honorable, trustworthy way. When those benefiting from the system act inconsistent with that honor and trust, it is a very corrosive, very serious matter.

Notwithstanding Ms. Rambert-Hairston's laudable past life, her engagement in this conspiracy over a substantial period of time, she benefited financially, enabled others to benefit through fraud.

The 3553(a) factors require a sentence that reflects the seriousness of the offense. Frankly, in this case, requires an active sentence.

Pursuant to the -- although I believe the government is right and that the Court should withdraw the 3-level reduction for acceptance of responsibility, for some reason I hesitate in doing that.

MR. SAVAGE: Yes, Your Honor.

THE COURT: And choose not to do it.

Pursuant to the Sentencing Reform Act of 1984 -- well, actually, what I am going to do is withdraw acceptance of responsibility because I do not believe Ms. Hairston has shown that.

I will vary from the otherwise applicable sentence and put the three levels back in, out of an overabundance of caution in terms of penalizing a defendant for remarks made in allocution. Although those remarks do clearly give the Court

# Page: 42

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:35:13 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:35:21 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:35:18 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:35:26 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:35:34 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:35:45 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:35:53 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:35:59 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:36:13 PM |
| › Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:36:19 PM |
| › Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:36:22 PM |

a mirror into the mind of Ms. Hairston.

Therefore, the Court does not believe that an appropriate application of the Guidelines would warrant a 3-level reduction. I will reduce and reinstate and order a sentence on Ms. Devon Rambert-Hairston of 12 months and one day.

The Court believes that is sufficient but not greater than necessary to accomplish the sentencing objectives of Section 3553(a), including the need for the imposed sentence to reflect the seriousness of the offense, promote respect for the law, just punishment, adequate deterrence, and protect the public from further crimes of the defendant.

It takes into account the nature and circumstances of the offense, and the history and characteristics of the defendant as just discussed.

Upon release from imprisonment, Ms. Hairston shall be placed on supervised release for a term of one year.

Within 72 hours of release from the custody of the Bureau of Prisons, she shall report in person to the probation office in the district to which she is released.

While on supervised release she shall not commit another federal, state or local crime, shall comply with the standard conditions of supervised release that have been adopted by the Court in the Western District of North Carolina.

# Page: 43

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:36:52 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:36:59 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:37:07 PM |

It is further ordered that she pay to the United States a special assessment of $100 due and payable immediately.

Further ordered, having determined the amount of restitution owed, that the defendant make restitution as directed to the United States District Court Clerk to be made paid to Medicaid in the amount of $813,726.

Ms. Hairston shall be held jointly and severally liable with her co-defendants for that amount.

Further ordered that the victim's recovery is limited to the amount of its loss, and the defendant's liability for restitution ceases if and when the victim receives full restitution.

The Court declines to impose a fine or interest in this case.

Is there a consent order in this case?

MR. SAVAGE: Yes, Your Honor. May I approach?

THE COURT: Oh, you have not filed it yet?

MR. SAVAGE: No. In the amount of $62,226 which is the amount we are seeking.

THE COURT: I will review that.

MR. SAVAGE: May I hand that up?

THE COURT: You may.

I will incorporate the terms of the consent order and judgment of forfeiture by reference into this judgment.

# Page: 44

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:37:29 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:37:34 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:37:40 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:37:48 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:37:59 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:38:08 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:38:19 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:38:30 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:38:33 PM |

Payment of the criminal monetary penalty shall be due and payable immediately.

The Court has considered the financial and other information contained in the presentence report and finds that the following is feasible:

The defendant shall make an immediate payment toward monetary penalties in the amount of $1,000. If the defendant is unable to pay any remaining amount immediately, then during the period of imprisonment, payments shall be made to the Federal Bureau of Prisons Inmate Financial Responsibility Program.

Upon release from imprisonment, any remaining balance shall be paid in monthly installments of no less than $500 to commence within 60 days until paid in full.

Throughout the period of supervision the probation officer shall monitor the defendant's economic circumstances and report to the Court with recommendations as warranted any material changes that affect her ability to pay any court-ordered penalty.

Other than what we have already discussed, is there any legal reason why the sentence should not be imposed as stated?

MS. OWEN: No, Your Honor.

MR. SAVAGE: No, Your Honor.

THE COURT: Let it be imposed.

# Page: 45

› Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 3:38:50 PM

› Number: 2    Author: Devon    Subject: Highlight    Date: 6/14/2020 3:38:54 PM

What is the government's position with regard to -- respect to self-reporting?

MR. SAVAGE: Your Honor, we have no objection to self-reporting. The defendant has appeared at all hearings. We also ask that the Court defer to the Bureau of Prisons as to when is a safe time to order reporting.

THE COURT: Let me take that under advisement and impose the sentence and give Ms. Rambert-Hairston her appeal -- appellate notice.

Ms. Rambert-Hairston, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary, or if there is some other defect in these proceedings that was not waived by your guilty plea.

You also have a right to appeal your sentence under certain circumstances particularly if you think the sentence is contrary to law. Any notice of appeal must be filed within 14 days from the entry of judgment.

If you are unable to pay the cost of an appeal, you may apply for leave to appeal with no cost to you. If you request, the Clerk of Court will prepare and file a notice of appeal on your behalf.

The Court recommends that you talk to your attorney about these appeal rights, especially about the impact on these rights on any waiver of appeal provision in your plea agreement.

# Page: 46

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:39:15 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:39:21 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:39:26 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:39:31 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:39:40 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:39:47 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:39:52 PM |

But do you understand these rights as I have just explained them to you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I would like to get input from the probation office as to the compliance with pretrial release by Ms. Rambert-Hairston.

PROBATION OFFICER: Yes, Your Honor. I spoke with her officer. She said that she's been compliant.

THE COURT: Thank you. Ms. Rambert-Hairston, I am going to allow you to self-report at a time that the Marshals tell you when and where to report.

I am going to direct the Marshals not to send that notice to you for another six months. So there will not be a designation in the next six months.

Ms. Owen, at whatever time the Marshals designate Ms. Hairston after that, if you believe you need to be heard on that I will take that up at that time.

MS. OWEN: Thank you, Your Honor.

THE COURT: Anything further from either side?

MR. SAVAGE: No, Your Honor. Thank you.

MS. OWEN: No, Your Honor.

THE COURT: This matter is concluded.

Ms. Rambert-Hairston, you are free to go at this time.

(The matter is concluded at 2:19.)

43

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF OFFICIAL REPORTER

I, Laura Andersen, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held through Skype to the best of my ability in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 15th day of May 2020.

S/Laura Andersen
Laura Andersen, RMR
Federal Official Court Reporter

3. Bill of Information (filed)

.UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION ·

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO.: 3: 19 CR 107 - RJC |
| v. | ) | |
| | ) | **BILL OF INFORMATION** |
| | ) | |
| DEVON RAMBERT-HAIRSTON | ) | |
| a/k/a "Devon Marshalle Rambert" | ) | Violation: 18 U.S.C. § 1956(h) |
| | ) | |

THE UNITED STATES ATTORNEY CHARGES:

At the specified time and at all relevant times:

**Individuals and Entities**

1.      DEVON RAMBERT-HAIRSTON, also known as "Devon Marshalle Rambert" during times relevant to this Information, was a resident of Huntersville, North Carolina. From September 2010 until at least August 2018, RAMBERT-HAIRSTON was licensed as a nurse practitioner through the North Carolina Board of Nursing. Beginning in at least October 2011, RAMBERT-HAIRSTON was enrolled as a rendering provider with the North Carolina Medicaid . Program ("Medicaid"). ·

2.      T.G.T. and J.T. were brothers that owned and operated a series of entities that claimed to provide mental and behavioral health services to at-risk youth in North Carolina and elsewhere.

3.      Taylor Behavioral Health Center, LLC ("TBHC"), owned by T.G.T and operated by T.G.T and J.T. during the relevant time period, was a business located in Monroe, North Carolina. T.G.T. and J.T. held TBHC out as a provider of mental and behavioral health services and after school programs. TBHC was enrolled as a Medicaid provider on or about June 9, 2015.

**The Medicaid Program**

4.      The North Carolina Medicaid Program is a state-administered program aided by federal funds.

a.      Medicaid helps pay for reasonable and medically necessary services for qualifying, enrolled individuals and their families, referred to herein as "beneficiaries." Covered services include mental and behavioral health services. The North Carolina Medicaid Program is administered by the Division of Health Benefits, North Carolina Department of Health and Human Services (referred to herein as "DHB"), also known as the Division of Medical Assistance ("DMA") during times relevant to this Information, which oversees mental health providers through the state who receive payments from

1

Medicaid. The North Carolina Medicaid Program and DHB are collectively referred to herein as "Medicaid."

b.      If qualified, an individual can enroll as a Medicaid beneficiary. Medicaid beneficiaries receive services from medical practitioners (referred to herein as "rendering providers") and companies (referred to herein as "billing provider"). Once a rendering or billing provider enrolls with Medicaid, the program issues a unique number to the provider, known as the "provider number." Rendering and billing providers must also obtain a federal identification number, known as a National Provider Identifier or "NPI" number. All Medicaid rendering and billing providers must certify that they will only bill the government for services that they actually render.

c.      After a rendering provider renders a covered medical service to a Medicaid beneficiary, the billing provider may bill Medicaid for the reasonable and necessary costs of the service.

d.      Medicaid billing providers are permitted to bill for outpatient behavioral health services only where certain objective criteria have been met. Medicaid requires billing providers to adhere to Current Procedural Terminology ("CPT") codes to determine whether these objective criteria have been met prior to billing Medicaid for those services. Under Medicaid regulations, certain procedures, such as evaluation and management medical services (for example, CPT codes 99205 and 99215, among others) can only be provided by a qualified medical professional, such as a physician, nurse practitioner, or physician's assistant.

e.      While Medicaid may reject a claim if, for example, the provider or beneficiary is not enrolled, Medicaid typically presumes the truth of each claim and generally pays providers for the services that they bill. In other words, Medicaid entrusts its providers to submit claims for the services that are actually performed.

5.      Medicaid is a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

## The Fraud Scheme and Money Laundering

6.      Beginning in or about July 2015, and continuing until at least in or about December 2017, T.G.T. and J.T. conspired with each other and with other persons known and unknown to the United States Attorney to engage in a scheme to defraud Medicaid of millions of dollars by submitting false and fraudulent reimbursement claims for non-existent services, as well as false and fraudulent claims that misrepresented the services actually provided in order to earn greater reimbursement than was owed.

7.      In furtherance of the fraudulent scheme, T.G.T. recruited RAMBERT-HAIRSTON to serve as the medical director of TBHC beginning at least as early as July 2015. T.G.T. asked RAMBERT-HAIRSTON to review and sign off on progress notes reflecting behavioral health services ostensibly provided by TBHC to juvenile Medicaid beneficiaries. RAMBERT-HAIRSTON did not, herself, provide any medical services to the beneficiaries and only rarely interacted with any beneficiaries at all.

2

# Page: 51

| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:40:33 PM |
|---|---|---|---|
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:40:40 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:40:47 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:40:45 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:40:53 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:41:03 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:41:09 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:41:16 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:41:24 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 3:41:27 PM |

8. The progress notes RAMBERT-HAIRSTON reviewed and signed purported the beneficiaries had been seen by a licensed marriage and family therapist, the identity of whom is known to the United States Attorney.

9. Although RAMBERT-HAIRSTON had provided services to the beneficiaries, T.G.T. and J.T. caused the submission of claims to Medicaid that falsely and fraudulently listed RAMBERT-HAIRSTON as the rendering provider for services billed by TBHC.

a. T.G.T. and J.T. specifically caused the submission of claims for lucrative evaluation and management services to Medicaid, falsely claiming the services had been provided by RAMBERT-HAIRSTON. In reality, many of the beneficiaries never received services of any kind from RAMBERT-HAIRSTON, TBHC, or anyone else working for TBHC. To the extent some beneficiaries did receive services, they were provided by the licensed marriage and family therapist, who was precluded by Medicaid regulations from rendering the evaluation and management services claimed.

b. For example, T.G.T. and J.T. caused the submission of false claims to Medicaid for evaluation and management services they purported were provided by RAMBERT-HAIRSTON to more than 50 beneficiaries, all occurring on September 1, 2015. The claims asserted that each of the 50 beneficiaries received one-on-one evaluation and management services lasting 50 minutes or more. No services were ever provided in connection with the submitted claims. Moreover, the submitted claims were fraudulent on their face, and represented services that could not possibly have been provided by any single individual in a given day. As a result of the fraudulent claims submission, Medicaid paid TBHC approximately $33,350.

10. TBHC was placed on pre-payment review by DHB on or about August 17, 2016, following an evaluation of claims submitted by TBHC. Thereafter, T.G.T, J.T., and others continued the fraudulent scheme by submitting false and fraudulent claims through a series of successive entities. In or around August 2016, RAMBERT-HAIRSTON agreed to allow T.G.T and J.T. to submit Medicaid claims using her NPI number as the billing provider until other entities owned and operated by T.G.T. and J.T. could be enrolled as Medicaid providers.

11. Between at least in or about September 2016 and continuing to at least in or about February 2017, T.G.T. and J.T. submitted and caused to be submitted approximately $1.3 million in fraudulent claims to Medicaid under RAMBERT-HAIRSTON's NPI number as both the rendering and billing provider.

12. As a result of the fraudulent claims submitted using RAMBERT-HAIRSTON's NPI number as both the rendering and billing provider, Medicaid wired at least $813,726 directly into RAMBERT-HAIRSTON's State Employees' Credit Union ("SECU") account *1005. RAMBERT-HAIRSTON knew these funds were not derived from any legitimate services she had provided to Medicaid beneficiaries during the relevant time period and reasonably should have known the services were not provided by anyone else.

13. RAMBERT-HAIRSTON arranged for the distribution of the Medicaid funds deposited in her SECU account to T.G.T. and J.T. through a series of monetary transactions of a

---

*Handwritten annotations:*

→ patient care plans were documented on EPC and USCW charts

→ They billed me w/o my knowledge (known to the government)

→ Again that they billed I saw patients I didn't know me, billed me.

→ They continued the fraudulent scheme → only the billing provider responsible to take payments sustain my emploument of staff and business due to crediteak due to billing months

Again, they caused the submission of claims w/o knowledge/ authority which documents specifically states them!

THEY submitted and caused me as the billing and rendering)

→ NOT WILLFULLY BLIND OR KNEW !!

→ My job was to review and co-sign notes from PCPs, reason why I knew I didn't provide services

# Page: 52

| | | | |
|---|---|---|---|
| ⟩ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:17 PM |
| ⟩ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:14 PM |
| ⟩ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:23 PM |
| ⟩ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:32 PM |
| ⟩ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:25 PM |
| ⟩ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:35 PM |
| ⟩ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:30 PM |
| ⟩ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:27 PM |
| ⟩ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:50 PM |
| ⟩ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:47 PM |
| ⟩ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:54 PM |
| ⟩ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:52 PM |
| ⟩ Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:56 PM |
| ⟩ Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:01 PM |
| ⟩ Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:53:59 PM |
| ⟩ Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:05 PM |
| ⟩ Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:17 PM |
| ⟩ Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:12 PM |
| ⟩ Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:08 PM |
| ⟩ Number: 20 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:14 PM |
| ⟩ Number: 21 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:28 PM |
| ⟩ Number: 22 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:33 PM |
| ⟩ Number: 23 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:27 PM |
| ⟩ Number: 24 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:54:36 PM |

Comments from page 52 continued on next page

8. The progress notes RAMBERT-HAIRSTON reviewed and signed purported the beneficiaries had been seen by a licensed marriage and family therapist, the identity of whom is known to the United States Attorney.

9. Although RAMBERT-HAIRSTON had provided no services to the beneficiaries, T.G.T. and J.T. caused the submission of claims to Medicaid that falsely and fraudulently listed RAMBERT-HAIRSTON as the rendering provider for services billed by TBHC.

a. T.G.T. and J.T. specifically caused the submission of claims for lucrative evaluation and management services to Medicaid, falsely claiming the services had been provided by RAMBERT-HAIRSTON. In reality, many of the beneficiaries never received services of any kind from RAMBERT-HAIRSTON, TBHC, or anyone else working for TBHC. To the extent some beneficiaries did receive services, they were provided by the licensed marriage and family therapist, who was precluded by Medicaid regulations from rendering the evaluation and management services claimed.

b. For example, T.G.T. and J.T. caused the submission of false claims to Medicaid for evaluation and management services they purported were provided by RAMBERT-HAIRSTON to more than 50 beneficiaries, all occurring on September 1, 2015. The claims asserted that each of the 50 beneficiaries received one-on-one evaluation and management services lasting 50 minutes or more. No services were ever provided in connection with the submitted claims. Moreover, the submitted claims were fraudulent on their face, and represented services that could not possibly have been provided by any single individual in a given day. As a result of the fraudulent claims submission, Medicaid paid TBHC approximately $33,350.

10. TBHC was placed on pre-payment review by DHB on or about August 17, 2016, following an evaluation of claims submitted by TBHC. Thereafter, T.G.T., J.T., and others continued the fraudulent scheme by submitting false and fraudulent claims through a series of successive entities. In or around August 2016, RAMBERT-HAIRSTON agreed to allow T.G.T and J.T. to submit Medicaid claims using her NPI number as the billing provider until other entities owned and operated by T.G.T. and J.T. could be enrolled as Medicaid providers.

11. Between at least in or about September 2016 and continuing to at least in or about February 2017, T.G.T. and J.T. submitted and caused to be submitted approximately $1.3 million in fraudulent claims to Medicaid under RAMBERT-HAIRSTON's NPI number as both the rendering and billing provider.

12. As a result of the fraudulent claims submitted using RAMBERT-HAIRSTON's NPI number as both the rendering and billing provider, Medicaid wired at least $813,726 directly into RAMBERT-HAIRSTON's State Employees' Credit Union ("SECU") account *1005. RAMBERT-HAIRSTON knew these funds were not derived from any legitimate services she had provided to Medicaid beneficiaries during the relevant time period and reasonably should have known the services were not provided by anyone else.

13. RAMBERT-HAIRSTON arranged for the distribution of the Medicaid funds deposited in her SECU account to T.G.T. and J.T. through a series of monetary transactions of a

· Number: 25    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:54:39 PM

· Number: 26    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:54:52 PM

· Number: 27    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:54:56 PM

· Number: 28    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:54:54 PM

· Number: 29    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:54:58 PM

· Number: 30    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:03 PM

· Number: 31    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:08 PM

· Number: 32    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:05 PM

· Number: 33    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:12 PM

· Number: 34    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:07 PM

· Number: 35    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:21 PM

· Number: 36    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:23 PM

· Number: 37    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:28 PM

· Number: 38    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:26 PM

· Number: 39    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:39 PM

· Number: 40    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:45 PM

· Number: 41    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:41 PM

· Number: 42    Author: Devon    Subject: Highlight    Date: 6/14/2020 4:55:50 PM

value greater than $10,000, including cash withdrawals and cashiers' checks, often occurring the same day as the Medicaid deposit. On several occasions, RAMBERT-HAIRSTON accompanied T.G.T. to a SECU branch in order to arrange cash withdrawals from RAMBERT-HAIRSTON's SECU account *1005 and simultaneous cash deposits into T.G.T.'s SECU account *0925.

14. The amount of loss known to or reasonably foreseeable by RAMBERT-HAIRSTON was $813,726. Between at least in or about September 2016 and continuing through at least in or about February 2017, RAMBERT-HAIRSTON transferred more than $751,000 in fraudulent proceeds to T.G.T. and J.T,. and RAMBERT-HAIRSTON kept the remainder.

*$162,226.00 * from 2015 - 2017

How did I benefit from the billing of 1.3 million dollars. Total sum they billed all providers were 6.4 million !!!

* a little over $62,000 that occurred over 1 1/2 years Total. only $44,000 from Sept 2016 - February 2017. IRS and medicaid provided me a sanction due to me being the Billing Crispon's(responsible) provider for payments of supposed services.

4

# Page: 53

· Number: 1        Author: Devon     Subject: Highlight   Date: 6/14/2020 4:56:04 PM

· Number: 2        Author: Devon     Subject: Highlight   Date: 6/14/2020 4:56:07 PM

## COUNT ONE
## 18 U.S.C. § 1956(h)
## (Money Laundering Conspiracy)

15.    The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 14 of the Bill of Information, and further alleges that:

16.    From at least in or about September 2016 through at least in or about February 2017, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

## DEVON RAMBERT-HAIRSTON,
## a/k/a "Devon Marshalle Rambert"

did knowingly combine, conspire, confederate, and agree with T.G.T., J.T., and others known and unknown to the United States Attorney, to commit an offense against the United States, to wit, money laundering, in violation of Title 18, United States Code, Section 1957.

### Object of the Conspiracy

17.    *Transactional Money Laundering* – It was a part and an object of the conspiracy that RAMBERT-HAIRSTON, T.G.T., J.T., and others knowingly engaged and attempted to engage in monetary transactions by, through, or to a financial institution in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is the deposits, withdrawals, and exchanges of United States currency, funds, and monetary instruments, such property having been derived from a specified unlawful activity, to wit, a Federal health care offense as described herein, in violation of Title 18, United States Code, Section 1957.

### Manner and Means

18.    The conspirators, including RAMBERT-HAIRSTON, carried out the conspiracy through the manner and means described in paragraphs 1 through 14 of this Bill of Information, among others.

All in violation of Title 18, United States Code, Section 1956(h).

5

## NOTICE OF FORFEITURE

Notice is hereby given of 18 U.S.C. §§ 982. The following property so subject to forfeiture in accordance with section 982:

a. All property constituting or derived from property involved in the violation set forth in this bill of information; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold do, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant to the extent of the value of the property described in (a).

The following property is subject to forfeiture on one or more of the grounds stated above: a forfeiture money judgment for all currency and monetary instruments which were received during or involved in the crimes alleged in this Bill of Information, including but not limited to the sum of approximately $62,226.00.

*How did I benefit over 1.3 million from them billing my name ???*

R. ANDREW MURRAY
UNITED STATES ATTORNEY

DALLAS J. KAPLAN
ASSISTANT UNITED STATES ATTORNEY

6

· Number: 1          Author: Devon          Subject: Highlight    Date: 6/14/2020 4:56:25 PM

Revised AO 45 (WDNC - 3/07)

# NEW CRIMINAL CASE COVER SHEET

## U. S. DISTRICT COURT

(To be used for all new Bills of Indictments and Bills of Information)

**CASE SEALED:** ○ YES ● NO

**DOCKET NUMBER:** 3:19cR107-RJC

*If case is to be sealed, a Motion to Seal and proposed Order must be attached.)*

| | |
|---|---|
| **CASE NAME** : US vs | DEVON RAMBERT-HAIRSTON, a/k/a "Devon Marshalle Rambert" |
| **COUNTY OF OFFENSE** : | Mecklenburg |
| **RELATED CASE INFORMATION** : | 3:19cr80-RJC-DSC |
| *Magistrate Judge Case Number* : | |
| *Search Warrant Case Number* : | 3:17mj298(DCK); 3:17mj285(DSC); 3:18mj344(DCK); 3:19mj21(DCK) |
| *Miscellaneous Case Number* : | 3:17mc64(DSC) |
| *Rule 20b* : | |
| **SERVICE OF PROCESS** : | Summons |

**U.S.C. CITATIONS** *(Mark offense carrying greatest weight):* ○ Petty ○ Misdemeanor ● Felony

18 U.S.C. § 1956(h)

**JUVENILE:** ○ Yes ● No

**ASSISTANT U. S. ATTORNEY** : Dallas Kaplan

**VICTIM/WITNESS COORDINATORS:** Lynne Crout

**INTERPRETER NEEDED** : No

**LIST LANGUAGE AND/OR DIALECT:**

**REMARKS AND SPECIAL INSTRUCTIONS:** Please assign to Judge Conrad

(Maintain form in the Attorney Work Product folder / purge before archiving )

Case 3:19-cr-00107-RJC-DCK   Document 1-1   Filed 03/28/19   Page 1 of 1

## 4. Plea Agreement



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA  ) DOCKET NO.:
  )
  v.  ) **PLEA AGREEMENT**
  )
**DEVON RAMBERT-HAIRSTON**  )
  )

NOW COMES the United States of America, by and through R. Andrew Murray, United States Attorney for the Western District of North Carolina, and the defendant, Devon Rambert-Hairston, in person and through counsel, C. Melissa Owen, and respectfully inform the Court that they have reached an agreement pursuant to Federal Rule of Criminal Procedure ("Rule") 11. References to the United States herein shall mean the United States Attorney for the Western District of North Carolina.

### I. Plea

1.      The defendant agrees to enter a voluntary plea of guilty to Count One as set forth in the Bill of Information, and admits to being in fact guilty as charged in Count One.

2.      The defendant understands that each and every provision set forth below is a material term of the Plea Agreement. Each of the following constitutes a breach of the Plea Agreement: (a) the defendant's failure to fully comply with any provision of the Plea Agreement; (b) the defendant's attempt to withdraw the guilty plea; or (c) the defendant's violation of any federal, state or local law or any order of any court, including any condition of pre-trial or pre-sentence, or post-sentence release.

3.      In addition to any other remedy available in law, the defendant's breach: (a) will relieve the United States of its obligations under the Plea Agreement, without relieving the defendant of the defendant's obligations under the Plea Agreement or permitting the defendant to withdraw the guilty plea; (b) may constitute the defendant's failure to accept responsibility under U.S.S.G. § 3E1.1; and (c) will permit the United States to proceed on any dismissed, pending, superseding or additional charges and, if applicable, any Information pursuant to 21 U.S.C. § 851.

### II. Sentence

4.      The defendant is aware that the statutory minimum and maximum sentences for each count are as follows:

> **Count One**: a violation of 18 U.S.C. § 1956(h); a maximum term of imprisonment of 10 years, a $250,000 fine or twice the value of the involved property and no more than three years' supervised release.

5.     The defendant understands that a violation of supervised release may subject the defendant to an additional period of incarceration.

6.     The defendant is aware that the Court: (a) will consider the advisory *United States Sentencing Guidelines (U.S.S.G.)* in determining the sentence; (b) has not yet determined the sentence, and any estimate of the likely sentence is a prediction rather than a promise; (c) has the final discretion to impose any sentence up to the statutory maximum for each count; and (d) is not bound by recommendations or agreements by the United States. Knowing this, the defendant understands that the defendant may not withdraw the plea as a result of the sentence imposed.

7.     Pursuant to Rule 11(c)(1)(B), the parties agree that they will jointly recommend that the Court make the following findings and conclusions as to the U.S.S.G.:

   a.     The following apply to the offense to which defendant is pleading guilty:

   Specific Characteristics:

   - An offense level of 20, because the defendant is accountable for the underlying health care fraud scheme and the amount of health care fraud loss known to or reasonably foreseeable by the defendant was $813,726, an amount more than $550,000 but less than $1,500,000 [U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(b)(1)(H)];

   - A 1-point enhancement because the offense involved a conspiracy to commit a violation of 18 U.S.C. § 1957 [U.S.S.G. §§ 2S1.1(b)(2)(A), 1B1.3 cmt. n. 7].

   b.     The United States agrees that the defendant was a minor participant in the criminal activity pursuant to U.S.S.G. § 3B1.2(b). The parties further agree that either party may argue their respective positions regarding any further reduction under U.S.S.G. § 3B1.2 (Mitigating Role).

   c.     The United States agrees that if the defendant is found by the Court to have accepted responsibility under U.S.S.G. § 3E1.1(a), the United States will acknowledge that defendant's entry of a guilty plea is timely for purposes of U.S.S.G. § 3E1.1(b), if that section applies to defendant.

   d.     The parties agree that either party may argue their respective positions regarding any other specific offense characteristics, cross-references, special instructions, reductions, enhancements, departures, and adjustments to the offense level.

   e.     The parties agree that either party may seek a departure or variance from the "applicable guideline range" (U.S.S.G. § 5C1.1) determined by the district court at sentencing, if such departure or variance is permitted by law. If the defendant wishes to argue for a departure or variance that could take the sentence outside of the advisory guidelines range, the defendant will notify the Court, the United States Probation Officer

# Page: 59

| Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:57:18 PM |
| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:57:23 PM |
| Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:57:19 PM |
| Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:57:20 PM |
| Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:57:17 PM |

and the United States at least ten days in advance of sentencing of the facts or issues the defendant intends to raise. If the defendant intends to rely upon any expert report or opinion at sentencing, the defendant must disclose any such opinion or report to the United States 30 days in advance of the sentencing date.

f.　　The United States will inform the Court and the probation office of all facts pertinent to the sentencing process and will present any evidence requested by the Court.

8.　　The defendant agrees to the following with respect to monetary penalties, assets, and financial disclosures:

a.　　To entry of an order for monetary penalties due and payable immediately, such penalties including full restitution, regardless of the resulting loss amount, to all victims directly or indirectly harmed by the defendant's "relevant conduct," as defined by U.S.S.G. §1B1.3, including conduct pertaining to any dismissed counts or uncharged conduct, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. Further, Defendant agrees that, should the Court impose a payment schedule, the payment schedule sets forth minimum payments and does not foreclose additional collection of restitution.

b.　　To forfeit, via an administrative or judicial proceeding, all assets listed in the charging document and, if applicable, Bill of Particulars, or seized during this investigation or a related investigation; to withdraw any claims and petitions for such assets; to entry of a money judgment in the amount specified in the charging document or Bill of Particulars; to a Magistrate Judge conducting forfeiture proceedings; to waive any rights to notice of forfeiture and to pronouncement of forfeiture at sentencing; and to abandonment of the defendant's interests, if any, in any seized assets not forfeited.

c.　　To truthfully complete under penalty of perjury, within thirty days of the execution of this Plea Agreement, a financial statement provided by the United States Attorney's Office and to update the statement within seven days of any material change, and to make full disclosure of all current and projected assets to the United States Probation Office before sentencing and again before termination of supervised release or probation, such disclosures to be shared with the United States Attorney's Office.

d.　　That monetary penalties will be subject to immediate enforcement as provided in 18 U.S.C. § 3613; that monetary penalties and the forfeiture money judgment will be submitted to the Treasury Offset Program so that payments to the defendant may be applied to federal debts; and to satisfaction of the 21 U.S.C. § 853(p) factors so that the forfeiture money judgment may be satisfied via forfeiture of substitute property.

e.　　To participation in the Inmate Financial Responsibility Program and to waiver of any challenge relating to defendant's participation in the Program.

### III. Procedure

9.    The defendant agrees that a federal Magistrate Judge may conduct the hearing required by Rule 11.

10.    The defendant stipulates that there is a factual basis, as required by Rule 11(b)(3), for the plea of guilty. The defendant further stipulates that the defendant has read and understood the Factual Basis filed with this Plea Agreement pursuant to Local Criminal Rule 11.2 and that such Factual Basis may be used by the Court, the United States Probation Office, and the United States without objection by the defendant for any purpose, including to determine the applicable advisory guideline range or the appropriate sentence under 18 U.S.C. § 3553(a).

11.    The defendant also agrees that the Factual Basis filed with the Plea Agreement does not necessarily represent all conduct relevant to sentencing; the United States may submit to the United States Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4; and the United States may present to the Court additional relevant facts prior to or at sentencing.

### IV. Waivers

12.    The defendant is aware that the law provides certain limited rights to withdraw a plea of guilty, has discussed these rights with defense counsel, and knowingly and voluntarily waives any right to withdraw the plea once the Magistrate Judge has accepted it.

13.    The defendant acknowledges that Rule 11(f) and Fed. R. of Evid. 408 and 410 are rules that ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions. The defendant knowingly and voluntarily waives these rights and agrees that any statements made in the course of the defendant's guilty plea or this Plea Agreement (in part or in its entirety, at the sole discretion of the United States) and the Factual Basis will be admissible against the defendant for any purpose in any criminal or civil proceeding if the defendant fails to enter, or attempts to withdraw, the defendant's guilty plea, or in any post-conviction proceeding challenging the knowing or voluntary nature of the guilty plea.

14.    The defendant agrees that by pleading guilty, the defendant is knowingly and voluntarily waiving the right: (a) to be tried by a jury; (b) to be assisted by an attorney at trial; (c) to confront and cross-examine witnesses; and (d) not to be compelled to incriminate him or herself.

15.    The defendant has discussed with defense counsel: (1) defendant's rights pursuant to 18 U.S.C. § 3742, 28 U.S.C. § 2255, and similar authorities to contest a conviction and/or sentence through an appeal or post-conviction action after entering into a Plea Agreement; (b) whether there are potential issues relevant to an appeal or post-conviction action; and (c) the possible impact of any such issue on the desirability of entering into this Plea Agreement.

16.    The defendant, in exchange for the concessions made by the United States in this Plea Agreement, waives all rights to contest the conviction and sentence in any appeal or post-conviction action. Claims of (1) ineffective assistance of counsel and (2) prosecutorial misconduct, and those claims only, are exempt from the waiver. This waiver precludes the defendant from

challenging his conviction or sentence on the basis of any other claim, including but not limited to any claim that the statute(s) to which the defendant is pleading guilty is or are unconstitutional and any claim that the admitted conduct does not fall within the scope of the statute(s).

17. The defendant agrees that the United States preserves all its rights and duties as set forth in 18 U.S.C. § 3742(b). Should the United States Sentencing Commission and/or Congress in the future amend the Sentencing Guidelines to lower the guideline range that pertains to the defendant's offense(s) and explicitly make such an amendment retroactive, the United States agrees that it will not assert this waiver as a bar to the defendant's filing a motion with the district court pursuant to 18 U.S.C. § 3582(c)(2). However, if the defendant files such a motion, the United States reserves the right to oppose the motion on any other grounds, and reserves the right to assert this waiver as a bar to an appeal from the district court's decision regarding the motion.

18. The defendant knowingly and voluntarily waives all rights, whether asserted directly or by a representative, to request or to receive from any department or agency any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

## V. Effects of Plea

19. The defendant understands that upon acceptance of the guilty plea, a judicial officer may order the defendant to be detained, unless the judicial officer finds that the defendant satisfies one of the statutory exceptions to the detention presumption, permitting the defendant's release.

20. The defendant recognizes that pleading guilty may affect the defendant's immigration status if the defendant is not a citizen of the United States. The defendant understands that no one can predict with certainty the effect of the defendant's conviction(s) on the defendant's immigration status. The defendant nevertheless seeks to plead guilty, even if the consequence is the defendant's automatic removal from the United States.

## VI. Assistance to United States

21. If requested by the United States, but only if so requested, the defendant agrees to cooperate with the United States, including but not limited to the following:

  a. The defendant will provide truthful information about the subject charges and about any other criminal activity within the defendant's knowledge to any United States agent or agency that the United States designates.

  b. The defendant will testify truthfully in any trial, hearing, or grand jury proceeding. This testimony includes, but is not limited to, testimony against any co-defendants, as the United States designates. Should the defendant testify at the request of the United States, the defendant hereby waives payment of any witness fees or expenses.

  c. The defendant will be reasonably available for debriefing and pre-trial conferences as the United States may require.

d.     The defendant will provide to the United States all documents or materials of any kind in the defendant's possession or under the defendant's care, custody, or control relating directly or indirectly to all areas of inquiry and investigation.

e.     The defendant understands that the United States desires only truthful and accurate information and testimony. The defendant understands further that knowingly giving false information or testimony may constitute a breach of the Plea Agreement and/or could be prosecuted as an additional criminal offense.

f.     The defendant's obligation under this section is a continuing one, and will continue after sentencing until all investigations and/or prosecutions to which the defendant's cooperation may be relevant are complete.

22.     The United States and the defendant agree that, once this Plea Agreement is effective, any prior agreements are superseded, and further statements of the defendant are governed solely by this Plea Agreement.

23.     The United States agrees that information provided by the defendant pursuant to this Plea Agreement and about which the United States had no prior knowledge will not be used against the defendant by the United States in this or any other criminal proceeding, except that the United States may use any information the defendant provides:

a.     Regarding crimes that involve violence;

b.     In a prosecution for any crime committed by the defendant after the effective date of this Plea Agreement;

c.     Derivatively, to pursue investigative leads, identify witnesses or to obtain evidence;

d.     In response to any defense argument or evidence in any hearing or proceeding inconsistent with statements or information provided by the defendant; and

e.     For any other purpose set forth in U.S.S.G. § 1B1.8(b).

24.     Nothing in this Plea Agreement places any obligation on the United States to seek the defendant's cooperation or assistance. If the defendant so assists the United States:

a.     The United States, in its sole discretion, will determine whether said assistance has been substantial.

b.     Upon a determination by the United States that the defendant has rendered substantial assistance, the United States may make a motion pursuant to U.S.S.G. § 5K1.1 for imposition of a sentence below the applicable Sentencing Guidelines or pursuant to Rule 35(b) for a reduction in the defendant's term of imprisonment. The United States may also, within its sole discretion, move the Court pursuant to 18 U.S.C. § 3553(e) and/or Rule 35(b) to impose a sentence below any applicable statutory mandatory minimum.

25.     Any determination that the defendant has failed to provide substantial assistance, or has knowingly provided false information, is within the sole discretion of the United States, and the defendant waives all objections and rights of appeal or collateral attack of such a determination. The defendant understands that if the United States makes a motion for reduction of sentence, the motion is not binding on the District Court.

### VII. Conclusion

26.     This Plea Agreement is effective and binding once signed by the defendant, the defendant's attorney, and an attorney for the United States. The defendant agrees to entry of this Plea Agreement at the date and time scheduled by the Court.

27.     There are no agreements, representations, or understandings between the parties in this case, other than those explicitly set forth in this Plea Agreement, or as noticed to the Court during the plea colloquy and contained in writing in a separate document signed by all parties.

SO AGREED:

_____        DATED: _____
Dallas J. Kaplan, Assistant United States Attorney


_____        DATED: _____
C. Melissa Owen, Attorney for Defendant


_____        DATED: _____
Devon Rambert-Hairston, Defendant


June 2018

5. Money Laundering Statute

### 6.18.1956-4 Money Laundering - Knowledge that Property Represents Proceeds of Some Form of Unlawful Activity Defined

The third element that the government must prove beyond a reasonable doubt is that in conducting a financial transaction *(name)* knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity. To satisfy this element, the government must prove that *(name)* knew the property involved in the transaction represented proceeds from some form of unlawful activity that is a felony offense under state, federal, or foreign law. The government is not required to prove that *(name)* knew what the unlawful activity was.

In this case, the government claims that *(name)* knew that the proceeds were derived from unlawful activity which constitutes *(describe criminal activity alleged; e.g., mail fraud)* which is a felony under *(federal)(state)(foreign)* law.

**Comment**

Sand et al., supra, 50A-18.

18 U.S.C. § 1956(c)(1) provides that, as used in this section

the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7).

# Page: 66

Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 4:58:28 PM

Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 4:58:36 PM

Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 4:58:16 PM

Number: 4     Author: Devon     Subject: Highlight     Date: 6/14/2020 4:58:43 PM

In *United States v. Wert-Ruiz*, 228 F.3d 250, 253 n.2 (3d Cir. 2000), the Third Circuit noted that "[t]hough knowledge that the funds have been obtained illegally is required, knowledge of what the specified unlawful activity is not." *See also United States v. Bansal*, 663 F.3d 634, 645 (3d Cir. 2011) (holding evidence of knowledge sufficient); *United States v. Carr*, 25 F.3d 1194, 1205 (3d Cir. 1994) (holding government could establish defendant's knowledge of the criminal nature of the proceeds through circumstantial evidence).

In *Wert-Ruiz*, 228 F.3d at 254-55, the trial court gave the following "willful blindness" instruction:

> When knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if a defendant is aware of a high probability of its existence, unless she actually believes that it does not exist.
>
> So with respect to the issue of a defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the defendant deliberately and consciously tried to avoid learning that certain currency was the proceeds of some form of illegal activity, and that the defendants deliberately and consciously tried to avoid learning that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.
>
> I must emphasize, however, that the requisite proof of knowledge on the part of a defendant cannot be established by demonstrating she was negligent, careless or foolish.

The Third Circuit concluded that the instruction was proper even though the government also contended that the defendant had actual knowledge. 228 F.3d at 256-57. *See also* 5.06 (Willful Blindness).

(Revised 10/2012)

# Page: 67

| | | | |
|---|---|---|---|
| ›Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:59:02 PM |
| ›Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 4:59:08 PM |
| ›Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:22 PM |
| ›Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:26 PM |
| ›Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:29 PM |
| ›Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:32 PM |
| ›Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:35 PM |
| ›Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:39 PM |
| ›Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:46 PM |
| ›Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:41 PM |
| ›Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:48 PM |
| ›Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:52 PM |
| ›Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:55 PM |
| ›Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:01:59 PM |
| ›Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:02:01 PM |
| ›Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:02:18 PM |
| ›Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:02:22 PM |
| ›Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:02:23 PM |

An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT OF JUSTICE This is archived content from the U.S. Department of Justice website. The information here may be outdated and
ARCHIVES links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive
site.

# 2169. JURY INSTRUCTION -- MULTIPLE MONETARY TRANSACTIONS

On or about the dates set forth below, in the _____ District of _____, and elsewhere, the defendants, as set forth below, [1] knowingly engage and attempt to engage and did aid, abet, counsel, command, induce and procure and cause the engaging and attempts to engage in the following monetary transactions by through or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the, [deposit] [withdrawal], [transfer] [exchange] of [U.S. currency], [funds], [monetary instruments], such property having been derived from a specified unlawful activity, that is, _____.

| COUNT | DEFENDANT | DATE | MONETARY TRANSACTION |
|-------|-----------|------|----------------------|

All in violation of Title 18, United States Codes, Sections 1957 and 2.

‹ 2168. Jury Instruction -- 18 U.S.C. 1957                    up                    2170. Jury Instruction -- 18 U.S.C. 1957 ›

*Updated January 17, 2020*

· Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:02:47 PM



An official website of the United States government
Here's how you know

THE UNITED STATES DEPARTMENT OF JUSTICE ARCHIVES This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

# 2166. JURY INSTRUCTION -- CONSPIRACY TO COMMIT MONEY LAUNDERING

1. Beginning on or about _____, and continuing through on or about _____, within the _____ District of _____, and elsewhere, the Defendants,

_____,

_____,

_____, did unlawfully, willfully and knowingly combine, conspire, confederate and agree together and with each other, and with others known and unknown to the Grand Jury, to commit certain offenses under Title 18, United States Code, Sections 1956 and 1957, as follows:

a. to conduct and attempt to conduct a financial transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity, (that is, ), (1) with the intent to promote the carrying on of such specified unlawful activity and (2) with the intent to engage in conduct constituting a violation of [26 U.S.C. § 7201], [26 U.S.C. § 7206] to wit, (describe conduct), and (3) knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and (4) knowing that the transaction was designed in whole and in part to avoid a transaction reporting requirement under [State] [Federal] law, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1); and

knowingly to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. §1956(a)(2)(A); and

knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place inside the United States knowing that such transportation was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, and to avoid a transaction reporting requirement under federal law, in violation of 18 U.S.C. §1956(a)(2)(B); and

knowingly to engage, attempt to engage and cause and aid and abet others in engaging in monetary transactions in criminally derived property that was of a value greater than $10,000, in violation of 18 U.S.C. 1957;

**MANNER AND MEANS**

3.

**OVERT ACTS**

#. In furtherance of this conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Western District of Texas:

**LIST OVERT ACTS**

# Page: 69

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:03 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:07 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:13 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:16 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:33 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:39 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:44 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:49 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:03:55 PM |
| › Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:04:04 PM |
| › Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:04:07 PM |
| › Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:04:15 PM |
| › Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:04:19 PM |
| › Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:04:25 PM |
| › Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:04:29 PM |
| › Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:04:31 PM |

All in violation of Title 18, United States Code, Section 1956(h).

‹ 2165. Jury Instruction -- Avoiding A Reporting Requirement (8300) -- 18 U.S.C. 1956(a)(3)(C)    up    2167. Jury Instruction -- Conspiracy -- 18 U.S.C. § 1956(h) ›

*Updated January 17, 2020*

 An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT OF JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

# 2167. JURY INSTRUCTION -- CONSPIRACY -- 18 U.S.C. § 1956(H)

The defendant is charged in Count(s) ___, with _____, in violation of _____, and in Count ___ with Conspiracy to Launder Money, in violation of Title 18, United States Code, Section 1956(h).

A conspiracy is an agreement between two or more people to join together to attempt to accomplish some unlawful purpose. It is a kind of "partnership in crime" in which each member becomes the agent of every other member. It does not matter whether or not the conspiracy was successful. The essence of the offense is that two or more persons have combined, or mutually agreed, to do something illegal.[FN1]

> 1. FN1. *Iannelli v. United States*, 420 U.S. 770, 777 (1975).

For you to find the defendant(s) guilty of this crime, you must be convinced beyond a reasonable doubt that the government has proved each of the following beyond a reasonable doubt:

> *FIRST: That two or more persons agreed to try to accomplish a common and unlawful plan, as charged in the indictment; and,*
> *SECOND: That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.*

*One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to further some object of the conspiracy.[FN2] One may become a member of a conspiracy without knowing all of the details of the unlawful plan or the identities of all of the other alleged conspirators. If the defendant, with an understanding of the unlawful character of a plan, knowingly joins in an unlawful scheme on one occasion, that is sufficient to convict him of conspiracy, even though he had not participated before and even though he played only a minor part in the conspiracy.*

> *FN2. Blumenthal v. United States, 332 U.S. 539, 557 (1947).*

*One who has no knowledge of the unlawful plan does not become a member of a conspiracy simply because one happens to be present at an event or transaction or because one happens to commit an act which inadvertently furthers some object of the unlawful plan or conspiracy. One does not become a member of a conspiracy through an association with members of the conspiracy or by the mere knowledge that a conspiracy exists.[FN3]*

> 1. *FN3. United States v. Falcone, 311 U.S. 205, 210(1940).*

*The evidence in the case need not show that the alleged members of the conspiracy entered into any express or formal agreement, or that they directly stated between themselves the details of the scheme and its object or purpose, or the precise means by which the object or purpose was to be accomplished. Similarly, the evidence in the case need not establish that all of the means or methods which were agreed upon were actually used or put into operation. Nor must the evidence prove that all of the persons charged were members of the conspiracy.*

*In your consideration of the conspiracy offenses alleged in Count(s)___ of the Indictment, you should first determine, from all the evidence and testimony, whether or not a conspiracy existed at all. If you conclude that a conspiracy did exist as alleged, you should next determine whether or not each defendant knowingly or intentionally became a member of the conspiracy.*

# Page: 71

› Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:04:59 PM

› Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:05:03 PM

› Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:05:09 PM

› Number: 4     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:05:19 PM

› Number: 5     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:05:24 PM

› Number: 6     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:05:29 PM

› Number: 7     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:05:43 PM

› Number: 8     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:05:50 PM

› Number: 9     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:05:56 PM

› Number: 10     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:06:01 PM

› Number: 11     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:06:05 PM

› Number: 12     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:06:15 PM

› Number: 13     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:06:21 PM

› Number: 14     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:06:27 PM

› Number: 15     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:06:31 PM

‹ 2166. Jury Instruction -- Conspiracy To Commit Money Laundering     up     2168. Jury Instruction -- 18 U.S.C. 1957 ›

*Updated January 17, 2020*

 An official website of the United States government
Here's how you know

THE UNITED STATES DEPARTMENT OF JUSTICE ARCHIVES This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 910. KNOWINGLY AND WILLFULLY

The prohibition of 18 U.S.C. § 1001 requires that the false statement, concealment or cover up be "knowingly and willfully" done, which means that "The statement must have been made with an intent to deceive, a design to induce belief in the falsity or to mislead, but § 1001 does not require an intent to defraud -- that is, the intent to deprive someone of something by means of deceit." *United States v. Lichenstein*, 610 F.2d 1272, 1276-77 (5th Cir.), *cert. denied*, 447 U.S. 907 (1980). The government may prove that a false statement was made "knowingly and willfully" by offering evidence that defendants acted deliberately and with knowledge that the representation was false. *See United States v. Hopkins*, 916 F.2d 207, 214 (5th Cir. 1990). The jury may conclude from a plan of elaborate lies and half-truths that defendants deliberately conveyed information they knew to be false to the government. *Id.* at 214-15.

As used in the statute, the term "knowingly" requires only that the defendant acted with knowledge of the falsity. *See United States v. Lange*, 528 F.2d 1280, 1287-89 (5th Cir. 1976); as in other situations, to commit an act "knowingly" is to do so with knowledge or awareness of the facts or situation, and not because of mistake, accident or some other innocent reason. *See Fifth Circuit Pattern Jury Instructions*, § 1.35 (1990). Knowledge of the criminal statute governing the conduct is not required.

The false statement need not be made with an intent to defraud if there is an intent to mislead or to induce belief in its falsity. Reckless disregard of whether a statement is true, or a conscious effort to avoid learning the truth, can be construed as acting "knowingly." *United States v. Evans*, 559 F.2d 244, 246 (5th Cir. 1977), *cert. denied*, 434 U.S. 1015 (1978).

A defendant is not relieved of the consequences of a material misrepresentation by lack of knowledge when the means of ascertaining truthfulness are available. In appropriate circumstances, the government may establish the defendant's knowledge of falsity by proving that the defendant either knew the statement was false or acted with a conscious purpose to avoid learning the truth. *See United States v. West*, 666 F.2d 16, 19 (2d Cir. 1981); *Lange*, 528 F.2d at 1288; *United States v. Clearfield*, 358 F. Supp. 564, 574 (E.D. Pa. 1973). Proof that the defendant acted with reckless disregard or reckless indifference may therefore satisfy the knowledge requirement, when the defendant makes a false material statement and consciously avoids learning the facts or intends to deceive the government. *See United States v. Schaffer*, 600 F.2d 1120, 1122 (5th Cir. 1979).

The term "willfully" means no more than that the forbidden act was done deliberately and with knowledge, and does not require proof of evil intent. *McClanahan v. United States*, 230 F.2d 919, 924 (5th Cir. 1955), *cert. denied*, 352 U.S. 824 (1956); *McBride v. United States*, 225 F.2d 249, 255 (5th Cir. 1955), *cert. denied*, 350 U.S. 934 (1956). An act is done "willfully" if done voluntarily and intentionally and with the specific intent to do something the law forbids. There is no requirement that the government show evil intent on the part of a defendant in order to prove that the act was done "willfully." *See generally United States v. Gregg*, 612 F.2d 43, 50-51 (2d Cir. 1979); *American Surety Company v. Sullivan*, 7 F.2d 605, 606 (2d Cir. 1925)(Hand, J.); *United States v. Peltz*, 433 F.2d 48, 54-55 (2d Cir. 1970),*cert. denied*, 401 U.S. 955 (1971) (involving 15 U.S.C. § 32(a). *See also* 1 E. Devitt, C. Blackmar, M. Wolff & K. O'Malley, *Federal Jury Practice and Instructions*, § 17.05 (1992).

[cited in JM 9-42.001]

‹ 909. False Statement                                    up                                    911. Materiality ›

# Page: 73

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:06:56 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:07:02 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:07:09 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:07:13 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:07:18 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:07:28 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:07:35 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:07:39 PM |



An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT OF JUSTICE This is archived content from the U.S. Department of Justice website. The information here may be
ARCHIVES outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any
questions about the archive site.

# 2171. JURY INSTRUCTION -- ELEMENTS OF 18 U.S.C. 1957

There are five elements to this offense that the government must prove:

FIRST, the defendant must knowingly engage or attempt to engage in a monetary transaction;

SECOND, the defendant must know that the transaction involved criminally derived property;

THIRD, the criminally derived property must be of a value greater than $10,000;

FOURTH, the criminally derived property must also, in fact, have been derived from a specified unlawful activity; and

FIFTH, the monetary transaction must have taken place [specify either]:

1. [in the United States [or, if applicable, the special maritime jurisdiction of the United States as defined in 18 U.S.C. § 7]]; or [outside the United States and the defendant is a U.S. person. You are instructed that the term "U.S. person" means [insert one of the six subsections of 18 U.S.C. § 3077(2), except for subsection (2)(D) which is expressly excluded by § 1957(d)(2)]].

In this case, it is alleged that the financial transaction took place in _____. I instruct you that this is within the [territory] of the United States.

Title 18, U.S.C. § 1957

Granted _____

Denied _____

‹ 2170. Jury Instruction -- 18 U.S.C. 1957              up              2172. Jury Instruction -- Monetary Transaction -- 18 U.S.C. 1957(f)(1) ›

*Updated January 17, 2020*

· Number: 1          Author: Devon          Subject: Highlight    Date: 6/14/2020 5:08:05 PM

6. Willful Blindness Instruction



## 2.15 ◆Willful Blindness◆ As a Way of Satisfying ◆Knowingly◆

In deciding whether [defendant] acted knowingly, you may infer that [defendant] had knowledge of a fact if you find that [he/she] deliberately closed [his/her] eyes to a fact that otherwise would have been obvious to [him/her]. In order to infer knowledge, you must find that two things have been established. First, that [defendant] was aware of a high probability of [the fact in question]. Second, that [defendant] consciously and deliberately avoided learning of that fact. That is to say, [defendant] willfully made [himself/herself] blind to that fact. It is entirely up to you to determine whether [he/she] deliberately closed [his/her] eyes to the fact and, if so, what inference, if any, should be drawn. However, it is important to bear in mind that mere negligence, or mistake in failing to learn the fact is not sufficient. There must be a deliberate effort to remain ignorant of the fact.

## Comment(s)

(1) This instruction is drawn from the instructions approved in <u>United States v. Gabriele</u>, 63 F.3d 61, 66 n.6 (1st Cir. 1995), and <u>United States v. Brandon</u>, 17 F.3d 409, 451-52 n.72 (1st Cir. 1994).

(2) The rule in the First Circuit is that:

[A] willful blindness instruction is warranted if (1) the defendant claims lack of knowledge; (2) the evidence would support an inference that the defendant consciously engaged in a course of deliberate ignorance; and (3) the proposed instruction, as a whole, could not lead the jury to conclude that an inference of knowledge was mandatory.

<u>Gabriele</u>, 63 F.3d at 66 (citing <u>Brandon</u>, 17 F.3d at 452, and <u>United States v. Richardson</u>, 14 F.3d 666, 671 (1st Cir. 1994)); <u>accord</u> <u>United States v. Coviello</u>, 225 F.3d 54, 70 (1st Cir. 2000); <u>United States v. Camuti</u>, 78 F.3d 738, 744 (1st Cir. 1996). ◆The danger of an improper willful blindness instruction is◆ the possibility that the jury will be led to employ a negligence standard and convict a defendant on the impermissible ground that he should have known [an illegal act] was taking place.◆◆ <u>Brandon</u>, 17 F.3d at 453 (quoting <u>United States v. Littlefield</u>, 840 F.2d 143, 148 n.3 (1st Cir. 1988)).

*Reasonably should have known is not knowingly or willfully blind.*

# Page: 76

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:08:25 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:08:30 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:08:33 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:08:37 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:08:45 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:08:52 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:08:58 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:06 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:01 PM |
| › Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:08 PM |
| › Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:16 PM |
| › Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:25 PM |
| › Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:20 PM |
| › Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:29 PM |
| › Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:30 PM |

# Jury Instructions - Deliberate Ignorance

**Favorable and Noteworthy Decisions in the Supreme Court and Federal Appellate Courts**

Garland, Samuel & Loeb
TRIAL ATTORNEYS

By **Don Samuel**
**Garland, Samuel & Loeb, P.C.**
Sep 1, 2015

*Global-Tech Appliances Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011)

In this patent case, the United States Supreme Court explained the concept of "willful blindness" in terms that should equally apply in criminal cases. Willful blindness is more than deliberate indifference to a known risk. Instead, willful blindness requires that the defendant (1) subjectively believed there was a high probability that a fact existed and (2) took deliberate actions or active efforts to avoid learning the fact. This is a higher standard than negligence and even recklessness.

*United States v. Macias*, 786 F.3d 1060 (7th Cir. 2015)

Even if a defendant is aware of facts that "pique" his interest and he then restricted his "natural curiosity," this is not enough to justify an instruction on deliberate ignorance after *Global-Tech*. In this case, Judge Posner wrote, "An ostrich instruction should not be given unless there is evidence that the defendant engaged in behavior that could reasonably be interpreted as having been intended to shield him from confirmation of his suspicious that he was involved in criminal activity."

*United States v. Esquenazi*, 752 F.3d 912 (11th Cir. 2014)

The trial court erred in providing a deliberate ignorance instruction to the jury in this case, though the error was harmless. There was no evidence of a purposeful contrivance to avoid learning the facts.

*United States v. Mathauda*, 740 F.3d 565 (11th Cir. 2014)

The Eleventh Circuit considered whether the theory of "deliberate ignorance" applied in applying an enhancement under the Sentencing Guidelines for violation of an administrative order. The Court accepted the holdings in other Circuits that the deliberate ignorance principle applied when either: (1) the defendant purposely contrived to avoid learning all the facts; or (2) the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact. Neither option applied in this case. There was no evidence to support a finding that the defendant purposely contrived to avoid learning the fact and he had no reason to be aware of a high probability that an administrative order had been entered previously.

*United States v Roussel*, 705 F.3d 184 (5th Cir. 2013)

# Page: 77

| | | | |
|---|---|---|---|
| ‚ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:54 PM |
| ‚ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:09:59 PM |
| ‚ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:02 PM |
| ‚ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:05 PM |
| ‚ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:12 PM |
| ‚ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:08 PM |
| ‚ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:14 PM |
| ‚ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:20 PM |
| ‚ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:25 PM |
| ‚ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:28 PM |
| ‚ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:32 PM |
| ‚ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:33 PM |

would establish his knowledge of fraud. Though he disguised various transactions, these were designed to hide his involvement in the fraud, not to avoid knowledge of it altogether. Harmless error.

*United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010)

A conscious avoidance instruction must include the concept that a jury may infer knowledge of the existence of a particular fact if the defendant is aware of a "high probability of its existence, unless the defendant actually believes that it does not exist." *See United States v. Feroz*, 848 F.2d 359 (2d Cir. 1988). The error in omitting these two components of the conscious avoidance instruction was plain error necessitating the reversal of the defendant's securities fraud conviction.

*United States v. Ciesiolka*, 614 F.3d 347 (7th Cir. 2010)

A deliberate ignorance instruction in a child-enticement prosecution was reversible error. The defendant was chatting with an undercover police officer. The officer said that she was 13 years old. But when asked what her interests were, the officer responded, Perdue University and beer. Then, when asked to send a photo, the officer twice sent a photo of a twenty year old woman. The Seventh Circuit opinion questions why, in a sting operation, the police would send a photo of a twenty year old, and then claim that the defendant remained deliberately ignorant of the girl's age. The instruction suggested that the defendant's negligent misunderstanding of the girl's age was sufficient to support an enticement of a minor conviction. The instruction is only appropriate when the defendant claims a lack of knowledge and there is evidence suggesting that he deliberately avoided the truth. Here, the defendant did not take deliberate steps to avoid learning the truth.

*United States v. Alston-Graves*, 435 F.3d 331 (D.C. Cir. 2006)

In a lengthy opinion that traces the development of the deliberate ignorance jury instructions in various Circuits, the D.C. Circuit apparently held that a deliberate ignorance instruction should not be given where the proof at trial demonstrates actual knowledge. Though the opinion ultimately holds that it was harmless error to instruct the jury on the principle of deliberate ignorance, the D.C. Circuit also held that the instruction should generally be reserved for cases in which there is proof of an affirmative effort to remain ignorant in order to have a defense at trial.

*United States v. Carrillo*, 435 F.3d 767 (7th Cir. 2006)

While approving the use of a deliberate ignorance instruction in this case (drugs in car that the defendant was driving), the court cautioned that the prosecutor should not have argued to the jury that deliberate ignorance is somehow equivalent to "what a reasonable person would have known." That formulation of the rule comes close to a negligence standard. The proper focus is not on what a reasonable person would have known, but on what this defendant did know, and what this defendant deliberately avoided learning.

*United States v. Heredia*, 429 F.3d 820 (9th Cir. 2005)

The trial court erred in instructing the jury on deliberate ignorance. The Ninth Circuit concluded that the government offered insufficient evidence that the defendant deliberately avoided investigating her suspicions in order to provide herself with a defense in the event of prosecution. The Ninth Circuit also held that

# Page: 78

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:44 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:10:53 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:04 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:13 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:20 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:23 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:33 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:29 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:34 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:41 PM |
| · Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:44 PM |
| · Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:47 PM |
| · Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:53 PM |
| · Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:11:57 PM |
| · Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:12:01 PM |
| · Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:12:03 PM |

suspicion had formed. In this case, once it became apparent to the defendant that her passengers were carrying drugs in the car, it was too late for her to do anything about it. DECISION REVERSED. 483 F.3d 913. THE EN BANC COURT CONCLUDED THAT A DELIBERATE IGNORANCE INSTRUCTION MAY BE GIVEN, EVEN IN THE ABSENCE OF PROOF THAT THE DEFENDANT REMAINED IGNORANT FOR THE EXPRESS PURPOSE OF PRESERVING HIS ABILITY TO CLAIM LACK OF KNOWLEDGE AT TRIAL.

*United States v. Mendoza-Medina*, 346 F.3d 121 (5th Cir. 2003)

Though it was harmless error, the trial court should not have given a deliberate ignorance instruction in this case. Where the jury is asked to decide simply between two versions of the facts: one in which defendant had actual knowledge; the other in which the defendant was no more than negligent or stupid, the deliberate ignorance instruction is inappropriate. To justify the instruction, the evidence must establish (1) that defendant was actually aware of a high probability of the existence of the illegal conduct; *and* (2) that he purposely contrived to avoid learning of the illegal conduct. In short, there must be proof that the defendant *consciously* attempted to escape confirmation of the conditions or event that he strongly suspected to exist.

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000)

The trial court erred in giving a conscious avoidance jury instruction in this case, but the error was harmless. The predicates for such an instruction are (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction; and (2) the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact. It is not enough only to show that the actual context should have apprised the defendant of the unlawful nature of his conduct. In this case, there was no suggestion that the defendant consciously avoided learning of the fraudulent loans that were at the center of his prosecution.

*United States v. Sicignano*, 78 F.3d 69 (2d Cir. 1996)

The defendant was the go-between delivering money to a narcotics supplier, and returning with drugs to an undercover agent. He claimed that he did not know what was in the bag he delivered in either direction. The trial court's deliberate ignorance instruction was flawed, because it failed to explain that if the defendant actually believed the bag did not contain drugs, then he could not be charged with knowledge of its contents. That is, if the defendant affirmatively believes that he is committing a crime, he cannot be found to have knowingly committed the crime. It is only when the defendant consciously remains ignorant of some fact (i.e., "Don't tell me what is in the bag") that he can be found to have deliberately remained ignorant.

*United States v. Adeniji*, 31 F.3d 58 (2d Cir. 1994)

The trial court erroneously instructed the jury that the element of knowledge may be found to be present if the evidence established that the defendant deliberately closed his eyes to what would otherwise have been obvious. The defendant testified,

# Page: 79

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:12:13 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:12:34 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:12:39 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:12:43 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:12:48 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:12:52 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:05 PM |
| ‹ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:01 PM |
| ‹ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:12 PM |
| ‹ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:21 PM |
| ‹ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:29 PM |
| ‹ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:32 PM |
| ‹ Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:35 PM |
| ‹ Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:39 PM |
| ‹ Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:41 PM |
| ‹ Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:43 PM |
| ‹ Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:46 PM |

This did not raise the issue of conscious avoidance. Harmless error.

*United States v. Soto-Silva*, 129 F.3d 340 (5th Cir. 1997)

It was reversible error in this case to give a deliberate ignorance instruction in connection with the offense of maintaining premises for the purpose of distributing marijuana. The court held that as a matter of law, this instruction should never be given in a prosecution under 21 U.S.C. §856(a)(1).

*United States v. Ojebode*, 957 F.2d 1218 (5th Cir. 1992)

Defendant was detained at the Houston Airport after a plane in which he was traveling from Germany to Mexico made a brief stop there. He was found to be in possession of heroin. He defended a charge of importation on the basis that he never intended to import the heroin into the United States. Though the evidence was sufficient to support the conviction, the failure to charge the jury that the defendant had to specifically intend to bring the contraband into the United States was reversible error. Moreover, it was error to instruct the jury that knowledge of the plane's flight schedule could be found if the defendant remained deliberately ignorant. There was no basis in the record for this deliberate ignorance instruction.

*United States v. Giovannetti*, 919 F.2d 1223 (7th Cir. 1990)

The defendant owned a lot with two houses on it. An undercover informant asked him if he could rent one of the houses. The house was then used as a "wire house" – a gambling house. The trial court improperly gave an "ostrich" instruction. The problem with the instruction is that it has a tendency to allow juries to convict upon a finding of negligence for crimes that require intent. The instruction is designed for cases in which there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealing, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings. A deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires. When the facts require the jury to make a "binary choice" between "actual knowledge" and "complete innocence," the ostrich instruction should not be given. The error was grounds to reverse the conviction.

*United States v. Barnhart*, 979 F.2d 647 (8th Cir. 1992)

If the evidence demonstrates only that the defendant either possessed or lacked actual knowledge of the facts in question – and did not also demonstrate some deliberate efforts on his part to avoid obtaining actual knowledge – a willful blindness instruction should not be given. The instruction should not be given unless there is evidence to support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution. In this bank fraud prosecution, the error in giving the instruction was reversible error.

*United States v. White*, 794 F.2d 367 (8th Cir. 1986)

Though considered to be harmless error in this case, the Eighth Circuit holds that it was error to give a "conscious avoidance" instruction in light of the absence of any evidence that the defendant made a conscious effort to avoid learning of the

# Page: 80

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:13:59 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:04 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:07 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:11 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:15 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:20 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:24 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:30 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:27 PM |
| › Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:34 PM |
| › Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:37 PM |
| › Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:46 PM |
| › Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:50 PM |
| › Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:14:54 PM |
| › Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:15:21 PM |
| › Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:15:25 PM |
| › Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:15:36 PM |
| › Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:15:41 PM |
| › Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:15:45 PM |
| › Number: 20 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:15:48 PM |
| › Number: 21 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:15:52 PM |
| › Number: 22 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:15:56 PM |

the error was harmless.

## United States v. Baron, 94 F.3d 1312 (9th Cir. 1996)

The trial court committed plain error in giving a deliberate ignorance instruction to the jury. There was no evidence that the defendant took steps to remain deliberately ignorant of the presence of drugs in his car. This decision may not have survived the later Ninth Circuit holding in *United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007), noted above.

## United States v. Aguilar, 80 F.3d 329 (9th Cir. 1996)

On remand from the Supreme Court, the issue is whether the trial court erred in instructing the jury on the element of knowledge in this prosecution of a federal judge for disclosing the existence of a wiretap in violation of 18 U.S.C. §2232(c). The trial court instructed the jury that "knowledge" could be found if the defendant had actual knowledge of the existence of the wiretap, or if he was aware of a high probability of the existence of a wiretap. This was erroneous. The latter alternative, "awareness of a high probability," does not equate with actual knowledge unless there is evidence of *willful* blindness, that is, *deliberate* ignorance. Even irrational, negligent ignorance is not sufficient.

## United States v. Mapelli, 971 F.2d 284 (9th Cir. 1992)

Where the evidence points to actual knowledge, there is no reason to give a deliberate ignorance instruction. It was reversible error to instruct the jury on this principle in this case. Here, either the defendant had knowledge or she did not. If she did not, then she was not guilty. There was no evidence of conduct designed to avoid acquiring confirmation of a fact which was "all but known."

## United States v. Sanchez-Robles, 927 F.2d 1070 (9th Cir. 1991)

The defendant was riding in a van which reeked of the odor of marijuana. The trial court should not have given a deliberate ignorance instruction. The evidence of the odor pointed either directly or circumstantially only to actual knowledge of illegality, not deliberate ignorance. If the defendant recognized the smell, then she knew of the illegal contraband. If she did not recognize the smell, then she would have no reason to be suspicious. In other words, either she had actual knowledge, or she had no knowledge. There was no evidence of conscious avoidance.

## United States v. Alvarado, 817 F.2d 580 (9th Cir. 1987)

The Ninth Circuit sets forth the rules for the giving of a deliberate ignorance instruction. The court cautions that it is a rare case where a deliberate ignorance instruction is appropriate. Here, the evidence established that the defendant had actual knowledge of the presence of cocaine in the suitcase. It was error to instruct the jury on the deliberate ignorance theory. Such an instruction is appropriate only where proof indicates that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all the facts in order to have a defense in the event of prosecution. This is a far cry from a standard of negligence. See also 838 F.2d 311. Note that the later decision in *Heredia* – the Ninth Circuit *en banc* decision – questioned the holding in this case and limited the Ninth Circuit's jurisprudence of deliberate ignorance.

## United States v. Hilliard, 31 F.3d 1509 (10th Cir. 1994)

# Page: 81

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:16:05 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:16:13 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:16:32 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:16:39 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:16:44 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:16:49 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:17:02 PM |
| ‹ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:16:51 PM |
| ‹ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:17:13 PM |
| ‹ Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:17:21 PM |
| ‹ Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:17:38 PM |
| ‹ Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:17:44 PM |
| ‹ Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:17:49 PM |
| ‹ Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:17:52 PM |
| ‹ Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:18:12 PM |

Here, the defendant was shown to be aware of an agency's civil regulatory position with regard to certain transactions, but disputed that interpretation. He was prosecuted for tax violations based on these same transactions. There was no evidence, however, that he intentionally remained ignorant of the tax laws, however. In order to justify a deliberate ignorance instruction, the government must prove that the defendant intentionally remained ignorant of a fact, not a law.

*United States v. Barbee*, 968 F.2d 1026 (10th Cir. 1992)

A deliberate ignorance instruction does not authorize a conviction of one who in fact does not have guilty knowledge. The deliberate ignorance instruction, however, is rarely appropriate because it is a rare occasion when the prosecution can present evidence that the defendant deliberately avoided knowledge. The deliberate ignorance instruction should be given only when evidence has been presented showing the defendant purposely contrived to avoid learning the truth. The defendant must deny knowledge and must engage in conduct which includes deliberate acts to avoid actual knowledge of the operant fact.

*United States v. de Francisco-Lopez*, 939 F.2d 1405 (10th Cir. 1991)

Deliberate ignorance and actual knowledge are mutually exclusive. In order to justify an instruction on the law of deliberate ignorance, therefore, there must be some evidence of deliberate ignorance other than the proof of actual knowledge – that is, there must be proof of a deliberate attempt to remain ignorant.

*United States v. Rivera*, 944 F.2d 1563 (11th Cir. 1991)

A deliberate ignorance instruction should not be given in every case in which a defendant claims a lack of knowledge, but only in those comparatively rare cases where there are facts that point in the direction of deliberate ignorance. The instruction is only warranted when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution. The trial court erred in giving the instruction in this case. Either the defendant knew that she was carrying contraband across the border, or she did not. There was no evidence that she consciously avoided acquiring the knowledge. There was no evidence, for example, that the defendant came into possession of the suitcase under suspicious circumstances. Harmless error.

Read on gsllaw.com

---

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Pricing

Switch

Big firm

Coverage

SmartCite

Public records

Partnerships and Resources

About us

Jobs

Blog

Podcast

News

Twitter

Facebook

# Page: 82

› Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:18:20 PM

› Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:18:24 PM

› Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:18:28 PM

› Number: 4     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:18:31 PM

› Number: 5     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:19:13 PM

› Number: 6     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:19:35 PM

› Number: 7     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:19:43 PM

› Number: 8     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:19:50 PM

› Number: 9     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:19:57 PM

› Number: 10     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:20:04 PM

› Number: 11     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:20:41 PM

› Number: 12     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:20:52 PM

› Number: 13     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:20:46 PM

› Number: 14     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:21:04 PM

7. Email of Suspected Discovery of Fraud – Ameera Ali (biller)

To: Devon Rambert-Hairston <d_rambert@hotmail.com>
Subject: Re: SHG Consultant

I don't bill with you on SHG. They do not have any NC tracks billing at all. They are with Cardinal MCO and you never completed the paperwork to be added to them.

Verily the life of the believer is good.

Ameera Ali

On Feb 24, 2017, at 6:24 AM, Devon Rambert-Hairston <d_rambert@hotmail.com> wrote:

Hi,

How do you bill with my name as the provider each week?

-------- Original message --------
From: Ameera Ali <ameera1us@yahoo.com>
Date: 2/23/17 9:20 PM (GMT-05:00)
To: Devon Rambert-Hairston <d_rambert@hotmail.com>
Subject: Re: SHG Consultant

Hi Devon

I never added you. Did you get notification that you are added on there group?

Verily the life of the believer is good.

Ameera Ali

> On Feb 24, 2017, at 4:49 AM, Devon Rambert-Hairston <d_rambert@hotmail.com> wrote:
>
> Hi Ameera,
>
> Can you remove my information from NC Tracks for SHG Consultants? I am no longer the provider for the company.
>
> Thank you,
>
> Devon
>
>

# Page: 84

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:21:39 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:21:50 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:21:54 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:22:25 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:22:14 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:22:30 PM |

CONFIDENTIALITY: The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

On Friday, February 24, 2017 6:53 AM, Devon Rambert-Hairston <d_rambert@hotmail.com> wrote:

Ok. Thank you. There shouldn't be anymore billing then. Thanks for clearing this up for me.

-------- Original message --------
From: Ameera Ali <ameera1us@yahoo.com>
Date: 2/23/17 9:51 PM (GMT-05:00)
To: Devon Rambert-Hairston <d_rambert@hotmail.com>
Subject: Re: SHG Consultant

I was instructed to submit claims with you as the rendering provider for you and Tony's project only under your own log in via NCTracks. We have not billed since January under your NCtracks for Tony's project. You can actually log in to NCtracks and see the remittance advice (explanation of benefits) under messages.

*Ameera Ali*
*CEO/Owner/Business Consultant*
*Accuracy Billing Agency, LLC*
*www.medicalbillingagency.net*
*Telehealth Counseling & Solutions, Inc*
*Cell: 678-793-1383*
*Fax: 888-855-5453*
*Email: ameera1us@yahoo.com*

CONFIDENTIALITY: The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

On Friday, February 24, 2017 6:39 AM, Devon Rambert-Hairston <d_rambert@hotmail.com> wrote:

I am confused. So, how do I get billed for patients with NC Tracks weekly? What company is it billed under? Or, just am I just the name that gets billed weekly for Tony's therapist?

-------- Original message --------
From: Ameera Ali <ameera1us@yahoo.com>
Date: 2/23/17 9:36 PM (GMT-05:00)

# Page: 85

| | | | |
|---|---|---|---|
| ⟩ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:23:25 PM |
| ⟩ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:23:40 PM |
| ⟩ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:23:36 PM |
| ⟩ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:23:47 PM |
| ⟩ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:24:10 PM |
| ⟩ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:23:59 PM |
| ⟩ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:24:06 PM |
| ⟩ Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:24:15 PM |
| ⟩ Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:24:39 PM |

## Fw: SHG Consultant

Ameera Ali <ameera1us@yahoo.com>
Thu 2/23/2017 10:20 PM
To: Devon Rambert-Hairston <d_rambert@hotmail.com>

You welcome :)

*Ameera Ali*
*CEO/Owner/Business Consultant*
*Accuracy Billing Agency, LLC*
*www.medicalbillingagency.net*
*Telehealth Counseling & Solutions, Inc*
*Cell: 678-793-1383*
*Fax: 888-855-5453*
*Email: ameera1us@yahoo.com*

CONFIDENTIALITY: The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

On Friday, February 24, 2017 7:13 AM, Devon Rambert-Hairston <d_rambert@hotmail.com> wrote:

Thank you for everything and all of your hardwork Ameera! Take care as well!!!

-------- Original message --------
From: Ameera Ali <ameera1us@yahoo.com>
Date: 2/23/17 9:56 PM (GMT-05:00)
To: Devon Rambert-Hairston <d_rambert@hotmail.com>
Subject: Re: SHG Consultant

No problem at all Devon if you need me just let me know :)

Take Care

*Ameera Ali*
*CEO/Owner/Business Consultant*
*Accuracy Billing Agency, LLC*
*www.medicalbillingagency.net*
*Telehealth Counseling & Solutions, Inc*
*Cell: 678-793-1383*
*Fax: 888-855-5453*
*Email: ameera1us@yahoo.com*

8. Email from Melissa Owen (attorney); Robert Heroy (attorney for second opinion)

I am putting you in touch with Attorney Rob Heroy who may be able and willing to review your Federal plea arrangement. Please follow up with Rob directly.

Rob,

Devon is a current Client who we represent in a civil defamation matter. She is currently represented by Missy Owens relating to a Federal Felony charge and is looking for a second opinion for her peace of mind.

Respectfully,

Corey V. Parton
Parton & Associates, PLLC
122 N. McDowell Street
Charlotte, NC 28204
Main: (704) 376-4488
Direct: (704) 295-6401
Fax: (704) 731-0904
Alt. Fax: (704) 945-8644
E-mail: Parton@PartonNC.com
www.PartonNC.com



[Quoted text hidden]
[Quoted text hidden]



image002.jpg
7K

---

**Rob Heroy** <rheroy@goodmancarr.net>
To: Devon Rambert-Hairston <devonrambert@gmail.com>

Tue, Sep 10, 2019 at 11:59 AM

Devon—

I am happy to discuss with you, but there are a couple things that are important to point out as an initial matter.

> You are not going to get better legal advice than the advice you have gotten. Missy is sharp and extremely well respected by the judges and the prosecution; and

2. you try to withdraw your plea agreement with Judge Conrad, he is going to punish you. Harshly.



# Page: 88

› Number: 1     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:25:15 PM

› Number: 2     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:25:41 PM

› Number: 3     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:25:45 PM

› Number: 4     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:25:25 PM

That being said, I'm around for the next 2-3 hours if you want to call at 704.372.2770.

[Quoted text hidden]

Charlotte, NC 28204
Main: (704) 376-4488
Direct: (704) 295-6401
Fax: (704) 731-0904
Alt. Fax: (704) 945-8644
E-mail: Parton@PartonNC.com
www.PartonNC.com



[Quoted text hidden]
[Quoted text hidden]

---

**Devon Rambert-Hairston** <devonrambert@gmail.com>                    Mon, Sep 9, 2019 at 9:55 PM
To: Corey Parton <parton@partonnc.com>

It would help me have a piece of mind. However, I was told that many attorneys will not even look at the case due to me signing a plea agreement.
[Quoted text hidden]

**4 attachments**


**image002.jpg**
7K


**image003.jpg**
64K


**image001.jpg**
64K


**image004.jpg**
7K

---

**Corey Parton** <parton@partonnc.com>                                Tue, Sep 10, 2019 at 10:12 AM
To: Rob Heroy <rheroy@goodmancarr.net>, Devon Rambert-Hairston <devonrambert@gmail.com>

Devon,

 Gmail

Devon Rambert-Hairston <devonrambert@gmail.com>

## Letter of Apology

7 messages

---

**Devon Rambert-Hairston** <devonrambert@gmail.com>        Wed, Jan 8, 2020 at 10:41 AM
To: Missy Owen <cmowen@tinfulton.com>

Judge Concord,

I stand before you today shameful, remorseful, and full of guilt from the circumstances that brought me in this courtroom. Ignorant to the law, I made a stupid decision not to check sources before I acted. I am a great healthcare provider that loves her patients whom made a grave decision that has affected me for the rest of my life. I devoted my life into helping and trusting others, believing that others will provide me the same respect and kindness. Some people just don't possess good intentions. I have beat myself up everyday in not asking questions and seeing that something was wrong with this company. I have learned some valuable lessons in how to say no, to ask questions, and understand that you cannot help everybody. I have suffered greatly from this adversity. This one mistake has cost me my career in the Armed Forces, friends, ridicule from others, trust from some the patients that are aware of this crime, and respect from the public. I apologize for my part in this crime and dearly hope that you will have mercy on my case. Thank you.

---

**Missy Owen** <cmowen@tinfulton.com>        Wed, Jan 8, 2020 at 10:58 PM
To: Devon Rambert-Hairston <devonrambert@gmail.com>

Let's discuss. I do not think the Court will react well to this.

I will send you by separate email the memo I filed on your behalf as well as the letters and attachments so you understand what information has been submitted to the Court.

If you want to maintain the posture of: I didn't ask enough questions, the Judge will remove the reduction for acceptance of responsibility and decline a reduction for cooperation. You will go to jail. Probably for a few years.

Not asking questions isn't a crime. It isn't. This isn't about trusting the wrong people, Devon. Trusting the wrong people, not a crime. This is about giving Tony and Jerry your provider number so Medicaid could be billed for patients and services that weren't being performed. You didn't know services weren't being performed but you weren't performing any. The only provider you had any knowledge of was John Bradshaw and you were the Clinic director. The money went into your account and you disbursed it to Tony and Jerry. And you had to know John Bradshaw couldn't bill those kind of hours.

I am free much of tomorrow afternoon and I would like to talk this through because this can either go very smoothly or it can be a total disaster. I have spent the last 48 hours totally immersed in your life and this case. You are an incredible woman. You have accomplished so very much through true sacrifice and hard work. I have no doubt you are a wonderful person. But this conduct was a real aberration from every other day of your life. I don't know why you did it, I don't think you know why. But you can't run away from it. The more you try the harder you will be hit, and I don't think you deserve that.

If you can't accept responsibility in front of your pastor or relatives, then don't bring them. Because the Judge won't change your sentence because friends showed up. It helps to have them, but the things that will matter to the Court, likely in this order are:
1. How helpful you were to the Government (Which means that you truly accept that you committed this crime).
2. whether you have done other bad things.
3. What good things you have done.

Let's try to catch up tomorrow and decide where you are on this. Okay?

I say this sternly but truly with much love. I desperately want you to get the lightest sentence possible because I know how much you have suffered. I know this is hard.

I look forward to talking.

# Page: 91

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:26:18 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:26:40 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:26:44 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:26:51 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:27:01 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:27:25 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:27:28 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:27:32 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:27:38 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:27:51 PM |

Missy

C. Melissa Owen
TIN FULTON WALKER AND OWEN
301 East Park Avenue
Charlotte, NC 28203
704-338-1220

> On Jan 8, 2020, at 10:41 AM, Devon Rambert-Hairston <devonrambert@gmail.com> wrote:
>
>
[Quoted text hidden]

---

**Devon Rambert-Hairston** <devonrambert@gmail.com>                     Thu, Jan 9, 2020 at 10:31 AM
To: Missy Owen <cmowen@tinfulton.com>

At this point, I dont' feel that it will be a good idea to speak this week. I am on the verge of a breaking point and I do not know what I might do or say as of now. There is a lot that I want to say in relation to our interactions and my case. But, for the sake of my sanity and trying to finish seeing patients, preparing for the license to being revoke, and informing my patients of the outcome next week, it is best to keep me at the peace I have left. I am fed up with you telling me YOUR version of what you think happened and what I knew. At times I feel that you want me to lose everything. So, I am going try to continue to believe that you have my best interest and to trust that you have done your all. Also, I still have my practice.
[Quoted text hidden]

---

**Missy Owen** <cmowen@tinfulton.com>                                   Thu, Jan 9, 2020 at 10:36 AM
To: Devon Rambert-Hairston <devonrambert@gmail.com>

Let's talk this afternoon

C. Melissa Owen
TIN FULTON WALKER AND OWEN
301 East Park Avenue
Charlotte, NC 28203
704-338-1220


On Jan 9, 2020, at 10:32 AM, Devon Rambert-Hairston <devonrambert@gmail.com> wrote:



[Quoted text hidden]

---

**Devon Rambert-Hairston** <devonrambert@gmail.com>                     Thu, Jan 9, 2020 at 2:54 PM
To: Will Hairston <whairston1982@hotmail.com>

[Quoted text hidden]

---

**Devon Rambert-Hairston** <devonrambert@gmail.com>                     Thu, Jan 9, 2020 at 2:56 PM
To: Will Hairston <whairston1982@hotmail.com>

[Quoted text hidden]

---

**Devon Rambert-Hairston** <devonrambert@gmail.com>                     Mon, Feb 24, 2020 at 1:57 PM
To: resq90@hotmail.com


On Wed, Jan 8, 2020 at 10:58 PM Missy Owen <cmowen@tinfulton.com> wrote:
[Quoted text hidden]

# Page: 92

Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:28:21 PM

Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:28:32 PM

 Gmail                                    **Devon Rambert-Hairston <devonrambert@gmail.com>**

## Previous Communication
5 messages

**Devon Rambert-Hairston <devonrambert@gmail.com>**                    Mon, Jan 13, 2020 at 2:32 PM
To: Missy Owen <cmowen@tinfulton.com>

I had a lot of time to think about our last phone conversation this past weekend. I so regret and apologize in letting you
see the vulnerable side of me in regards to my adversity. In knowing that we are at the near end of my case and the
report has been submitted to the court, I am so glad that you sent that email to me. This will definitely be my last time
expressing my frustration or justifying my actions to you. I can definitely see how everything occurred the way it did. It is
very true that if you want to know how someone is feeling, get them upset.
You feel that you did a wonderful job on my case because you represented me in the eyes of condemnation and
judgement. I now understand how you have justified every negative event that I have suffered through. You saw what you
wanted to see from a criminal standpoint instead of belief that a person (whom never been in any criminal situation) could
actually feel that they were doing something legitimate to help another person who ask for assistance. All you can see is
what good of job that you have done for me instead of looking at the circumstances of the crime. I definitely can hear you
say...Well, Devon let's look at the chain of events! And yes, I am not disagreeing that I did something wrong but, there is a
definitely a question did I intend to do it not knowing that these people were committing fraud. And honestly, having a
provider as a billing provider to bill insurance (especially in the field of chiropractor) is fairly common in the healthcare
industry. Many are not actually in the clinic, just affiliated. There are several clinics and organizations that I can name just
in the Charlotte area. And, the more I tried to explain all of this to you, the more you blew me off feeling that I some idea
what was going on at TBH? Because, your job is mostly to get the best sentence possible of someone that has committed
a crime. But, how can you empathize with someone if you can't relate?
I am the most difficult person that you represented because my case was unique. You couldn't understand that a secret
security clearance will immediately alarm the authorities of a potential threat if that person got involve in any crime. You
couldn't understand that a military officer couldn't have a felony record. You couldn't understand that a medical
professional couldn't be looked at or appear to be fraudulent. You couldn't understand how that this will cause a long-term
or permanent effect on someone that built there character on sacrifice, dedication, love, and spiritual hope for others. You
couldn't understand that a person whom trusted others was deceived and used would have a hard time believing or
trusting another person to help them or have their best interest. It makes you feel good to think that you done everything
you can do for your clients because of what something appears to be in your eyes. And, that was and still is your biggest
focus. I really experienced first hand how someone can easily get caught up in the criminal system and now understand
why so many people plead guilty as they are convinced by their attorneys that this is the only or best option for a good
outcome the attorney feel they deserve. They have already been judged and convicted with their attorneys before even
reaching court. Honestly, after everything, I don't fault you and I believe everything happens for a reason because you
were just doing your job. I have faced everything in my life head on and suffered or experienced a lot of challenges inspite
of what you already know about me. But, I will not be labeled or feel guilty anymore from you or anyone else of what
"appears to be." My character and my work for others has spoken for itself of the impact that I brought to so many
nationwide (literally).

**Missy Owen <cmowen@tinfulton.com>**                              Mon, Jan 13, 2020 at 4:01 PM
To: Devon Rambert-Hairston <devonrambert@gmail.com>

I am not sure I understand what you are saying? Are you retaining new counsel?

C. Melissa Owen
TIN FULTON WALKER AND OWEN
301 East Park Avenue
Charlotte, NC 28203
704-338-1220

> On Jan 13, 2020, at 2:32 PM, Devon Rambert-Hairston <devonrambert@gmail.com> wrote:
>
>
[Quoted text hidden]

# Page: 93

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:31:49 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:32:02 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:31:53 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:32:13 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:32:19 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:32:42 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:32:51 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:33:06 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:33:10 PM |

**Devon Rambert-Hairston** <devonrambert@gmail.com>                          Mon, Jan 13, 2020 at 6:12 PM
To: Missy Owen <cmowen@tinfulton.com>

I just regret showing my vulnerability to you and not really understanding what I was really up against in regards to this case.
[Quoted text hidden]

---

**Missy Owen** <cmowen@tinfulton.com>                                        Mon, Jan 13, 2020 at 6:21 PM
To: Devon Rambert-Hairston <devonrambert@gmail.com>

Okay. Thank you for letting me know how you feel.

The Government will likely be reaching out to meet with you again in the next few weeks, unless their trial either settles or is continued again. I am happy to meet with you in advance to prepare you for what to expect in that meeting. The meeting with them will likely take several hours. I will keep you advised on when they would like to meet. Just let me know if you wish to meet in advance.

[Quoted text hidden]

---

**Devon Rambert-Hairston** <devonrambert@gmail.com>                          Mon, Jan 13, 2020 at 6:36 PM
To: Missy Owen <cmowen@tinfulton.com>

We can meet to prepare for the meeting. Just let me know when they are interested in meeting and I can adjust my schedule to meet with you prior to.
[Quoted text hidden]

9. Text Messages (Melissa Owen)



**1/3/20 4:02 PM**

Yes- that works. And I have not heard back from the AUSA on the press release. I will follow up with him.

**1/3/20 4:51 PM**

Ok

**1/7/20 6:43 PM**

What was your highest rank in the military

Rank: Major. Do you have my last performance report I emailed?

**1/10/20 3:25 PM**

At the Government's request, the Court has continued your sentencing date. No new date has been set. The Government will likely
want to interview you prior to the

Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:33:38 PM


**12/30/19 12:57 PM**

I will give you a call at this number at 1:10

**12/30/19 1:06 PM**

Ok

I am ready now if you are?

**1/3/20 1:44 PM**

Hi. Is 4pm Tuesday, January 7th good to meet? Also, did they ever provide information on removing the incorrect statement on <u>justice.gov</u> that I admitted to falsifying documents for TBHC?



**1/3/20 4:02 PM**

Yes- that works. And I have not heard back from the AUSA on the press

   

· Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:34:06 PM

11/21/19 10:10 AM

Thanks- just requested correction.[1]

11/21/19 10:44 AM

Thank you!

12/9/19 4:35 PM

Hi. Sorry to bother you but, do you know the status of the correction on the justice.gov website? [2]

12/9/19 5:16 PM

I will follow up with the new AUSA-we recently met about your case. He was unaware of this issue as he is just getting a grasp of where things stand. I will follow up. [3]

12/9/19 5:56 PM

Oh thanks

# Page: 98

| Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:34:21 PM |

| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:34:29 PM |

| Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:34:33 PM |

Do you have the exact link. I don't see this on their site.

Leader Of $6.1 Million Medicaid Fraud Scheme Pleads Guilty To Federal Charges | USAO-WDNC | Department of Justice  https://www.justice.gov/usao-wdnc/pr/leader-61-million-medicaid-fraud-scheme-pleads-guilty-federal-charges

11/21/19 10:10 AM

Thanks- just requested correction

11/21/19 10:44 AM

Thank you!

12/9/19 4:35 PM

Hi. Sorry to bother you but, do you

  

Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:34:47 PM

Number: 2    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:34:52 PM

Ok. Thanks

**11/21/19 8:52 AM**



Devon Rambert-Hairston, 41, of Huntersville,
N.C. and a licensed as a nurse practitioner,
previously admitted to falsifying patient
records used by Tony Taylor and Jerry Taylor to
submit fraudulent reimbursement claims to
Medicaid. Rambert-Hairston pleaded guilty to
money laundering conspiracy on April 16, 2019,
and is currently awaiting sentencing.

Good morning. This was
sent to me from Tony's case
online from the Western
District justice.gov website.
I didn't admit to falsefying
records.

**11/21/19 9:59 AM**

. I will ask them to correct this.

Do you have the exact link. I don't

  　　　　　

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:35:04 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:35:06 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:35:12 PM |

9/5/19 1:45 PM

Hi. I was informed by my commander that JAG pushed to the General that I should be dismissed from service. I was relieved of my military duties. An officer cannot have a felony record. I will be informed of my separation date soon.

Thank you for letting me know. I am sorry for how difficult I know this must be on you.

9/17/19 11:34 AM

Hi. I am not sure if I suppose to contact you about this but, I had two providers reached out to me regarding potential fraudulent activity with one of the individuals that you warned me to stop working with.

· Number: 1  Author: Devon  Subject: Highlight  Date: 6/14/2020 5:35:23 PM

· Number: 2  Author: Devon  Subject: Highlight  Date: 6/14/2020 5:35:38 PM



5/15/19 12:57 PM

I just wanted to let you know that I had a patient called my office arguing with my secretary stating I am a fraud and I am going to jail because he Googled my name and the retraction came up with the other link. Some patients canceled their appts.

I am sorry. I know the collateral effect of your plea is both painful and difficult. I am happy to discuss if you like.

There's no need

I would like to talk with you. The probation officer needs to adjust the






> Number: 1  Author: Devon  Subject: Highlight  Date: 6/14/2020 5:35:53 PM

> Number: 2  Author: Devon  Subject: Highlight  Date: 6/14/2020 5:35:57 PM



**4/18/19 2:04 PM**

Would they like a copy of the bill of information?

I gave them the plea agreement and documents regarding supervision. Security forces got a red flag that healthcare fraud came up in the news that raised alot of eyebrows.

The bed to make these determinations based on the actual offense, not on how a news story spins this. Please let me know if you believe me speaking with your commander or anyone else will help.

Ok. I will reach out to him. Thank

**4/18/19 2:30 PM**

   

Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:36:10 PM


**4/16/19 6:48 PM**

https://www.wsoctv.com/news/local/local-nurse-pleads-guilty-in-multimillion-dollar-medicaid-fraud-scheme/940654184

**4/18/19 1:18 PM**

I just got a call from the military stating its healthcare fraud from the news report and they are thinking of discharging me.

**4/18/19 2:04 PM**

Would they like a copy of the bill of information?

I gave them the plea agreement and documents regarding supervision. Security forces got a red flag that healthcare fraud came up in the news


from legitimate services and that she knew the services were not provided.

**Fewer Than Average Patients**

As a nurse practitioner, Rambert-Hairston could perform many of the same services as a physician, including diagnosing illnesses and prescribing medication. While she certainly appeared busy according to her claims, her 2015 Medicare reimbursements were well below average.

That year, she reported only 54 Medicare

M   https://www.medicaidfraudhotline.com › ...

North Carolina Man Faces Up to 15 Years for Medicaid Fraud

Jun 21, 2019 · Taylor conspired with Devon Rambert-Hairston, a Monroe nurse practitioner, who pleaded guilty in April to money ...



You visited this page on 9/25/19.

📞    (888) 742-7248

**9/26/19 10:52 AM**

Would you like for me to withdraw?  I can file a motion.

**9/26/19 11:42 AM**

   

Number: 1          Author: Devon          Subject: Highlight     Date: 6/14/2020 5:36:36 PM

Number: 2          Author: Devon          Subject: Highlight     Date: 6/14/2020 5:36:38 PM



**9/26/19 11:42 AM**

Please let me know as soon as you can. It will be in your best interest to get new counsel in place sooner rather than later. I think we have had this conversation enough times to be certain that you do not trust the advice I have given or will continue as we proceed. You need to have counsel you can trust. You can hire new counsel or if you qualify, the court can appoint counsel. There are many good attorneys who handle these matters that I am happy to recommend. Please confirm that you would like for me to file this motion. If you have identified new counsel, they can substitute my appearance. I am happy to share with them any and all information to make the

Ok. See you then.

**6/7/18 4:52 PM**

Tony sent me a bogus address to send the 1099 in March that was sent back to me. Do I send this to the IRS?

**6/7/18 5:02 PM**

Did it just get returned?

Yes, I just got it over a week ago. It came to my office as unable to forward.

He gave me this address in March to send.

**6/12/18 6:04 PM**

I wanted to touch base- the AUSA on this investigation has had to delay

Number: 1      Author: Devon      Subject: Highlight      Date: 6/14/2020 5:36:49 PM



**12/20/17 11:02 PM**

So sorry- I thought you meant it came from HHS. I understand now that it came fromStephanie Tyson. Let me follow up with Kelli.

**12/21/17 8:14 AM**

Ok. Thanks

**2/7/18 10:36 AM**

Good morning. I hope you are well. I have received a 1099 with earnings of the monies for Mr. Taylor. Do I give the 1099 to him again this year?

Let me check in with Kelli to see if she wants to monitor any contact you have with him. I hope you are going well.



**2/8/18 1:06 PM**

Hi. Did you find out anything yet?

Not yet- Kelli has been tied up in meetings today.  I will let you know as soon as I hear from her.

Ok. Thanks

**4/12/18 2:38 PM**

Hi. I hope you are well. I am still getting this statement that they want $3,804.54 for the patient due to not having the records Medicaid is asking for. What should I do?



   

Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:37:06 PM


**4/12/18 2:38 PM**

Hi. I hope you are well. I am still getting this statement that they want $3,804.54 for the patient due to not having the records Medicaid is asking for. What should I do?



   

Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:37:17 PM




Rambert, Devon Marshalle DK-09105
April 4, 2011

Pursuant to 42 CFR 433 Subpart F, DMA must collect all overpayments made to Medicaid providers in order to receive full federal financial participation for the NC Medicaid Program. Within 30 days from the date this overpayment becomes final pursuant to N.C. Session Law 2015-399, N.C.G.S. §108C-2(5), you must send a check in the amount of $3,804.24 (or the amount specified in the decision, if any) to:

Office of Controller
DMA Accounts Receivable
2022 Mail Service Center
Raleigh, North Carolina 27699-2022
Attention PI Case #: 814-09305

To assure your payment is properly credited, please enclose the attached payment form with your check or you may request that the overpayment be recovered from claim payments. Payment plans can be requested by contacting the DMA Budget Management Office at (919) 855-4180. Payment plans, if approved may not exceed 24 months. Please contact the DMA Budget Management Office for payment plan qualification requirements.

**PLEASE NOTE:** The Department is not required to approve requests for payment plans.

In accordance with N.C.G.S. §105-241.21 and as required by N.C.G.S. §147-86.23, a late payment penalty will be assessed and monthly interest will begin to accrue 30 days from the date this notification becomes final, either because you failed to request a reconsideration review, you chose to contest a reconsideration review decision, or upon the issuance of a final agency decision.

*Any communication about this matter should be with the Division of Medical Assistance Program Integrity Section. Do not, under any circumstances, request that CSRA, the Department's fiscal intermediary, adjust for the amount or items identified here as this will result in duplicate recoupment.*

If you have questions about this Notice, please call Susan Bryan at 919-814-0054 or by fax 919-814-0038.

Sincerely,

Susan Bryan, MBA, NCI, NP, AHFI | Accredited Healthcare Fraud Investigator
*Administrative Hearings Officer*
*Audit Manager*
Program Integrity

Enclosures
/pf

cc: Accounts Receivable Section
Program Integrity Assistant Director



DEPARTMENT OF HEALTH AND HUMAN SERVICES
DIVISION OF MEDICAL ASSISTANCE

Roy Cooper

April 4, 2011

TENTATIVE NOTICE OF OVERPAYMENT

Devon Marshalle Rambert                                   CERTIFIED MAIL
NPI#: 1972805893                                     7012 1640 0000 9855 7761
2711 Randolph Road Ste 207
Charlotte, NC 28207-2027

Subject: 814-09105

Dear Provider:

The North Carolina Division of Medical Assistance ("DMA") Program Integrity authorized agents periodically conduct announced and unannounced audit reviews of Medicaid paid claims in order to identify program abuse in accordance with 42 U.S.C. §1396a, Parts 455 and 456 of Title 42 Regulations and 10A NCAC Subchapter 22F.

A post-payment review of your Medicaid paid claims for dates of service 03/28/2016 was recently completed. The results of the post-payment review abuse including but not limited to the following:

Provider did not produce medical records to support claim.

   

Number: 1          Author: Devon          Subject: Highlight          Date: 6/14/2020 5:37:32 PM

10.     Text Message (Colonel Chuck Scronce – Commander)

**1/18/19 1:20 PM**

Just wanted to make it clear that I am NOT charged with healthcare fraud! The news report was very inaccurate!!!

**2/18/19 1:52 PM**

I know...however security forces got a hit from the data base since your guilty plea was entered. Felony conviction means security clearance is suspended until things are sorted out. Please scan and email all paperwork you have so we can get it to Maj. Armour for your file. IT's cool if you want to RUTA May... it's Family Day.... not sure how you want to approach it. I wish the news would have kept it under wraps for you.

   

Number: 1  Author: Devon  Subject: Highlight  Date: 6/14/2020 5:37:49 PM

Number: 2  Author: Devon  Subject: Highlight  Date: 6/14/2020 5:37:52 PM

11.    Description of Billing Provider and Rendering Provider

 
ELECTRONIC DATA INTERCHANGE

# Glossary of Terms

| TERM | DEFINITION |
|---|---|
| Account Number/Client Code | This is the number you will see in the welcome letter you receive upon enrolling with Infinedi. You will also see this number on your invoice each month. Example: P999-AAA The last three letters is your client code. |
| Adjudication | The claim process used for verification of eligibility, level of benefits available and determination of reimbursement amount. |
| ANSI | American National Standard Institute (ANSI) is a private, not for profit organization that sets and approves standards for many industries. Healthcare ANSI Standards are approved by the ANSI organization and are published by the Washington Publishing Company. www.ansi.org or www.wpc-edi.com |
| Assignment of Benefits | A patient request for health benefit payments to be made directly to a designated person or facility, such as a physician or hospital. |
| Billing Provider/Pay-to-Provider | The entity or provider that the payer issues payment to. |
| Billing Service | A company contracted by a Healthcare Provider to perform day to day medical billing operations such as: Submitting and following up on medical claims on their behalf, to facilitate payment for service rendered. |
| Business Associate Agreement | Signed privacy agreement between Infinedi and provider. |
| Clean Claim | A claim submitted to Infinedi that passes the scrubbing process and does not reject for errors. |
| Clearinghouse | An entity that accepts electronic transaction from other organizations, performs high-level edits, translates data from one format to another and routes transactions electronically to a receiving entity. |
| CLIA Number (Clinical Laboratory Improvement) | A ten digit number issued to all facilities that perform even one test on "materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings". If a facility performs tests for these purposes, it is considered a laboratory under CLIA and must apply and obtain a certificate from the CLIA program that corresponds to the complexity of tests performed. |
| CLP-01 Segment | Patient account number that is returned in the X835 transaction for ERAs. This information is used for invoicing ERAs. |
| CMS (Centers for Medicare and Medicare Services) | The federal agency that runs the Medicare program. In addition, CMS works with the States to run the Medicaid program. CMS works to make sure that the beneficiaries in these programs are able to get high quality health care. |
| CMS-1500/Paper Claim | The government mandated uniform professional claim form used to request payment for services from an insurance carrier. Infinedi will print and mail paper claims received from clients. This service is optional and additional fees apply. |

Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:38:11 PM



# Glossary of Terms

| TERM | DEFINITION |
|---|---|
| Provider | |
| Rendering Provider | The provider who rendered the care to the patient. |
| Secondary Payer | An insurance policy, plan, or program that pays second on a claim for medical care. This could be Medicare, Medicaid, or other insurance depending on the situation |
| Set-Up Fee/Enrollment Fee | An initial one-time fee is charged that is charged upon enrollment with Infinedi which includes: software for one computer, processing of this agreement, carrier agreements, contracts and set-up for one provider. Additional providers in the group will be charged an additional set-up fee. |
| Subscriber | The owner of the insurance policy. (Parent, Spouse or Self) |
| Taxonomy Code | An administrative code set that classifies health care providers by type, classification and specialization. |
| Tertiary Payer | An insurance policy, plan, or program that pays third and/or last on a claim for medical care. This could be Medicare, Medicaid, or other insurance depending on the situation. Example: Medicaid will ALWAYS be the payer of last resort. |
| Timely Filing | The time period allowed for filing a claim to an insurance company for reimbursement. Timely filing limitations vary from payer to payer. |
| Trading Partner (Gateway) | An entity that exchanges electronic transactions with Infinedi. A payer's preferred clearinghouse would be a Trading Partner (Gateway) with Infinedi since they facilitate the transmission of claims for a particular payer. |
| Trouble Ticket Number | Each time you call Infinedi with a new problem or issue, a Trouble Ticket is created. If the Infinedi representative you reach doesn't give you a Trouble Ticket Number, ask them for one. The Trouble Ticket Number enables us to track and route your problems to the appropriate support staff. Knowing your Trouble Ticket Number each time you call will allow our receptionist to route your call more efficiently, which will save you valuable time. |
| UB-04/Paper Claim | The government mandated uniform institutional claim form used to request payment for services from an insurance carrier. Infinedi will print and mail paper claims received from clients. This service is optional and additional fees apply. |
| VIC | Visually Integrated Claims ( see www.infinedi.net ) |

Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:38:18 PM



**Related Change Request #:** N/A

**Effective Date:** N/A

**MLN Matters Number:** SE0441

> **Note:** This article was revised on August 23, 2016 to clarify the language under the *Hospital or SNF* paragraph on page 2. All other information remains the same.

All Medicare providers of professional services

This article is for your information only. It clarifies when and how to bill for services "incident to" professional services.

The intent of this article is to clarify "incident to" services billed by physicians and non-physician practitioners to carriers. "Incident to" services are defined as those services that are furnished incident to physician professional services in the physician's office (whether located in a separate office suite or within an institution) or in a patient's home.

These services are billed as Part B services to your carrier as if you personally provided them, and are paid under the physician fee schedule.

> **Note:** "Incident to" services are also relevant to services supervised by certain non-physician practitioners such as physician assistants, nurse practitioners, clinical nurse specialists, nurse midwives, or clinical psychologists. These services are subject to the same requirements as physician-supervised services. Remember that "incident services" supervised by non-physician practitioners are reimbursed at 85 percent of the physician fee schedule. For clarity's sake, this article will refer to "physician" services as inclusive of non-physician practitioners.

To qualify as "incident to," services must be part of your patient's normal course of treatment, during which a physician **personally performed an initial service** and remains **actively**

**Disclaimer**

This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

# Page: 117

› Number: 1   Author: Devon   Subject: Highlight   Date: 6/14/2020 5:38:37 PM

› Number: 2   Author: Devon   Subject: Highlight   Date: 6/14/2020 5:38:41 PM

› Number: 3   Author: Devon   Subject: Highlight   Date: 6/14/2020 5:38:45 PM

**involved** in the course of treatment. You do not have to be physically present in the patient's treatment room while these services are provided, but you must provide **direct supervision**, that is, you must be present in the office suite to render assistance, if necessary. The patient record should document the essential requirements for incident to service.

More specifically, these services must be all of the following:

- An integral part of the patient's treatment course;

- Commonly rendered without charge (included in your physician's bills

- Of a type commonly furnished in a physician's office or clinic (not in an institutional setting); and

- An expense to you.

Examples of qualifying "incident to" services include cardiac rehabilitation, providing non-self-administrable drugs and other biologicals, and supplies usually furnished by the physician in the course of performing his/her services (for example, gauze, ointments, bandages, and oxygen).

The following paragraphs discuss the various care settings, which are important to note because the processes for billing vary somewhat depending on the care site.

In your office, qualifying "incident to" services must be provided by a caregiver whom you directly supervise, and who represents a direct financial expense to you (such as a "W-2" or leased employee, or an independent contractor).

You do not have to be physically present in the treatment room while the service is being provided, but you must be present in the immediate office suite to render assistance if needed. If you are a solo practitioner, you must directly supervise the care. If you are in a group, any physician member of the group may be present in the office to supervise.

For inpatient or outpatient hospital services and services to residents in a Part A covered stay in a SNF, the bundling provision (§1862 (a)(14) of the Social Security Act (the Act) for hospitals, and §1862(a)(18) of the Act for SNFs) provides that payment for all services are made to the hospital or SNF by a Part A Medicare Administrative Contractor (MAC) (except for certain professional services personally performed by physicians and other allied health professionals). Therefore, incident to services are not separately billable to the Part B MAC or payable under the physician fee schedule.

In institutions including SNF, your office must be confined to a separately identifiable part of the facility and cannot be construed to extend throughout the entire facility. Your staff may provide service incident to your service in the office to outpatients, to patients who are not in a Medicare covered stay or in a Medicare certified part of a SNF. If your employee (or contractor) provides

**Disclaimer**
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

services outside of your "office" area, these services would not qualify as "incident to" unless you are physically present where the service is being provided. One exception is that certain chemotherapy "incident to" services are excluded from the bundled SNF payments and may be separately billable to the carrier.

In general, you must be present in the patient's home for the service to qualify as an "incident to" service. There are some exceptions to this direct supervision requirement that apply to homebound patients in medically underserved areas where there are no available home health services only for certain limited services found in Pub 100-02, Chapter 15 Section 60.4 (B). In this instance, you need not be physically present in the home when the service is performed, although general supervision of the service is required. You must order the services, maintain contact with the nurse or other employee, and retain professional responsibility for the service. All other incident to requirements must be met. A second exception applies when the service at home is an individual or intermittent service performed by personnel meeting pertinent state requirements (for example, nurse, technician, or physician extender), and is an integral part of the physician's services to the patient).

Neither ambulance services nor EMT services performed under your telephone supervision are billable as "incident to" services.

To provide additional clarity, we present the following scenarios:

These services have their own statutory benefit categories and are subject to the rules applicable to their specific category. They are not "incident to" services and the "incident to" rules do not apply.

Yes, if the requirements are met, i.e., the services are part of a course of treatment during which the physician personally performs the initial service and is actively involved in the course of treatment, is physically present in the immediate office when services are rendered by the employee, and the service represents an expense to the physician or other legal entity that bills for the service.

No, because the services are not being provided by an employee under supervision of Doctor X.

**Disclaimer**
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

# Page: 119

› Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:39:11 PM

› Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:39:16 PM

› Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:39:31 PM

› Number: 4     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:39:27 PM

› Number: 5     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:39:41 PM

› Number: 6     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:39:46 PM

No, because Doctor Y is not treating the patient for the underlying condition. However, If Doctor Y receives a referral from Dr. X, and Dr. Y performs an initial evaluation of the patient and then orders and supervises the services, they may be billed by Doctor Y incident to her initial service.

If you have any questions, please contact your MAC at their toll-free number. That number is available at under - How Does It Work.

**Disclaimer**
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents.

12. Media – Defamation of Character



 

### THE UNITED STATES ATTORNEY'S OFFICE

# WESTERN DISTRICT *of* NORTH CAROLINA

U.S. Attorneys » Western District of North Carolina » News

**Department of Justice**

U.S. Attorney's Office

Western District of North Carolina

FOR IMMEDIATE RELEASE                       Thursday, October 31, 2019

# Leader Of $6.1 Million Medicaid Fraud Scheme Pleads Guilty To Federal Charges

CHARLOTTE, N.C. – Tony Garrett Taylor, 39, formerly of Charlotte, N.C. and currently residing in Atlanta, Georgia, pleaded guilty today to health care fraud conspiracy and tax evasion, for his role in a scheme that defrauded the North Carolina Medicaid (Medicaid) of more than $6.1 million, announced Andrew Murray, U.S. Attorney for the Western District of North Carolina. U.S. Magistrate Judge David S. Cayer presided over the plea hearing.

North Carolina Attorney General Josh Stein, who oversees the North Carolina Medicaid Investigations Division (MID), joins U.S. Attorney Murray in making today's announcement.

According to the bill of information and plea documents filed with the court, from June 2015 to December 2017, Tony Garrett Taylor conspired with his brother, Jerry Lewis Taylor, and others, and defrauded Medicaid of millions of dollars, by submitting fraudulent reimbursement claims for services that were never provided, and by submitting claims that misrepresented the services actually provided to Medicaid beneficiaries in order to receive greater reimbursement.

Court documents show that the brothers perpetuated the fraud through series of entities they owned and/or operated, which purported to provide outpatient behavioral health services to at-risk youth in North Carolina and elsewhere. Among the entities involved in the fraudulent scheme were Taylor Behavioral Health Center, LLC (TBHC) and Options Drive LLC, both located in Monroe, N.C.; Design for Change (DFC) located in Raleigh, N.C.; and SHG Consultants, Inc. (SHG), located in Gastonia, N.C. and elsewhere.

According to court documents, as the leader of the conspiracy, Tony Taylor was responsible for recruiting other co-conspirators to participate in the fraudulent scheme. He also obtained prospective patient lists that contained identifying information for Medicaid beneficiaries, some of which was used to perpetrate the fraud. As a result of the fraudulent scheme, Tony Taylor and Jerry Taylor and their co-conspirators received approximately $6.1 million in fraudulent reimbursement payments from Medicaid.

In addition to defrauding Medicaid, Tony Taylor also failed to file timely U.S. Individual Income Tax Return Form 1040 for tax years 2015, 2106, and 2017, even though he received and deposited a total of over $4.1 million in fraudulent receipts from Medicaid into bank accounts he controlled. Tony Taylor also admitted to

taking steps to willfully evade and defeat his income tax obligations for tax years 2015, 2016, and 2017, by, among other things, diverting fraudulent receipts from Medicaid to nominee entities and individuals, and making personal expenditures from business entity accounts he controlled.

To date, four other defendants have been charged in connection with this conspiracy:

Jerry Lewis Taylor, 54, of Wingate, N.C. pleaded guilty on June 19, 2019, to health care fraud conspiracy and tax evasion. Together with Tony Taylor, he owned and/or operated entities that defrauded Medicaid. He is currently awaiting sentencings.

Ameera Ali, 40, of Columbus, Ohio, previously admitted to filing fraudulent reimbursement claims with Medicaid on behalf of companies owned and operated by Tony Taylor, Jerry Taylor and others. She pleaded guilty on April 22, 2019, to health care fraud conspiracy and is currently awaiting sentencing.

Tevon Rambert-Hairston, 41, of Huntersville, N.C. and a licensed as a nurse practitioner, previously admitted to falsifying patient records used by Tony Taylor and Jerry Taylor to submit fraudulent reimbursement claims to Medicaid. Rambert-Hairston pleaded guilty to money laundering conspiracy on April 16, 2019, and is currently awaiting sentencing.

Christine Yvette Knight., 50, of Clermont, Florida, allegedly prepared fraudulent treatment notes and billing spreadsheets for companies owned and operated by Tony Taylor and Jerry Taylor. She is charged with health care fraud conspiracy and is currently awaiting trial.

Tony Taylor was released on bond following the plea hearing. The health care fraud conspiracy charge carries a maximum prison sentence of 10 years and a $250,000 fine. The tax evasion charge carries a maximum of five years in prison and a $250,000 fine or twice the actual gain, or both. A sentencing date for Tony Taylor has not been set yet.

The investigation was handled by MID. Assistant U.S. Attorney Dallas Kaplan and Special Assistant U.S. Attorney Timothy Rodgers of the U.S. Attorney's Office in Charlotte.

The investigation and charges are the work of the Western District's joint Health Care Fraud Task Force. The Task Force is multi-agency team of experienced federal and state investigators, working in conjunction with criminal and civil Assistant United States Attorneys, dedicated to identifying and prosecuting those who defraud the health care system, and reducing the potential for health care fraud in the future. The Task Force focuses on the coordination of cases, information sharing, identification of trends in health care fraud throughout the region, staffing of all whistle blower complaints, and the creation of investigative teams so that individual agencies may focus their unique areas of expertise on investigations. The Task Force builds upon existing partnerships between the agencies and its work reflects a heightened effort to reduce fraud and recover taxpayer dollars.

**To report Medicaid fraud in North Carolina, call the North Carolina Medicaid Investigations Division at 919-881-2320**

---

**Topic(s):**
Financial Fraud
Health Care Fraud
Tax

**Component(s):**
USAO - North Carolina, Western

| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:40:19 PM |

| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:40:23 PM |

| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:40:29 PM |

| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:40:33 PM |

# REPORT MEDICAID FRAUD

## MEDICAID FRAUD

**888.742.7248**

**REPORT ONLINE**
AND CLAIM REWARD

**NC VS MEDICAID FRAUD**

More Info & Intel

## North Carolina Man Faces Up to 15 Years for Medicaid Fraud

June 21, 2019

A Monroe, North Carolina man pleaded guilty to Medicaid fraud on June 20, and now faces up to 15 years in prison. Jerry Taylor pleaded guilty to healthcare fraud and tax evasion. He admitted conspiring with healthcare providers over a two-year period and submitting Medicaid claims for children who were not treated by these providers.

## REPORT MEDICAID FRAUD

**Your Name**

First Name Last Name

**My Personal Email (not employer's)**

janesmith@gmail.com

**Best Phone to Reach Me**

**My State:**

Select ▾

**I am reporting this Healthcare Provider**

Company Name or Person

**Are or Were You an Employee**

Taylor conspired with Devon Rambert-Hairston, a Monroe nurse practitioner, who pleaded guilty in April to money laundering, as well as collecting "thousands of dollars" in services she did not render. A nurse at Taylor's behavioral health company, where Rambert-Hairston worked, had claimed she met with 50 patients for 50 minutes a day — just do the math to determine the absurdity of the claim.

In her plea agreement, Rambert-Hairston admitted she knew the funds were not derived from legitimate services and that she knew the services were not provided.

## Fewer Than Average Patients

As a nurse practitioner, Rambert-Hairston could perform many of the same services as a physician, including diagnosing illnesses and prescribing medication. While she certainly appeared busy according to her claims, her 2015 Medicare reimbursements were well below average.

That year, she reported only 54 Medicare patients, ranking her 1058th out of 1,394 providers in North Carolina with this specialty. There were only 120



**Description of Fraud in 100 words:**

( SEND YOUR REPORT )

## TEN STEP WHISTLEBLOWER GUIDE

### MEDICAID FRAUD NEWS

Miami Herald,
November 28, 2018

Watching the Hawks,
September 28, 2016

Wall St. Journal,
February 16, 2016

NY Attorney General
Announcement,
January 21, 2016

More News

"Healthcare fraud costs the average taxpayer *nearly $1,500 each year*. Reporting provider fraud is crucial to solving this social crisis."

# Page: 125

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:40:52 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:40:55 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:01 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:05 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:08 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:10 PM |
| › Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:14 PM |
| › Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:16 PM |
| › Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:21 PM |
| › Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:24 PM |
| › Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:26 PM |
| › Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:30 PM |
| › Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:37 PM |
| › Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:42 PM |
| › Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:44 PM |
| › Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:48 PM |
| › Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:50 PM |
| › Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:55 PM |
| › Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:41:58 PM |
| › Number: 20 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:42:01 PM |
| › Number: 21 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:42:03 PM |
| › Number: 22 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:42:05 PM |

services performed on these patients, ranking her 1030th out of 1,394 providers in North Carolina with this specialty. The total number of services she provided patients was approximately half the number of the average provider with her specialty.

## A New Position

In July 2015, Rambert-Hairston became the medical director of Taylor Behavioral Health Center (TBHC). Between September 2016, and February 2017, Taylor and his business submitted over $1.3 million in fraudulent Medicaid claims using Rambert-Hairston's National Provider Identification Standard number as both the rendering and billing provider. She funneled $300,000 of the stolen funds to her own account, then send the remainder on to Taylor and other conspirators.

## Durham Woman Sentenced to 46 Months

In another recent North Carolina Medicaid fraud case, a Durham woman was sentenced in February to serve 46 months in prison for her role in a $900,000 scheme. She must also pay more than $500,000 in restitution and forfeit several pieces of real estate to North Carolina Medicaid. Co-conspirator Christopher Brown was

· Number: 1     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:18 PM

· Number: 2     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:21 PM

· Number: 3     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:25 PM

· Number: 4     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:28 PM

· Number: 5     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:31 PM

· Number: 6     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:34 PM

· Number: 7     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:47 PM

· Number: 8     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:52 PM

· Number: 9     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:54 PM

· Number: 10     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:42:58 PM

· Number: 11     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:43:04 PM

· Number: 12     Author: Devon     Subject: Highlight    Date: 6/14/2020 5:43:08 PM

13.     National Practitioner Data Bank Report (Provided by US Attorney's Office)



**DCN:** 5500000160292141
Process Date: 05/08/2020
Page: 1    of    3
RAMBERT HAIRSTON, DEVON
For authorized use by:
RAMBERT HAIRSTON, DEVON



NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

# RAMBERT HAIRSTON, DEVON

## *NC MEDICAID FRAUD CONTROL UNIT*

| JUDGMENT OR CONVICTION REPORT | Date of Action: 04/14/2020 |
| --- | --- |
| **Initial Action** | **Basis for Initial Action** |
| - CRIMINAL CONVICTION (GUILTY PLEA OR TRIAL) | - BILLING FOR SERVICES NOT RENDERED/SUPPLIES NOT PROVIDED<br>- OTHER, SEE SECTION C. OF THE REPORT FOR DETAILS |

| A. REPORTING ENTITY | | |
| --- | --- | --- |
| | Entity Name: | NC MEDICAID FRAUD CONTROL UNIT |
| | Address: | 5505 CREEDMOOR RD STE 300 |
| | City, State, Zip: | RALEIGH, NC 27612-6334 |
| | Country: | |
| | Name or Office: | SAMANTHA AMICK |
| | Title or Department: | PARALEGAL I |
| | Telephone: | (919) 881-4744 |
| | Entity Internal Report Reference: | MISC-3-19 |
| | Type of Report: | INITIAL |

| B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL) | | |
| --- | --- | --- |
| | Subject Name: | RAMBERT HAIRSTON, DEVON |
| | Other Name(s) Used: | RAMBERT, DEVON MARSHALLE |
| | Gender: | FEMALE |
| | Date of Birth: | 08/29/1978 |
| | Organization Name: | |
| | Work Address: | |
| | City, State, ZIP: | |
| | Organization Type: | |
| | Home Address: | 9804 SKYBLUFF CIR |
| | City, State, ZIP: | HUNTERSVILLE, NC 28078-2455 |
| | Deceased: | NO |
| Federal Employer Identification Numbers (FEIN): | | |
| Social Security Numbers (SSN): | | ***-**-5064 |
| Individual Taxpayer Identification Numbers (ITIN): | | |
| National Provider Identifiers (NPI): | | 1972805893 |
| Occupation/Field of Licensure: | | NURSE PRACTITIONER |
| State License Number, State of Licensure: | | 213123, NC |
| Drug Enforcement Administration (DEA) Numbers: | | |
| Unique Physician Identification Numbers (UPIN): | | |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | | TAYLOR BEHAVIORAL HEALTH SERVICES |
| Business Address of Affiliate: | | 1918 E ROOSEVELT BLVD |
| City, State, ZIP: | | MONROE, NC 28112-4130 |
| Nature of Relationship(s): | | SUBJECT IS MANAGER/SUPERVISOR/DIRECTOR OF AFFILIATE OR ASSOCIATE (150) |

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000160292141
Process Date: 05/08/2020
Page: 2   of   3
RAMBERT HAIRSTON, DEVON
For authorized use by:
RAMBERT HAIRSTON, DEVON

| **C. INFORMATION REPORTED** | | |
|---|---|---|
| | Venue (Court): | US DISTRICT COURT- WESTERN DISTRICT NC |
| | Jurisdiction: | FEDERAL COURT |
| | City, State of Court: | CHARLOTTE, NC |
| | Docket/Court File Number: | 3:19-CR-00107 |
| | Prosecuting Agency or Civil Plaintiff: | USAO |
| | Case Number Used by Prosecuting Agency: | |
| | Type of Action: | CRIMINAL CONVICTION (GUILTY PLEA OR TRIAL) (10) |
| | Investigating Agency(Agencies): | FBI |
| | Case Number(s) Used by Investigating Agency(Agencies): | 209A-CE-2094204 |
| | | MID |
| | | MISC-3-19 |
| | Statutory Offense(s) and Count(s): | 18 USC 1956(H) MONEY LAUNDERING CONSPIRACY (1) |
| | Act or Omission Code(s): | BILLING FOR SERVICES NOT RENDERED/SUPPLIES NOT PROVIDED (205) |
| | | OTHER ACT/OMISSION NOT CLASSIFIED, (SPECIFY) (999) |
| | Other Description: | MONEY LAUNDERING |
| | Narrative Description of Act(s) or Omission(s): | Rambert-Hairston submitted false and fraudulent Medicaid claims under her individual NPI provider number. Once the Medicaid funds were deposited into her account, she distributed them to her accomplices in the Medicaid fraud scheme knowing the funds were fraudulently obtained. |
| | Date of Judgment/Sentence: | 04/14/2020 |

### Judgment/Sentence

| | | | | | |
|---|---|---|---|---|---|
| Amount of Restitution: | $ 813,726.00 | | | | |
| Other Amount Ordered: | $ 100.00 | | | | |
| Incarceration: | Years: 1 | Months: | | Days: 1 | |
| Suspended Sentence: | Years: | Months: | | Days: | |
| Home Detention: | Years: | Months: | | Days: | |
| Probation: | Years: | Months: | | Days: | |
| Community Service: | Hours: | | | | |
| Other: | ONE YEAR SUPERVISED RELEASE | | | | |

☐ Subject identified in Section B has appealed the reported adverse action.

| **D. SUBJECT STATEMENT** | If the subject identified in Section B of this report has submitted a statement, it appears in this section. |
|---|---|

| **E. REPORT STATUS** | Unless a box below is checked, the subject of this report identified in Section B has not contested this report. |
|---|---|
| | ☐ This report has been disputed by the subject identified in Section B. |
| | ☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached. |
| | ☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision. |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

# Page: 129

' Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:44:04 PM

' Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:44:12 PM

' Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:44:15 PM

' Number: 4     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:44:19 PM

' Number: 5     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:44:22 PM

' Number: 6     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:44:25 PM

' Number: 7     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:44:28 PM



NATIONAL PRACTITIONER DATA BANK

**NPDB**

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

**DCN:** 5500000160292141
Process Date: 05/08/2020
Page: 3    of    3
RAMBERT HAIRSTON, DEVON
For authorized use by:
RAMBERT HAIRSTON, DEVON

☐ At the request of the subject identified in Section B, this report was reviewed by
the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision
is shown below:

Date of Original Submission:        05/08/2020
Date of Most Recent Change:        05/08/2020

**F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK**

The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report.

Subject Name(s):  RAMBERT, DEVON

**This report is maintained under the provisions of:** Section 1921

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Section 1921 of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

——————————————————— **END OF REPORT** ———————————————————

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



**DCN:** 5500000160000833
Process Date: 05/01/2020
Page: 1     of     3
RAMBERT-HAIRSTON, DEVON
For authorized use by:
RAMBERT-HAIRSTON, DEVON

# RAMBERT-HAIRSTON, DEVON

## EXECUTIVE OFFICE FOR US ATTORNEYS

| JUDGMENT OR CONVICTION REPORT | Date of Action: 04/14/2020 |
|---|---|
| Initial Action | Basis for Initial Action |
| - CRIMINAL CONVICTION (GUILTY PLEA OR TRIAL) | - OTHER, SEE SECTION C. OF THE REPORT FOR DETAILS |

| **A. REPORTING ENTITY** | | |
|---|---|---|
| | Entity Name: | EXECUTIVE OFFICE FOR US ATTORNEYS |
| | Address: | 600 E ST NW RM 7600 |
| | | BICN BLDG. |
| | City, State, Zip: | WASHINGTON, DC 20530-0032 |
| | Country: | |
| | Name or Office: | OFFICE OF LEGAL AND VICTIM PROGRAMS |
| | Title or Department: | |
| | Telephone: | (202) 252-5858 |
| | Entity Internal Report Reference: | |
| | Type of Report: | INITIAL |

| **B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)** | | |
|---|---|---|
| | Subject Name: | RAMBERT-HAIRSTON, DEVON |
| | Other Name(s) Used: | RAMBERT, DEVON MARSHALLE |
| | Gender: | UNKNOWN |
| | Date of Birth: | 08/29/1978 |
| | Organization Name: | |
| | Work Address: | |
| | City, State, ZIP: | |
| | Organization Type: | |
| | Home Address: | 9804 SKYBLUFF CIRCLE |
| | City, State, ZIP: | HUNTERSVILLE, NC 28078 |
| | Deceased: | UNKNOWN |
| Federal Employer Identification Numbers (FEIN): | | |
| Social Security Numbers (SSN): | | ***-**-5064 |
| Individual Taxpayer Identification Numbers (ITIN): | | |
| National Provider Identifiers (NPI): | | |
| Occupation/Field of Licensure: | | OTHER OCCUPATION - NOT CLASSIFIED, SPECIFY |
| State License Number, State of Licensure: | | |
| Other, as Specified: | | UNKNOWN |
| Drug Enforcement Administration (DEA) Numbers: | | |
| Unique Physician Identification Numbers (UPIN): | | |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | | |
| Business Address of Affiliate: | | |
| City, State, ZIP: | | |
| Nature of Relationship(s): | | |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

**DCN:** 5500000160000833
Process Date: 05/01/2020
Page: 2   of   3
RAMBERT-HAIRSTON, DEVON
For authorized use by:
RAMBERT-HAIRSTON, DEVON

**C. INFORMATION REPORTED**

| | |
|---|---|
| Venue (Court): | DISTRICT COURT |
| Jurisdiction: | FEDERAL COURT |
| City, State of Court: | UNKNOWN, NC |
| Docket/Court File Number: | 19-CR-00107:3 |
| Prosecuting Agency or Civil Plaintiff: | DOJNCW2019R002059414112 |
| Case Number Used by Prosecuting Agency: | NCW2019R00205 |
| Type of Action: | CRIMINAL CONVICTION (GUILTY PLEA OR TRIAL) (10) |
| Investigating Agency(Agencies): | FEDERAL BUREAU OF INVESTIGATION |
| Case Number(s) Used by Investigating Agency(Agencies): | 209A-CE-2094204 |
| Statutory Offense(s) and Count(s): | 18 :01956H CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS (1) |
| Act or Omission Code(s): | OTHER ACT/OMISSION NOT CLASSIFIED, (SPECIFY) (999) |
| Other Description: | UNKNOWN |
| Narrative Description of Act(s) or Omission(s): | Health Care Fraud |
| Date of Judgment/Sentence: | 04/14/2020 |

### Judgment/Sentence

| | | | |
|---|---|---|---|
| Amount of Restitution: | $ 813,726.00 | | |
| Other Amount Ordered: | $ 100.00 | | |
| Incarceration: | Years: | Months: 12 | Days: 1 |
| Suspended Sentence: | Years: | Months: | Days: |
| Home Detention: | Years: | Months: | Days: |
| Probation: | Years: | Months: | Days: |
| Community Service: | Hours: | | |
| Other: | | | |

☐ Subject identified in Section B has appealed the reported adverse action.

**D. SUBJECT STATEMENT**

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

**E. REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:45:00 PM


**DCN:** 5500000160000833
Process Date: 05/01/2020
Page: 3    of    3
RAMBERT-HAIRSTON, DEVON
For authorized use by:
RAMBERT-HAIRSTON, DEVON

| Date of Original Submission: | 05/01/2020 |
| Date of Most Recent Change: | 05/01/2020 |

**F. SUPPLEMENTAL SUBJECT INFORMATION ON FILE WITH DATA BANK**

The following information was not provided by the reporting entity identified in Section A of this report. The information was submitted to the Data Bank from other sources and is intended to supplement the information contained in this report.

Subject Name(s):  RAMBERT, DEVON

**This report is maintained under the provisions of:** Section 1128E

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Section 1128E of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

———————————————— **END OF REPORT** ————————————————

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

14.    Prosecution Misconduct Information





**Select Page**

≡

# Misconduct

Prosecutors commit misconduct when in the course of their professional duties they act in ways that are inconsistent with ethical mandates they are obliged to obey. Such misconduct exists at and near the intersection of two sets of rules: one is the legal rules that bind prosecutors so as to ensure due process – the state and federal constitution, statutory law, rules of criminal procedure, judicial orders, and the like. The other is the ethical standards of the legal profession as expressed in each state bar's rules of professional responsibility and similar professional codes.

Often an act of prosecutorial misconduct will violate both legal and professional codes. Though, because the codes differ in some ways, sometimes an act of misconduct may violate one code but not the other. Prosecutors are required to abide by both.

Enforcement of the two codes differs. When prosecutors violate legal rules as part of a criminal case, the primary recourse is for the criminal defendant to ask to have his conviction overturned (or if the trial is in progress, to ask the judge for a mistrial, to strike matters from the record, or to otherwise minimize the damage caused). When prosecutors violate professional rules, the bar complaint process is the primary enforcement mechanism.

## Types of Misconduct

Below is a list of some common types of prosecutorial misconduct. Prosecutorial misconduct comes in many forms, and this list is not meant to be exhaustive, nor is it designed to preclude other ways of describing and classifying misconduct.

## Failure to disclose exculpatory evidence

In *Brady v. Maryland* and a line of subsequent cases, the U.S. Supreme Court has held that the U.S. Constitution requires that prosecutors turn over to the defense evidence that tends to show the defendant is not guilty or deserves a lesser punishment. The failure to disclose "Brady material" is one common form of prosecutorial misconduct. This behavior also frequently violates professional rules which prohibit lawyers from disobeying obligations, obstructing access to evidence, and failing to comply with discovery, as well as professional rules which require prosecutors to make timely disclosure of all information that tends to negate guilt or mitigate punishment. (See, e.g., ABA Model Rules 3.4, 3.8, and 8.4) To learn more about the failure to disclose and *Brady*-type prosecutorial misconduct click here.

## Introduction of false evidence

In several cases including *Napue v. Illinois*, the U.S. Supreme Court has held that the U.S. Constitution prohibits prosecutors from introducing false evidence, including false testimony, and requires prosecutors to correct falsehoods. Such behavior may also violate professional rules which prohibit attorneys from offering evidence the lawyer knows to be false, assisting or inducing a witness to testify falsely, or eliciting false testimony without taking measures to correct it. (See, e.g., ABA Model Rules 3.3, 3.4, and 8.4) Because misconduct involving false evidence also frequently involves the failure to disclose (see above), you might find our page about *Brady* helpful.

## Improper argument

In opening and closing statements at trial (and other similar circumstances), a prosecutor's use of certain types of prohibited modes of argument may constitute prosecutorial misconduct. For example, a prosecutor may not: assert facts not in evidence, misstate the law, vouch for the credibility of a witness, mischaracterize evidence, criticize the defendant for exercising his constitutional right not to testify, or engage in other similar prohibited behavior. This type of misconduct may violate federal and state constitutions as well as professional rules which prohibit these types of arguments. (See, e.g., ABA Model Rules 3.3 and 3.4)

## Discrimination in jury selection

# Page: 136

・Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:45:35 PM

・Number: 2    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:45:41 PM

・Number: 3    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:45:48 PM

・Number: 4    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:45:55 PM

・Number: 5    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:46:08 PM

When selecting a jury, prosecutors are prohibited from excluding potential jurors based on certain characteristics, including race, sex, ethnicity, religion, and other similar characteristics. When prosecutors do this, they violate the defendant's constitutional rights as well as the constitutional rights of the prospective juror. This comes to light most commonly when African American or Latino prospective jurors are struck because the prosecution assumes that such jurors will be more sympathetic to a similar-raced defendant, more skeptical of authorities, or more lenient generally. Lawyers sometimes refer to a prosecutor's discriminatory exclusion of racial minorities from a jury as a *Batson* violation, named after the Supreme Court case *Batson v. Kentucky* which established some rules to address the problem.

## Interference with a defendant's right to representation

Though they have positions of authority, prosecutors are not neutral, they are participants in adversarial proceedings against criminal defendants. Prosecutors also are also sophisticated, repeat players in a criminal justice system that may be foreign, confusing and terrifying to defendants. Prosecutors may not discourage defendants from obtaining counsel, nor may prosecutors take advantage of a defendant who has not yet had the opportunity to avail himself of counsel. If a prosecutor knows that a defendant is represented, the prosecutor may not speak to a defendant about his case without the defendant's attorney present. (See, e.g., ABA Model Rules 3.8(b), 3.8(c), 4.2 and 4.3)

## Improper communications with a judge or juror

Rules restrict the types of interactions that all attorneys, including prosecutors, may have with a judge or juror. For example there are rules which regulate *ex parte* communication with judges – that is, an attorney communication with a judge where the opposing counsel is not present. Similarly, during trial, it is generally improper for a prosecutor or any attorney to communicate with jurors in any manner other than before the judge, on the record. Furthermore, it is unethical and illegal for a prosecutor or any attorney to attempt to influence a judge or juror with improper inducements. (See, e.g., ABA Model Rules 3.5 and 8.4)

## Improper use of the media

Number: 1          Author: Devon          Subject: Highlight    Date: 6/14/2020 5:46:20 PM

Cases are meant to be tried in court, based on evidence, not in the press. Rules broadly prohibit prosecutors from engaging in public communications that may prejudice the defendant's case or heighten public condemnation of the accused. Other than the basic details about a crime, most public communications about the defendant or the defendant's case are improper and constitute prosecutorial misconduct. (See, e.g., ABA Model Rules 3.6 and 3.8(f))

## Failure to train subordinates and maintain systems of compliance

Prosecutors who have managerial responsibilities in district attorneys offices have a professional obligation to create systems in those offices that ensure that all lawyer and nonlawyer professionals are aware of and comply with rules of professional conduct. Prosecutors who supervise subordinates may not encourage or ratify misconduct by subordinates and must make reasonable efforts to ensure that subordinates abide by ethical rules. (See, e.g., ABA Model Rules 5.1, 5.3 and 8.4(a))

## Failure to report a violation of the rules of professional responsibility

In many states, professional rules require that members of the bar inform the appropriate authorities if they become aware that another attorney has committed a serious violation of those professional rules. When prosecutors witness or learn of misconduct and fail to report it, in certain instances, they too may be guilty of misconduct. (See, e.g. ABA Model Rules 3.8)

This list is not meant to be exhaustive. There are other types of prosecutorial misconduct. We will continue to add to this list to give readers a better understanding of the various forms such misconduct takes.

## Search The Open File

Search

## Misconduct

Overview
Failure to disclose

# Page: 138

Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:46:33 PM

Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:46:38 PM

Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:46:44 PM



# MOLOLAMKEN
#### LLP

  

# What, Exactly, Is "Prosecutorial Misconduct"?

As the Supreme Court has famously written, the government's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done." An inscription on the walls of the Department of Justice, just outside the door to the Attorney General's office, expresses similar sentiments: "The United States wins its point whenever justice is done its citizens in the courts."

For that reason, federal prosecutors have a special duty – imposed not only by their professional obligations but the Constitution itself – to ensure fairness in a criminal case. They engage in prosecutorial misconduct when they improperly or illegally act (or fail to act, when required to do so) in a way that causes a defendant to be wrongfully convicted or punished unjustifiably.

Prosecutorial misconduct comes in many forms. Prosecutors in the United States exercise substantial control over most phases of a criminal case – from participating in the investigation, to deciding what charges to seek, to recommending a sentence after conviction – and prosecutorial misconduct can infect any stage of this process.

Actions that courts have labeled prosecutorial misconduct include:

- Using improper investigative techniques, such as "entrapment" – inducing a person to commit a crime who was not otherwise disposed to commit it.
- Bringing criminal charges in bad faith without realistic hope of winning a conviction – for example, to punish a political rival, or to retaliate against someone.
- Making statements to the media that prejudice the jury pool.
- Engaging in improper plea-bargaining – for example, convincing a defendant to plead guilty through false promises or misrepresentations about the existence of incriminating evidence.
- Failing to turn over exculpatory evidence.
- Tampering with evidence.
- Knowingly presenting false witness testimony or other false evidence to a court or grand jury.

Number: 1      Author: Devon     Subject: Highlight    Date: 6/14/2020 5:47:01 PM

Number: 2      Author: Devon     Subject: Highlight    Date: 6/14/2020 5:47:13 PM

- Asking a defendant or defense witness damaging and suggestive questions with no factual basis.

- Making improper statements in front of the jury – for example, expressing a personal opinion about the guilt of a defendant or the credibility of testimony, mentioning facts not in evidence, or criticizing the defendant for exercising his constitutional right not to testify.

Sufficiently culpable and harmful misconduct can result in the dismissal of charges or a declaration of a mistrial. Misconduct can also be raised on appeal or by a collateral attack on the conviction through a petition for habeas corpus.

Such relief is rare, however. To show that prosecutorial misconduct requires dismissal of the indictment or a mistrial, the defendant usually has to show that the prosecutor willfully engaged in misconduct and that the misconduct "prejudiced" the defendant. In other words, when considering a sanction, judges will consider whether the prosecutor intended to act improperly or was motivated by some illicit or sinister reason.

Even when the prosecutor did not act intentionally, however, a judge might still dismiss the indictment or declare a mistrial if the error rendered the proceeding fundamentally unfair to the defendant. And if the error did not affect the fundamental fairness of proceeding – and if a judge believes the prosecutor acted in good faith or simply made a mistake – she may impose some lesser sanction, like a stern warning or a curative jury instruction.

For example, in the securities fraud case against Broadcom CEO Henry Nicholas III and Broadcom CFO William J. Ruehle, the court dismissed the indictment and entered a judgment of acquittal to punish prosecutorial misconduct. The court concluded that the government had improperly intimidated three witnesses critical to the defendants' case, and improperly influenced their testimony in an attempt to make it more favorable to the prosecution.

In another highly publicized case, the so-called "KPMG tax-shelter case," the court dismissed charges of fraud and tax evasion that were brought against 13 former executives at the accounting firm KPMG. The court concluded that prosecutors had engaged in misconduct by pressuring KPMG to withhold payment of attorneys' fees that the firm had previously agreed to pay for the 13 former executives. That conduct, the court concluded, unjustifiably interfered with the defendants' Sixth Amendment right to counsel.

To learn more about corporate and executive criminal liability, follow us on LinkedIn. "Brilliant lawyers with courtroom savvy" – Benchmark Litigation. Copyright MoloLamken LLP 2018.

# Page: 140

| Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:47:41 PM |

| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:47:47 PM |

| Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:47:52 PM |

for the defendant. It can take place in both **state and federal criminal cases**.

**Prosecutorial misconduct** may occur not only at a criminal trial (https://www.shouselaw.com/jury-trial.html). It can take place at any stage of the criminal court process (https://www.shouselaw.com/criminal-court-process.html). Some of these stages may include pretrial proceedings (https://www.shouselaw.com/pretrial.html) and sentencing hearings (https://www.shouselaw.com/sentencing-hearing.html).

In general, there are **four main types** of prosecutorial misconduct. These are:

1. failing to disclose **exculpatory** evidence,

2. introducing **false** evidence,

3. using **improper arguments**, and

4. **discriminating** in jury selection.

A judge can do any of the following if he/she finds that misconduct **prejudiced** the accused:

1. dismiss the charge(s),

2. admonish the jury to disregard certain evidence or comments, or

3. grant a motion for a new trial (https://www.shouselaw.com/motion-for-new-trial.html)

Note that "malicious prosecution (https://www.shouselaw.com/personal-injury/malicious-prosecution)" refers to something different than prosecutorial misconduct. The phrase refers to a case that gets filed without any **legal foundation** or basis for it. The case can be either civil or criminal in nature.

Note also that California law is consistent with the above rules and information. Penal Code 1181 is the California statute that says a judge may award a defendant with a new trial upon a finding of misconduct.

Our criminal defense attorneys will highlight the following in this article:

1. What are the four main types of prosecutorial misconduct?

1.1. Failure to disclose exculpatory evidence

1.2. Introducing false evidence

1.3. Improper arguments

1.3.1. Asserting facts not in evidence

3.2. Commenting on the defendant's failure to testify

, Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:48:13 PM

, Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:48:15 PM

, Number: 3     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:48:21 PM

, Number: 4     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:48:27 PM

1.3.3. Expressing personal opinions

1.3.4. Inflammatory comments

1.4. Discrimination in jury selection

2. What are the remedies for a defendant?

2.1. Prejudice

2.2. Objection to misconduct

3. Is vindictive or malicious prosecution a form of misconduct?

4. Can the prosecutor be sued in civil court?

5. What is the law in California?



Prosecutorial misconduct is when a prosecutor in a criminal court case performs an illegal or unethical act.

# 1. What are the four main types of prosecutorial misconduct?

There are four main types of prosecutorial misconduct. These are:

failure to disclose exculpatory evidence,

introducing false evidence,

Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:48:38 PM

Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:48:46 PM

3. using improper arguments, and

4. discriminating in jury selection.

# 1.1. Failure to disclose exculpatory evidence

Prosecutors have a **legal duty** to give the defense the following evidence:

evidence suggesting that the accused **is not guilty**, and

evidence suggesting that the accused deserves a **lesser sentence**.[1]

This evidence is often referred to as "**Brady material**." The label comes from a real legal case **Brady v. Maryland**.

A prosecutor's failure to turn over Brady material can lead to a finding of misconduct.

> ***Example:*** Doug is charged with rape (https://www.shouselaw.com/ca/defense/penal-code/261). He has vehemently denied the charge since the first days he was investigated for it. In defense, he has always maintained that he was somewhere else when the crime was committed. He maintains he was at a going away party for an acquantance.
>
> A problem with the defense is that Doug's lawyer cannot find a solid alibi witness (https://www.shouselaw.com/alibis.html) to testify to having seen Doug at the party.
>
> A few weeks before trial, a person comes to the prosecutor's office and gives a statement about the party. In it, she makes quick reference to seeing Doug there. The prosecutor buries the statement in the case file and does not share it with defense counsel. This is prosecutorial misconduct since the prosecutor failed to turn over Brady material.
>
> Note that a defendant can try to obtain this material by bringing a Brady motion (https://www.shouselaw.com/brady-motion).

# 1.2. Introducing false evidence

It is misconduct if a prosecutor introduces evidence that is false or inadmissible.[2]

Some of this evidence can include:

\ty statements (https://www.shouselaw.com/hearsay.html),

\ue or unfounded character evidence (https://www.shouselaw.com/character-evidence.html), and

# Page: 143

· Number: 1　　　Author: Devon　　　Subject: Highlight　　Date: 6/14/2020 5:48:48 PM

· Number: 2　　　Author: Devon　　　Subject: Highlight　　Date: 6/14/2020 5:49:04 PM

lies from a witness (or false witness testimony (https://www.shouselaw.com/ca/defense/penal-code/118)).

> **Example:** A prosecutor is in the middle of a well-contested felony hit and run (https://www.shouselaw.com/felonyhr.html) case. The only evidence he has left to try and secure a conviction is the testimony from a police officer. The officer is willing to testify that the defendant admitted to him that he committed the crime.
>
> The problem, however, is that the prosecutor knows that the officer is lying about the admission.
>
> Bent on getting a guilty charge, the prosecutor has the police officer testify. The officer lies under oath and testifies that the defendant admitted that he committed the crime. The accused is later convicted.
>
> Here, the prosecutor committed misconduct by introducing evidence that he knew was false.

# 1.3. Improper arguments

There are several types of arguments, or assertions, that a prosecutor **cannot** make during a criminal case.

For example, prosecutors cannot:

1. assert or argue about facts **not in evidence,**
2. comment on a defendant's decision to **not testify,**
3. express **personal opinions** about evidence or matters in a case, and
4. give **inflammatory** comments.

It is considered misconduct if a prosecutor engages in any of the above. Note that this type of misconduct often occurs in either the prosecutor's:

opening argument, or

closing argument.

## 1.3.1. Asserting facts not in evidence

criminal trial, both the prosecutor and defense counsel have to provide **evidence** for any facts

ish to assert.

# Page: 144

| | | | |
|---|---|---|---|
| › Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:49:21 PM |
| › Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:49:24 PM |
| › Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:49:28 PM |
| › Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:49:34 PM |
| › Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:51:09 PM |
| › Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:51:11 PM |

It is misconduct, then, if the prosecutor refers to a fact for which there is no evidence of. [3]

> **Example:** Nia is on trial for a violent robbery (https://www.shouselaw.com/robbery.html). In her closing remarks at the trial, Ruth, the prosecutor, tells the jury that violent crime has declined significantly in the area where the robbery occurred since Nia has been locked up.
>
> Ruth never introduced any evidence during the trial to support the statement that crime has declined in that area. Therefore, she has committed prosecutorial misconduct by arguing facts not in evidence.

## 1.3.2. Commenting on the defendant's failure to testify

A prosecutor can never comment on a defendant's choice to **not testify** on his/her behalf.

The Fifth Amendment to the U.S. Constitution (https://www.law.cornell.edu/constitution/fifth_amendment) says that a defendant:

does not have to testify against himself or herself, and

does not have to do so in a criminal case.

It is misconduct, then, if:

a defendant exercises his/her right not to testify, and

the prosecutor comments about it. [4]

## 1.3.3. Expressing personal opinions

A prosecutor commits misconduct by:

expressing his/her **personal opinion**, and

doing so about some matter in a trial. [5]

Note, though, that not **every opinion** will result in misconduct.

For example, it is okay for a prosecutor to provide an opinion on the guilt of the accused. He/she can also give an opinion on the credibility of a witness. This is provided the opinion is based on actual evidence produced at trial.

Number: 1    Author: Devon    Subject: Highlight    Date: 6/14/2020 5:51:25 PM

The general rule is that a prosecutor can opine if the opinion has a **basis in the evidence** presented. But **unfounded opinions** may lead to a finding of misconduct. [6]

## 3.4. Inflammatory comments

Certain inflammatory comments from a prosecutor can lead to a misconduct finding. This is provided that the comments are:

1. dramatic, and

2. appeal to the passions of the jury. [7]

An example is when the district attorney makes a so-called "safe streets argument." This is an appeal to jury's general fear of crime, rather than the evidence that the defendant committed a crime.

> **Example:** In a child molestation trial, in closing arguments, the prosecutor comments "None of your own children will be safe if you let a predator like this back on the street."

## 1.4. Discrimination in jury selection

Prosecutors can never **discriminate** when selecting a jury. [8]

This means a prosecutor cannot exclude a potential juror from a case because of his/her:

sex,

religion,

ethnicity, or

some other similar trait. [9]

Doing this is not only misconduct, but the act(s) violate:

the defendant's Sixth Amendment (https://www.law.cornell.edu/constitution/sixth_amendment) right to a fair trial, and

the juror's rights under the Equal Protection Clause (https://www.law.cornell.edu/constitution-conan/amendment-14/section-1/equal-protection-of-the-laws) of the Fourteenth Amendment.

› Number: 1　　　Author: Devon　　　Subject: Highlight　Date: 6/14/2020 5:51:48 PM

› Number: 2　　　Author: Devon　　　Subject: Highlight　Date: 6/14/2020 5:52:01 PM

> **Example:** Marcos is the prosecutor on a highly publicized and graphic murder case. The defendant is a prominent member of the neighborhood's African American community. The victim was a white supremacist.
>
> During jury selection, Marcos's plan is to try and exclude every potential juror that is an African American. He believes members of this race will side with the accused and vote for an acquittal. He succeeds in excluding four witnesses. Each exclusion is made on the sole basis of the juror's race.
>
> Here, Marcos discriminated on the basis of race, and therefore, committed prosecutorial misconduct.



Fortunately, there are remedies for a defendant

# 2. What are the remedies for a defendant?

There are several possible remedies in cases of prosecutorial misconduct. These include:

1. the judge **dismisses** the charge(s) against the accused,

2. the judge admonishes the jury to disregard ceratin evidence or comments, or

3. the judge may grant the defendant a **new trial.**

As to the latter, a judge can only award this after defense counsel brings a **motion for a new trial.** motion has to be filed **before** the defendant's sentencing.

.nough that these remedies **are not** available unless:

1. the misconduct **prejudiced** the defendant, and

2. the defense counsel **objected** to the misconduct.

## 2.1. Prejudice

Prosecutorial misconduct will not result in a remedy unless it **prejudiced** the defendant.

This means that the misconduct must have **materially affected** the outcome of the trial. If misconduct took place, but it did not affect the case in a material way, then a remedy is not granted. [10]

> *Example:* Anthony is on trial for committing certain lewd acts with a child (https://www.shouselaw.com/lewd-conduct-minor.html). During trial, the prosecutor makes several improper arguments, including:
>
> referring to facts not into evidence,
>
> giving inflammatory comments, and
>
> - expressing personal opinions.
>
> Anthony's lawyer objects after each bout of "misconduct." The judge then instructs the jury to disregard the arguments. Anthony is later found guilty on all charges.
>
> Here, the objection and resulting instruction work to minimize the prejudicial effects of the prosecutor's arguments. Given the instructions to the jury, the arguments did not impact the outcome of the trial. Thus, the misconduct is not prejudicial, and the guilty verdict would be upheld.

Note too that misconduct will not be deemed prejudicial if:

1. the evidence against the accused was so overwhelming, and

2. the outcome of the trial would have been the same even without the misconduct. [11]

## 2.2. Objection to misconduct

In most cases, a defendant cannot challenge a finding of misconduct unless:

1. the defense counsel objected to it, and

he/she did when the misconduct occurred. [12]

# Page: 148

| | | | |
|---|---|---|---|
| ‹ Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:52:34 PM |
| ‹ Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:52:38 PM |
| ‹ Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:52:41 PM |
| ‹ Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:52:43 PM |
| ‹ Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:52:49 PM |
| ‹ Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:52:53 PM |
| ‹ Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:53:01 PM |

The reasoning behind this rule is that:

if defense counsel objected to the misconduct at the time it happened,

the judge could have instructed the jury to disregard it.

This instruction would have prevented prejudice and removed the need for a new trial.

Note that if no objection, an accused can still try to get a new trial on grounds of ineffective assistance of counsel (https://www.shouselaw.com/ineffective-assistance-counsel.html).

# 3. Is vindictive or malicious prosecution a form of misconduct?

"Malicious prosecution" is different from a type of prosecutorial misconduct.

The phrase refers to a case that gets filed without any legal foundation or basis for it. The case can be either civil or criminal in nature.

A prosecutor or plaintiff often brings these cases out of ill-will or for some unjust reason. Some reasons may include:

harassment,

political gain, or

protection for the real wrongdoer.

Malicious prosecution technically occurs when:

1. a person files a frivolous claim against another,

2. the lawsuit was filed not to win, but rather for some other purpose, and

3. a person suffered damages as a result.

# 4. Can the prosecutor be sued in civil court?

A person may be able to sue a prosecutor in civil court for malicious prosecution if:

1. the prosecutor filed a frivolous charge, and

2. the accused suffered some type of damages.

› Number: 1     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:53:14 PM

› Number: 2     Author: Devon     Subject: Highlight     Date: 6/14/2020 5:53:17 PM



# Governmental Misconduct

Favorable and Noteworthy Decisions in the Supreme Court and Federal Appellate Courts

Garland, Samuel & Loeb
TRIAL ATTORNEYS

By **Don Samuel**
**Garland, Samuel & Loeb, P.C.**
Sep 1, 2015

*Illinois v. Fisher*, 540 U.S. 544 (2004)

The defendant was arrested on drug charges and the state crime lab confirmed that the substance was cocaine. The defendant filed a discovery demand, but then became a fugitive. Ten years later he was re-captured and demanded the right to test the substance. In the meantime, it had been destroyed. This did not violate the defendant's due process rights, because there was no showing of bad faith on the part of the state, even though there was a specific discovery request by the defendant.

*United States v. Alvarez-Machain*, 504 U.S. 655 (1992)

The fact that the DEA forcibly abducted the defendant in Mexico and kidnapped him back to California did not prevent him from being tried in the United States District Court. The forcible abduction of the defendant did not explicitly violate any terms of the treaty between the United States and Mexico. Because there was no violation of any treaty, *Ker v. Illinois*, 119 U.S. 436 (1886), applies and there was no prohibition on trying the defendant.

*United States v. Bowen*, --- F.3d --- (5th Cir. 2015)

In a case described by the Fifth Circuit as extraordinary and *sui generis*, the Fifth Circuit upheld the lower court's decision to reverse the conviction of several police officers in connection with the Hurricane Katrina shootings. Three prosecutors, two from the U.S. Attorney's Office and another from DOJ had anonymously posted numerous posts on a website, posing as citizens of New Orleans, whipping up anger in the community and creating a "carnival atmosphere." The Court compared this to an angry mob outside the courthouse. The impropriety of this conduct was coupled with the US Attorney's office denials that his assistants were involved, while at least one assistant who was involved sat in the courtroom and listened to these claims.

*Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014)

The prosecutor introduced evidence in a murder trial that the defendant admitted having sex with a horse (and that the horse talked to him) and other evidence of deviant sexual acts that were contained in psychiatric reports. The Sixth Circuit, reviewing the case in habeas, held that this amounted to flagrant prosecutorial misconduct that required setting aside the conviction.

*United States v. Black*, 750 F.3d 1053 (9th Cir. 2014)

poor, minority neighborhoods and seek to tempt their residents to commit crimes that might well result in their escape from poverty[?]" He then noted, "These cases force us to consider the continued vitality of the outrageous government conduct doctrine itself." The case involves the use of a CI, who was instructed by the government to go to Phoenix and recruit random people to help rob a non-existent cocaine stash house. The CI went to a bad part of town and looked for people who looked like bad guys. When the defendant said he was interested, the CI introduced him to the undercover agent who told the defendant about the large quantity of cocaine at the fictitious stash house (thus driving up the Guideline calculation). Judge Reinhardt emphasized numerous problems with this operation, including its inception: The CI was sent to look for "bad guys" in a "bad part of town," i.e., a minority neighborhood. This was an open invitation to racial discrimination. The CI was not told to invite known or suspected criminals to get involved in the stash house robbery. This dissenting opinion contains a wealth of quotable observations, including, "The government verges too close to tyranny when it sends its agents trolling through bars, tempts people to engage in criminal conduct, and locks them up for unconscionable periods of time when they fall for the scheme . . . In this era of mass incarceration, in which we already lock up more of our population than any other nation on Earth, it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them – people who but for the government's scheme might have ever entered the world of major felonies. Of course, the government also controls the (often extraordinarily long) amount of time that its targets spend in prison after reverse sting operations, as it can specify the amount of drugs involved in the fake conspiracies." Chief Judge Kozinski joined this dissent.

## United States v. Leal-Del Carmen, 697 F.3d 964 (9th Cir. 2012)

Deporting a potentially exculpatory witness prior to providing the defense an opportunity to interview the witness violates the defendant's right to compulsory process and to due process. The defendant, however, is required to show that the government acted in bad faith, a showing that was, in fact, made in this case, because the government had interviewed the witness prior to deporting him. The Ninth Circuit held that once the government is aware that a witness has exculpatory evidence, the government must alert the defense. If defense counsel has not yet been appointed or retained, the government may not deport the witness until after counsel is appointed or retained and given an opportunity to preserve the testimony. The Ninth Circuit also held that the trial court should have permitted the defendant to introduce the witness's statement to the border agent prior to being deported. The out-of-court declaration was admissible pursuant to Rule 804(b)(6) – the forfeiture by wrongdoing hearsay exception – because the government rendered the witness unavailable. Finally, the appellate court held that the defendant was entitled to a "missing witness" instruction that would have advised the jury that the failure of a party to produce a material witness who could elucidate matters under investigation gives rise to a presumption that the testimony of that witness would be unfavorable to that party if the witness is peculiarly within the party's control. The deported witness could have been paroled back into the country, but only the government could produce the witness under that procedure. "For the government to say that it isn't responsible for her absence because it no longer knows where to find her comes close to the classic definition of chutzpah."

Number: 1        Author: Devon      Subject: Highlight    Date: 6/14/2020 5:53:47 PM

prosecutor said, "And you don't really need to worry about that Fifth Amendment protection unless you're worried that you're doing something illegal. They knew perfectly well precisely what they were doing. . . . In this case, they're using the Fifth Amendment not as a shield to protect themselves from incrimination, but as a sword to prevent the IRS from getting the information that they are entitled to." This improper argument amounted to prosecutorial misconduct that required setting aside one defendant's conviction under the plain error standard. *See Griffin v. California*, 380 U.S. 609 (1965).

*United States v. Liburd*, 607 F.3d 339 (3rd Cir. 2010)

The defendant was arrested attempting to smuggle cocaine form the Virgin Islands into the United States. When he went through the TSA checkpoint in the Virgin Islands, two blocks were seen in the Xray scanner and when questioned about the items, he said that they were blocks of cheese. Later, another TSA agent found that the blocks were cocaine. At trial, the defendant claimed that someone must have placed the items in his bag. The government never revealed in discovery that the defendant had made the "cheese statement" and prior to trial told the court unequivocally that no statement of the defendant would be introduced at trial. Repeatedly during trial, however (including opening statement), the prosecutor referred to the cheese statement. This was misconduct and that necessitated granting a new trial. Whether the government was required to make no mention of the cheese statement or not, it agreed to do so, and having agreed to do so, it was obligated to honor that agreement. *See also United States v. McKinney*, 758 F.2d 1036 (5th Cir. 1985) (Agreements between the government and a defendant to forego the presentation of otherwise admissible evidence are enforceable.).

*United States v. Nobari*, 574 F.3d 1065 (9th Cir. 2009)

Eliciting testimony that Mexicans are involved in the drug trade in one way, and Middle Easterners are involved in another aspect, was improper, especially given the government's closing argument that pointed out that the Middle Eastern defendants played precisely the role that was described by the agent. To the extent that the evidence was minimally relevant (for example, there was a taped call where one of the conspirators referred to "the Mexicans"), the evidence should have been excluded pursuant to Rule 403.

*United States v. Reyes*, 577 F.3d 1069 (9th Cir. 2009)

In this "combative" trial involving allegations of illegal options back-dating, the defendant, who was a corporate executive who signed corporate financial statements defended on the basis that he thought the Finance Department was aware of the back-dating and properly documented the options transactions in the financial statements. Only one person from the Finance Department testified for the government and she testified that she did not know about the back-dating. However, the government knew – both through FBI interviews and through a pending SEC lawsuit against other people in the Finance Department – that people in the Finance Department were aware of the back-dating. No other people from the Finance Department testified (in part because they asserted the Fifth Amendment right to testify). In closing argument, the defendant argued that other people in the Finance Department knew (though there was no evidence of this at trial). The government responded that no other people in the Finance Department knew (though the

# Page: 152

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:53:59 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:02 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:04 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:07 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:10 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:13 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:18 PM |
| · Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:21 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:30 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:35 PM |
| · Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:39 PM |

lightly tolerate a prosecutor asserting as a fact to the jury something known to be untrue or, at the very least, that the prosecution had every strong reason to doubt."

*Ferrara v. United States*, 456 F.3d 278 (1st Cir. 2006)

Twelve years ago, the defendant entered a guilty plea to a RICO case that charged various predicate offenses, including murder. A key witness for the government provided a statement implicating the defendant in one of the charged murders. Later, however, he recanted and told the AUSA and the case agents that the defendant was not involved in the murder. The AUSA and agents met once again with the witness and he recanted his recantation. The witness's recantation was never provided to the defense, despite *Brady* obligations that were ongoing pursuant to *Brady*. The defendant entered a guilty plea, though during the plea colloquy, he never admitted participation in the murder. Years later, the witness's recantation was revealed. The District Court granted § 2255 relief. The First Circuit affirmed, concluding that the government's conduct amounted to a violation of *Brady* and amounted to gross governmental misconduct.

*Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005)

The petitioner was entitled to an evidentiary hearing on his claim that the state intimidated and threatened a witness he wanted to call at a hearing on his Motion for New Trial. Though the Ninth Circuit made no findings regarding whether this event actually occurred, the defendant proffered an affidavit from the witness and he was at least entitled to an evidentiary hearing in support of this allegation, which, if true, might entitle him to relief. *Chambers v. Mississippi*, 410 U.S. 284 (1973); *United States v. Vavages*, 151 F.3d 1185 (9th Cir. 1998); *Webb v. Texas*, 409 U.S. 95 (1972); *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004).

*United States v. Wilson*, 390 F.3d 1003 (7th Cir. 2004)

The government withdrew a Rule 35 motion for reduction of sentence because the defendant threatened to bring a civil suit against the government unrelated to the criminal case in which he was cooperating (or in which he was presently involved). The Seventh Circuit held that this was "bad faith" and ordered the lower court to consider a reduction in sentence.

*United States v. Rutherford*, 371 F.3d 634 (9th Cir. 2004)

During the defendant's tax evasion trial, several IRS agents sat behind the prosecution table. Post-trial interviews with jurors indicated that some of them felt intimidated by the agents. The lower court held that the defendant had to prove that the government acted with the intent to intimidate the jurors. The Ninth Circuit, however, held that the defendant was only required to prove a prejudicial impact on the jury; the defendant was not required to prove that this was the government's intent. A remand for further development of the record was required. The defendant should be permitted to introduce evidence regarding the jurors' perceptions of the agents' conduct and any discussions among the jurors concerning the possibility of IRS retaliation if they voted to acquit.

*United States v. Derrick*, 163 F.3d 799 (4th Cir. 1998)

| | | | |
|---|---|---|---|
| Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:49 PM |
| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:54:53 PM |

powers. The Fourth Circuit reversed in a lengthy opinion that canvasses the law regarding the propriety of dismissing an indictment based on governmental misconduct in the discovery process. Even with a finding of a "flagrant misconduct" the defendant must still demonstrate prejudice, except, perhaps, in the most egregious circumstances. In this case, the appellate court found insufficient basis for the drastic remedy of dismissal.

*United States v. Gonzales*, 164 F.3d 1285 (10th Cir. 1999)

Although the defense has no right under Rule 16 to interview a witness, it has a right to be free from prosecution interference with a witness's freedom of choice about whether to talk to the defense. The court ordered the government to provide to the defense "face-to-face" access to its confidential witnesses. The government then misled the court about the government's knowledge of the witness's whereabouts. The Tenth Circuit concludes that excluding the witness's testimony was not an appropriate remedy. Less severe sanctions, including allowing the witness to be deposed, or recommending disciplinary proceedings against the government attorneys should have been considered.

*United States v. Wilson*, 149 F.3d 1298 (11th Cir. 1998)

The prosecutor engaged in various instances of misconduct during cross-examination of the defendant. The Eleventh Circuit concluded that this conduct did not warrant a new trial. However, the court reiterated the principle, "That we find an error not to be reversible does not transmute that error into a virtue. The error is still an error. And urging the error upon the trial court still violates the United States Attorney's obligation to the court and to the public." The appellate court invited the trial court to take more aggressive measures, including disciplinary proceedings, contempt citations, fines, and reprimands to curb this type of misconduct.

*United States v. Nolan-Cooper*, 155 F.3d 221 (3rd Cir. 1998)

This case contains a primer on the law of governmental misconduct caused by an undercover agent getting under the covers with the target. The single inappropriate act in this case (the agent had sexual intercourse with the target one time over the course of a year-long investigation) was not enough to merit dismissing the prosecution.

*Siddiqi v. United States*, 98 F.3d 1427 (2d Cir. 1996)

The government shifted its theory of prosecution in this Medicare fraud trial repeatedly during the course of trial, and in post-trial litigation. Its positions were inconsistent during various portions of the case and constantly changed to accommodate the evidence presented by the defense which rebutted the theory du jour. The Second Circuit vacated the conviction.

*United States v. Tarricone*, 11 F.3d 24, amended by 21 F.3d 474 (2d Cir. 1993)

The government possessed a handwriting expert's opinion that the writing on a particular document was not the defendant's. At trial, however, the government elicited testimony from more than one witness that the writing was that of the

# Page: 154

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:11 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:17 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:20 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:24 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:28 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:31 PM |

are encouraged to remain vigilant and consider more fully such sanctions in cases of persistent or flagrant misconduct by prosecutors.

### *United States v. Crutchfield*, 26 F.3d 1098 (11th Cir. 1994)

The government engaged in serious prosecutorial misconduct which necessitated reversing the conviction. Among the tactics which were condemned were (1) engaging in totally irrelevant inquiries of government witnesses in the specialized area of reptiles, for the purpose of demonstrating to the jury the prosecutor's own expertise in the area; (2) introducing improper bad character evidence against the defendants; (3) implying that one of the defendant's witnesses was involved in marijuana smuggling; (4) frequent disobedience of trial court's rulings.

### *United States v. Eyster*, 948 F.2d 1196 (11th Cir. 1991)

On cross-examination, a government witness indicated that certain counts of the indictment to which he pled guilty were false – he was not guilty of the charges to which he pled guilty. On re-direct, the prosecutor suggested that there was a typographical error in the plea agreement and thus, the witness only pled guilty to the charges which he was, in fact, guilty of. This re-direct was erroneous: there was no typographical error. The prosecutor's questions were based on evidence not in the record and amounted to improper bolstering of the witness. This was reversible error. In assessing whether this was grounds for reversal, the court noted that "the government's reference to a typographical error was ultimately an outright falsehood designed to mitigate [the witness'] willful perjury."

### *United States v. Eason*, 920 F.2d 731 (11th Cir. 1990)

The government engaged in misconduct by introducing evidence of a co-conspirator's conviction for the offense for which the defendant was being tried. The Eleventh Circuit recites dozens of cases from the Southern District of Georgia in which the court found that the United States Attorney either engaged in misconduct or erroneously introduced evidence. The court reminded the prosecutors that they have a duty to properly advise the court of the Rules of Evidence, and not, as here, mislead the court as to the admissibility of certain evidence. The court also cites the famous passage from *Berger v. United States*, relating to the duty of a United States Attorney to seek justice, not a conviction.

### *United States v. Espinosa-Hernandez*, 918 F.2d 911 (11th Cir. 1990)

A critical witness for the government in this drug prosecution was a customs agent. The government had also used an informant who was controlled by that agent, but who was not available at the time of trial. After the defendant was convicted, he filed a motion for new trial and a request for additional discovery relating to the customs agent's impending charges of lying on his employment application, participation in the escape of an informant from custody, and distribution of drugs. Additionally, the defendant sought discovery concerning the agent's participation in rendering the informant unavailable at trial. The trial court erred in not affording the defendant an opportunity to take additional post-trial discovery.

### *United States v. Heller*, 830 F.2d 150 (11th Cir. 1987)

| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:43 PM |

| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:49 PM |

| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:55:51 PM |

Search all cases and statutes...    JX    Search    § Help   Sign In   Free Trial

and required granting a writ. The prosecutor compared the defendant to the two most recent notorious killers (Daumer and Susan Smith), but the present case and those cases had no similarity. The prosecutor also made numerous Biblical references that were inappropriate and implored the jurors to perform their duty to return a death penalty, which the prosecutor suggested was, in fact, obligatory.

*United States v. Andaverde-Tinoco*, 741 F.3d 509 (5th Cir. 2013)

The prosecutor improperly referenced the defendant's post-arrest silence during closing argument in an effort to imply that this disproved the defendant's defense and he was justified in illegally crossing the border after being beaten and robbed before crossing the Rio Grande. Not plain error, however.

*United States v. Richards*, 719 F.3d 746 (7th Cir. 2013)

The defendant was charged with being a member of a drug conspiracy. He denied knowing that he was being used as a drug courier. The government offered Rule 404(b) evidence to show that the defendant was familiar with the drug trade. Admitting this testimony was not error. However, the government during closing argument insisted that the evidence proved that the defendant was, in fact, a drug dealer and therefore, the jury could infer that he was guilty of the charged offense. This was an improper propensity argument that was inconsistent with the limited purpose for which the 404(b) evidence was offered.

*United States v. Woods*, 710 F.3d 195 (4th Cir. 2013)

The prosecutor may not state during closing argument that "the defendant lied when he testified" because this implies that the prosecutor has some basis for claiming that the defendant lied other than the evidence in the case. This argument was in error, but not sufficient to warrant reversal of the conviction.

*United States v. Darden*, 688 F.3d 382 (8th Cir. 2012)

A prosecutor should not argue to the jury that in order to find the defendant not guilty, it would mean that police officers were lying, who had no motive to lie to frame an innocent man and who face danger in their jobs everyday from violent criminals. Harmless error (Court majority disagreed, noting that the argument was reversible error, and noted other ways in which the argument was improper, including denouncing defense counsel).

*United States v. Parkes*, 668 F.3d 295 (6th Cir. 2012)

The defendant, a customer of a small Tennessee bank, was charged with participating in bank fraud. During closing argument, the prosecutor argued, "And if it's right to acquit them, you do it, you let them keep the $4 million, you tell the government, "Shame on you for persecuting these poor people." This was improper for at least two reasons: First, the government knew that in a civil settlement, the defendant had already agreed to a repayment plan. Second, even if there had been no repayment plan that was not a reason to convict if there had been no fraud. In fact, the government had previously moved to exclude evidence that the defendant had, in fact, repaid most of the money. "Even a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated."

# Page: 156

| | | | |
|---|---|---|---|
| Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:06 PM |
| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:14 PM |
| Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:18 PM |
| Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:22 PM |
| Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:27 PM |
| Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:33 PM |
| Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:37 PM |
| Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:42 PM |
| Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:56:45 PM |

the courier to bring the drugs into the U.S. In his closing argument, the prosecutor said that if the defendant's argument was validated, we might as well send a memo to the Mexican cartels that the defense of duress was all that was needed to win an acquittal in a drug smuggling case. The Ninth Circuit held that this was error requiring reversal of the conviction even in the absence of an objection. This was a plea to convict the defendant despite his defense, which if believed, was a valid defense. Asking the jury to convict because of the possible social consequences of acquitting – despite a valid defense – is an improper argument.

*United States v. Aguilar*, 645 F.3d 319 (5th Cir. 2011)

The prosecutor committed plain error by arguing to the jury that the agent risked their lives by pursuing drug dealers, only to come to court to be called a liar by the defense. The Fifth Circuit reversed the conviction.

*United States v. Delgado*, 631 F.3d 685 (5th Cir. 2011)

Several errors in this case – when considered cumulatively – required that the conviction be set aside: (1) there was insufficient evidence offered to support a deliberate ignorance instruction, because there was no evidence of the defendant's knowledge of the high probability of the criminal activity; (2) the prosecutor improperly stated during closing argument that the defendant, who did not testify, "lied to agents when they interviewed her" when she denied guilt. This amounted to an improper statement of the prosecutor's personal opinion; (3) a government agent testified (non-responsively to a question) that defendant's trucking company had been involved in other drug trafficking; (4) the absence of a transcript of the proceeding. In a separate holding, the Fifth Circuit also reversed the defendant's conspiracy conviction on sufficiency grounds. All these errors, when considered cumulatively, denied the defendant a fair trial.

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)

The prosecutor impermissibly commented about his service in the military and the JAG Corps, none of which was relevant in any way to the issues on trial. He simply attempted to increase his stature with the jury, which was not proper. The prosecutor also improperly suggested that the decision of the grand jury to indict the defendant pointed to their belief that the defendants were guilty. Again, an improper argument. Harmless error.

*United States v. Wright*, 625 F.3d 583 (9th Cir. 2010)

During the prosecutor's closing argument in this child pornography case, he stated that he had tried numerous similar cases and that it was not infrequent for the defendant to blame the crime on his roommate, or that some other person (or persons) put the child pornography on his computer, and that the interrogating officer did something wrong. The prosecutor then commented that seeing all three – in one case – a trifecta – was unusual. The Ninth Circuit held that this was error because it amounted to introducing evidence that was not in the record and also "denigrated the defense as a sham." Harmless error.

*United States v. Hills*, 618 F.3d 619 (7th Cir. 2010)

# Page: 157

| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:07:20 PM |
| · Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:57:09 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:57:51 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:57:54 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:57:27 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:57:30 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:57:36 PM |
| Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:02 PM |
| · Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:05 PM |
| · Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:08 PM |
| · Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:57:40 PM |
| · Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:57:45 PM |
| · Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:11 PM |
| · Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:14 PM |
| · Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:17 PM |
| · Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:21 PM |
| · Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:24 PM |
| · Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:27 PM |
| · Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:34 PM |

protection unless you're worried that you're doing something illegal. They knew perfectly well precisely what they were doing. . . . In this case, they're using the Fifth Amendment not as a shield to protect themselves from incrimination, but as a sword to prevent the IRS from getting the information that they are entitled to." This improper argument amounted to prosecutorial misconduct that required setting aside one defendant's conviction under the plain error ~~~~~~~~ California, 380 U.S. 609 (1965).

## United States v. Reyes, 577 F.3d 1069 (9th Cir. 2009)

In this "combative" trial involving allegations of illegal options back-dating, the defendant, who was a corporate executive who signed corporate financial statements defended on the basis that he thought the Finance Department ~~~~ ~~~~~~~~~~~~~ and properly documented the options transactions at the relevant ~~~~~~~~~. Only one person from the Finance Department testified for the government and she testified that she did not know about the back-dating. However, the government knew – both through FBI interviews and through a pending SEC lawsuit against other people in the Finance Department – that people in the Finance Department were aware of the back-dating. No other people from the Finance Department testified (in part because they asserted the Fifth Amendment right not to testify). In closing argument, the defendant argued that other people in the Finance Department knew (though there was no evidence of this at trial). The government then responded that no other people in the Finance Department knew (though the government knew that this was false). The Ninth Circuit held that this amounted to prosecutorial misconduct that necessitated reversing the conviction. "We do not lightly tolerate a prosecutor asserting as a fact to the jury something known to be untrue or, at the very least, that the prosecution had every strong reason to doubt."

## United States v. Ayala-Garcia, 574 F.3d 5 (1st Cir. 2009)

The defendants were prosecuted for drugs and firearm offenses. During rebuttal closing argument, the prosecutor held up the individual bullets – 31 of them – and said that each bullet represented a life that was saved. He further argued that there was a war going on in the housing projects and the defendant was a soldier in that war. The First Circuit held that these improper arguments necessitated granting a new trial.

## United States v. Mannava, 565 F.3d 412 (7th Cir. 2009)

The defendant was charged under 18 U.S.C. § 2422(b) with attempting to persuade a person to engage in sexual activity that constitutes a violation of state law. The state law that was allegedly violated was statutory rape, which is actually termed "child molestation" under Indiana law. Repeatedly, however, the prosecutor decried the defendant's effort to "rape" the victim in this case (there was no victim, just FBI agent posing as a child in email conversations with the defendant). These improper accusations by the prosecutor were reversible error.

## United States v. Farinella, 558 F.3d 695 (7th Cir. 2009)

In this case involving misbranded food, the prosecutor repeatedly misrepresented the nature of the evidence. The food that the defendant purchases wholesale had a "best when sold by" date on the label. He changed that date and re-sold the food. There was no evidence what the "best when sold by" date referred to. There was no

# Page: 158

| | | | |
|---|---|---|---|
| · Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:43 PM |
| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:46 PM |
| · Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:49 PM |
| · Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:55 PM |
| · Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:58:59 PM |
| · Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:02 PM |
| · Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:05 PM |

the testimony that was just heard.

*Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006)

The prosecutor urged the penalty phase jury to do their duty and vote to execute the _____. The comments implored the jury to act as good soldiers do and protect _____ toughen up. The message for these types of people _____ be death. I am the top law enforcement officer in this jurisdiction and I determine which cases are appropriate for the death penalty. Etc. The Eighth Circuit _____ these comments were too inflammatory and required setting aside the death

_____

During the closing argument, the prosecutor argued to the jury that once the evidence was introduced, the presumption of innocence went out the window. When the defense objected, the judge failed to correct this erroneous statement, _____ instead, that "that's proper rebuttal." The defendant's conviction was

*Hodge v. Hurly*, 426 F.3d 368 (6th Cir. 2005)

The Sixth wrote, "During his egregiously improper closing argument, the prosecutor commented on the credibility of witnesses, misrepresented the fact of the _____ _____ _____ the defendant, and generally tried to convince the jury to convict on the basis of bad character, all while defense trial counsel sat idly. We conclude that defendant's trial counsel was constitutionally ineffective in failing to object to this misconduct . . ."

*Ward v. Dretke*, 420 F.3d 479 (5th Cir. 2005)

Trial counsel was ineffective in failing to object to closing argument statements by the prosecutor that the jury would be ridiculed if they sentenced the defendant too leniently; and that they should use Biblical standards in imposing punishment

*United States v. Holmes*, 413 F.3d ___ __ ___

Statements by the prosecutor that the jury _____ ____ ___ __ _____ with the defendant to deceive the jurors was an improper argument. Arguments by the prosecutor that repeatedly referred to counsel, by name, and claimed that he was using red herrings to confuse the jury were inappropriate. The prosecutor was encouraging the jury to focus on defense counsel, rather than the evidence. The ____ __ ___ ___ __ ___ prosecutor required that the conviction be set aside.

*Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005)

In this death penalty trial, the prosecutor's closing argument included the following improper arguments (1) suggested to the jury that if the defendant's life was spared, the jurors would be accomplices in ___ _____ ___ _____ __ _____; (2) accused the defense attorney of being paranoid and _____ __ _____ __ _____ objections to evidence; (3) commented on the credibility, by expressing personal opinions, about the defense mental health experts; (4) likened the defendant to a rabid dog, the only solution to which is death. The Sixth Circuit set aside the death penalty.

# Page: 159

| | | | |
|---|---|---|---|
| • Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:26 PM |
| • Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:34 PM |
| • Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:39 PM |
| • Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:42 PM |
| • Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:47 PM |
| • Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:51 PM |
| • Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 5:59:55 PM |

innocence necessitated a new trial.

*United States v. Smith*, 806 F.2d 971 (10th Cir. 1986)

It is plain error for a prosecutor during closing argument to refer to the defendant's co-conspirators having pled guilty. The prosecutor stated that these pleas should be used as substantive evidence against the defendant.

*United States v. Gainey*, 111 F.3d 834 (11th Cir. 1997)

The prosecutor argued as follows: Mr. Gainey's residence was a drug den. He had the spoons. He had the needles. He had the cut. He had the heroin around his neck. And he had the weapons. These are all tools of the drug trade. Ladies and gentlemen, we live here in south Florida and we are very familiar with it by our local common sense, but they may not be admitted or presented to the jury. The prosecutor tried to exploit inappropriately the widespread community fear about drugs.

*United States v. Blakey*, 14 F.3d 1557 (11th Cir. 1994)

During closing argument, the prosecutor stated that the defendant was a professional criminal; that he presented insufficient exculpatory evidence; and that he was violent, indicating that the defendant had "real problems." Each of these remarks was improper. There was no evidence of any prior record — the defendant was not a "professional criminal." The failure to introduce exculpatory evidence was an improper burden shifting argument. The circumstances of the arrest violated a pretrial agreement limiting the relevance of this evidence. The cumulative effect of these arguments required a reversal, even though the trial court instructed the jury to disregard these arguments.

*United States v. Beasley*, 2 F.3d 1551 (11th Cir. 1993)

The prosecutor's references in the closing argument to the war on drugs and the jury's role in that war was improper and was calculated to inflame the jury. Nevertheless, the trial court sustained an objection and neutralized any harm.

*Presnell v. Zant*, 959 F.2d 1524 (11th Cir. 1992)

In this death penalty *habeas*, the court holds that the state prosecutor's closing argument which recited potions of the 1873 Georgia Supreme Court decision in *Eberhart v. State*, was prejudicial. The *Eberhart* court had decried the plea for mercy and held that the victim's family was more important than the defendant.

*Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991)

The prosecutor argued to the jury that he was "offended" that the defendant had exercised his Sixth Amendment right to a jury trial in the guilt innocence phase of the trial. This was an outrageous argument, which, along with other errors, required the granting of the writ.

*McCorquodale v. Kemp*, 829 F.2d 1035 (11th Cir. 1987)

# Page: 160

| | | | |
|---|---|---|---|
| Number: 1 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:20 PM |
| Number: 2 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:09 PM |
| Number: 3 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:27 PM |
| Number: 4 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:32 PM |
| Number: 5 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:35 PM |
| Number: 6 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:41 PM |
| Number: 7 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:48 PM |
| Number: 8 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:52 PM |
| Number: 9 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:55 PM |
| Number: 10 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:00:58 PM |
| Number: 11 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:01 PM |
| Number: 12 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:05 PM |
| Number: 13 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:09 PM |
| Number: 14 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:14 PM |
| Number: 15 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:18 PM |
| Number: 16 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:28 PM |
| Number: 17 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:39 PM |
| Number: 18 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:43 PM |
| Number: 19 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:47 PM |
| Number: 20 | Author: Devon | Subject: Highlight | Date: 6/14/2020 6:01:51 PM |