| | |
|---|---|
| DEVON RAMBERT-HAIRSTON, )<br>)<br>Petitioner, )<br>)<br>vs. )<br>)    **ORDER**<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Respondent. )<br>) | |

**THIS MATTER** is before the Court on Petitioner's *pro se* 28 U.S.C. § 2255 Motion to Vacate Sentence, (Doc. No. 3).

Petitioner, a license nurse practitioner, was charged in connection with a Medicaid fraud conspiracy conducted by T.G.T. and J.T., brothers who owned and operated a series of entities that claimed to provide mental and behavioral health services to at-risk youth including Taylor Behavioral Health Center ("TBHC"). See (3:19-cr-107 ("CR") Doc. No. 1). Petitioner, a TBHC employee, was charged by Bill of Information[1] with a single count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h). (CR Doc. No. 1).

Petitioner pleaded guilty as charged pursuant to a written Plea Agreement and admitted that she is, in fact, guilty of the charged money laundering conspiracy. (CR Doc. No. 2 at 1). The Plea Agreement sets forth Petitioner's sentencing exposure of a maximum of 10 years in prison. (CR Doc. No. 2 at 1). The Plea Agreement states that: the Court would consider the U.S. Sentencing Guidelines; had not yet determined the sentence; any estimate of the sentence that

---

[1] The Petitioner waived indictment. (CR Doc. No. 8).

1

Petitioner might receive was a prediction rather than a promise; the Court would have the final discretion to impose any sentence up to the statutory maximum and would not be bound by the parties' recommendations or agreements; and Petitioner would not be permitted to withdraw her plea as a result of the sentence imposed. (CR Doc. No. 2 at 2). The parties agreed to jointly recommend: an offense level of 20 because Petitioner was accountable for the underlying health care fraud scheme and the amount of health care loss known or reasonably foreseeable to Petitioner was $813,726 pursuant to U.S. Sentencing Guidelines §§ 2S1.1(a)(1) and 2B1.1(b)(1)(H); Petitioner was a minor participant pursuant to § 3B1.2(b); and the plea entry was timely. (CR Doc. No. 2 at 2). The parties retained the right to argue their respective positions regarding: any further reduction under § 3B1.2 for mitigating role; any other specific offense characteristics, cross-references, special instructions, reductions, enhancements, departures, and adjustments to the offense level; and departures or variances from the applicable guideline range. (CR Doc. No. 2 at 2). The Petitioner stipulated to the existence of a factual basis to support the guilty plea as set forth in the Factual Basis filed with the Plea Agreement. (CR Doc. No. 2 at 4). The Plea Agreement sets forth the rights Petitioner was waiving by pleading guilty including an express waiver of Petitioner's right to contest her conviction and sentence in post-conviction motions and on appeal except for claims of ineffective assistance of counsel or prosecutorial misconduct. (CR Doc. No. 2 at 4). The Plea Agreement provides that "[t]here are no agreements, representations, or understandings between the parties in this case, other than those explicitly set forth in this Plea Agreement, or as noticed to the Court during the plea colloquy and contained in writing in a separate document signed by all parties." (Doc. No. 2 at 7).

The Factual Basis that was filed along with the Plea Agreement provides in relevant part:

Beginning in or about July 2015, and continuing until at least in or about

December 2017, T.G.T. and J.T. conspired with each other and with other persons known and unknown to the United States Attorney to engage in a scheme to defraud Medicaid of millions of dollars by submitting false and fraudulent reimbursement claims for non-existent services, as well as false and fraudulent claims that misrepresented the services actually provided in order to earn greater reimbursement than was owed.

In furtherance of the fraudulent scheme, T.G.T. recruited RAMBERT-HAIRSTON to serve as the medical director of TBHC beginning at least as early as July 2015. T.G.T. asked RAMBERT-HAIRSTON to review and sign off on progress notes reflecting behavior health services ostensibly provided by TBHC to juvenile Medicaid beneficiaries. RAMBERT-HAIRSTON did not, herself, provide any medical services to the beneficiaries and only rarely interacted with any beneficiaries at all.

The progress notes RAMBERT-HAIRSON reviewed and signed purported the beneficiaries had been seen by a licensed marriage and family therapist, the identity of whom is known to the United States Attorney.

Although RAMBERT-HAIRSTON had provided no services to the beneficiaries, T.G.T. and J.T. caused the submission of claims to Medicaid that falsely and fraudulently listed RAMBERT-HAIRSTON as the rendering provider for services billed by TBHC….. As a result of the fraudulent claims submissions, Medicaid paid TBHC approximately $33,350.

TBHC was placed on pre-payment review by DHB on or about August 17, 2016, following an evaluation of claims submitted by TBHC. Thereafter, T.G.T, J.T., and others continued the fraudulent scheme by submitting false and fraudulent claims through a series of successive entities. In or about August 2016, RAMBERT-HAIRSTON agreed to allow T.G.T. and J.T. to submit Medicaid using her NPI number as the billing provider until other entities owned and operated by T.G.T. and J.T. could be enrolled as Medicaid providers.

Between at least in or about September 2016 and continuing to at least in or about February 2017, T.G.T. and J.T. submitted and caused to be submitted approximately $1.3 million in fraudulent claims to Medicaid under RAMBERT-HAIRSTON's NPI number as both the rendering and billing provider.

As a result of the fraudulent claims submitted using RAMBERT-HAIRSTON's NPI number as both the rendering and billing provider, Medicaid wired at least $813,726 directly into RAMBERT-HAIRSTON's State Employees' Credit Union ("SECU") account *1005. RAMBERT-HAIRSTON knew these funds were not derived from any legitimate services she had provided to Medicaid beneficiaries during the relevant time period and reasonably should have known the services were not provided by anyone else.

RAMBERT-HAIRSTON arranged for the distribution of the Medicaid funds deposited in her SECU account to T.G.T. and T.J. through a series of monetary transactions of a value greater than $10,000, including cash withdrawals and cashier's checks, often occurring the same day as the Medicaid deposit. On several occasions, RAMBERT-HAIRSTON accompanied T.G.T. to a SECU branch in order to arrange cash withdrawals from RAMBERT-HAIRSTON's SECU account *1005 and simultaneous cash deposits into T.G.T.'s SECU account *0925.

The amount of loss known to or reasonably foreseeable by RAMBERT-HAIRSTON was $813,726. Between at least in or about September 2016 and continuing through at least in or about February 2017, RAMBERT-HAIRSTON transferred more than $751,000 in fraudulent proceeds to T.G.T. and J.T., and RAMBERT-HAIRSTON kept the remainder.

(CR Doc. No. 3 at 3-4) (paragraph numbers omitted).

On April 16, 2019, a United States Magistrate Judge conducted a plea hearing pursuant to Rule 11 at which Petitioner was represented by retained counsel. (CR Doc. No. 39). Petitioner stated, under oath, that: she wanted the Court to accept her guilty plea to money laundering conspiracy as charged; she understood the charge, her sentencing exposure, and the consequences of pleading guilty; she understood the rights she was waiving by pleading guilty; and she was pleading guilty because she is guilty of the charged offense. (CR Doc. No. 39 at 10-17). Petitioner further stated that she understood and agreed with the Plea Agreement including the appellate and post-conviction waivers. (CR Doc. No. 39 at 22-23). She stated that she read the Factual Basis, discussed it with counsel, understood it, and agreed with it. (CR Doc. No. 39 at 24). Petitioner stated that nobody threated, intimidated, or forced her to plead guilty; nobody made any promises of leniency or a light sentence to induce her to plead guilty; and that there were no agreements other than those contained in the Plea Agreement. (CR Doc. No. 39 at 22-25, 33). Petitioner confirmed that she had enough time to discuss any possible defense with her attorney and was satisfied with counsel's services, stating "[s]he's wonderful." (CR Doc. No. 39 at 25).

4

The Presentence Investigation Report ("PSR") scored the base offense level as 20 because Petitioner was held responsible for a loss of $813,726. (CR Doc. No. 16 at ¶ 38). One level was added pursuant to § 2S1.1(b)(2)(A) because Petitioner was convicted under 18 U.S.C. § 1957. (CR Doc. No. 16 at ¶ 39). Two levels were deducted because Petitioner was a minor participant, and three levels were deducted for acceptance or responsibility. (CR Doc. No. 16 at ¶¶ 41, 45, 46). This resulted in a total offense level of 16. (CR Doc. No. 16 at ¶ 47). Petitioner had zero criminal history points and criminal history category of I. (CR Doc. No. 16 at ¶ 54). This resulted in an advisory guideline range of 21 to 27 months' imprisonment. (CR Doc. No. 16 at ¶ 83).

A sentencing hearing was held on April 14, 2020. (CR Doc. No. 40). The parties stipulated to the existence of a factual basis in support of the guilty plea and agreed that the Court may rely upon the offense conduct set forth in the PSR. (CR Doc. No. 40 at 3). Petitioner confirmed that she received and reviewed the PSR, understood it, and had adequate time to review it with counsel. (CR Doc. No. 40 at 3). There were no objections to the PSR and the parties agreed that the correct advisory guideline range is 21 to 27 months' imprisonment. (CR Doc. No. 40 at 4).

The Government moved for a downward departure sentence of between 12 and 18 months' imprisonment. (CR Doc. No. 26). Defense counsel sought a further downward variance of home confinement. (CR Doc. No. 24); (CR Doc. No. 40 at 12).

Petitioner addressed the Court, stating that she had made an "innocent mistake" of allowing others to use her NPI number. (CR Doc. No. 40 at 13). She claimed that she did not know that she was laundering money until her attorney informed her of such and that she did not have any "ill intent." (CR Doc. No. 40 at 14). Petitioner told the Court that she had tried to withdraw her

plea but that she received a letter from an attorney[2] stating that the Court would punish her harshly if she attempted to do so. (CR Doc. No. 40 at 14). Petitioner further stated that: she was "defrauded in the media," which resulted in threats; she was administratively discharged by the military and was stripped of her security clearance; and her nursing license would be taken away because of this felony. (CR Doc. No. 40 at 14). Petitioner stated that she signed the Plea Agreement because she was told that she would go to prison if she failed to sign, and that she did not know "all the penalties and stuff" when she entered her guilty plea. (CR Doc. No. 40 at 32).

The prosecutor was "taken aback" because Petitioner had repudiated essential elements of the money laundering offense to which she pleaded guilty. (CR Doc. No. 40 at 15-16). The prosecutor outlined the conduct that Petitioner admitted in the Factual Basis and noted that "[m]ost charitably under these facts you could say that the defendant was willfully blind, but she cannot not know what is in front of her. Willful blindness is a state of knowledge just like anything else." (CR Doc. No. 40 at 17). In response, Petitioner stated that "[i]t's not willful blindness. Willful blindness is knowingly. And I didn't know." (CR Doc. No. 40 at 30). The Government thus objected to the three-level reduction for acceptance of responsibility because the Petitioner changed her position and was refusing to admit even willful blindness. (CR Doc. No. 40 at 33).

The Court addressed the Petitioner's claim that she would have received harsher treatment had she attempted to withdraw her plea, stating that it "would never penalize someone for withdrawing or even attempting to withdraw a plea…." (CR Doc. No. 40 at 26). However, the Court went on to state that, "as everybody who practices in this court knows, … there are benefits that don't occur if someone doesn't plead guilty, you don't get acceptance of responsibility" and

---

[2] This refers to another lawyer, not Petitioner's criminal defense attorney. (CR Doc. No. 40 at 14).

that there is always a danger to when someone who asserts their innocence and goes to trial. (CR Doc. No. 40 at 26). The Court noted that Petitioner's allocution was in "marked contrast" to the criminal conduct set forth in the PSR. (CR Doc. No. 40 at 27).

The Court asked the prosecutor what the Government's position would have been had Petitioner moved to withdraw her plea. (CR Doc. No. 40 at 33). The prosecutor stated that the Government likely would have opposed a motion to withdraw because the facts supported the plea, Petitioner was represented by counsel, and the Government had planned to call Petitioner in another case. (CR Doc. No. 40 at 34). The Government noted that Petitioner would no longer be of any value as a witness because she stated that she had perjured herself before the Magistrate Judge. (CR Doc. No. 40 at 36).

The Court granted the Government's Motion for a downward departure. (CR Doc. No. 40 at 5, 37). The Court also withdrew the three-level reduction for acceptance of responsibility because such conflicted with Petitioner's protestations of innocence at the sentencing hearing. (CR Doc. No. 40 at 37-38). However, the Court considered the § 3553(a) factors and granted a downward variance of 12 months and one day in prison. (Id.).

On April 27, 2020, the Court entered a Judgment sentencing Petitioner to 12 months and one day in prison followed by one year of supervised release. (CR Doc. No. 30) (Judgment); see (CR Doc. No. 42) (Amended Judgment correcting a clerical error).

On direct appeal, Petitioner argued that her plea was involuntary because counsel told her she would go to prison unless she pleaded guilty, her lawyer provided ineffective assistance, and the Court erred in applying the U.S. Sentencing Guidelines. (4th Cir. 20-4281, Doc. No. 16). On October 6, 2020, the Fourth Circuit Court of Appeals affirmed Petitioner's conviction. United States v. Rambert-Hairston, 824 F. App'x 179 (4th Cir. 2020). With regards to the plea's

voluntariness, the Fourth Circuit found that Petitioner, at the Rule 11 hearing, "confirmed, without qualification that her guilty plea did not result from force, threats, intimidation, or promises other than those contained in the plea agreement" and "lauded the quality of her attorney's services." Id. at 180. The Fourth Circuit thus rejected her uncorroborated claim to the contrary that counsel "overrode her agency and left her no choice but to plead guilty," and it affirmed her conviction. Id. The Fourth Circuit further found that the sentencing challenge was barred by Petitioner's appellate waiver and that the claim that counsel rendered ineffective assistance during the plea proceedings should be brought, if at all, in a § 2255 motion.

Petitioner filed a "humble request for review…" that was docketed in the instant case as a § 2255 petition on March 30, 2021. (Doc. No. 1). The Court issued an Order on April 13, 2021 informing Petitioner of its intent to recharacterize the petition as a § 2255 Motion to Vacate pursuant to United States v. Castro, 540 U.S. 375, 383 (2003). The Court also informed Petitioner that the petition was deficient and granted her 30 days to amend. (Doc. No. 2).

Petitioner filed the instant Amended § 2255 Motion to Vacate on May 5, 2021.[3] (Doc. No. 3). She raises claims of trial court error, ineffective assistance of counsel, and prosecutorial misconduct.

## II. SECTION 2255 STANDARD OF REVIEW

A federal prisoner claiming that her "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to

---

[3] The docketing date is used because Petitioner failed to certify the date upon which she placed the Motion to Vacate in the prison's mail system. See Houston v. Lack, 487 U.S. 266, 276 (1988) (establishing the prisoner mailbox rule); Rule 3(d), 28 U.S.C.A. foll. § 2255 (addressing inmate filings). The Amended Motion to Vacate was addressed to the undersigned's chambers rather than the Clerk's Office. Petitioner is instructed to direct any further filings to the Clerk's Office so that they can be properly processed and docketed.

8

collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970). The Court also determines that no response from the Government is required.

### III. DISCUSSION[4]

**(1) Trial Court Error**

"[A] guilty plea constitutes a waiver of all nonjurisdictional defects, including the right to contest the factual merits of the charges." United States v. Willis, 992 F.2d 489, 490 (4th Cir. 1993). Thus, after a guilty plea, a defendant may not "raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Blackledge v. Perry, 417 U.S. 21, 29-30 (1974). A defendant is limited "to attacks on the voluntary and intelligent nature of the guilty plea, through proof that the advice received from counsel was not within the range of competence demanded of attorneys in criminal cases." Id.

The record reveals that Petitioner pleaded guilty knowingly and voluntarily with a full understanding of her plea's direct consequences. The Magistrate Judge conducted a thorough Rule 11 colloquy and concluded that Petitioner understood the charge, her sentencing exposure, and the

---

[4] Petitioner's Amended § 2255 Motion to Vacate, including attachments, exceeds 200 pages in length. Any sub-claim or argument not specifically mentioned in this Order has been considered and rejected.

rights she was waiving by pleading guilty. Petitioner stated that she was pleading guilty because she was guilty of Count One, that she was satisfied with counsel's services, and that she was not promised anything or coerced to enter a guilty plea. Moreover, the Petitioner's knowing and voluntary guilty plea included an express waiver of her post-conviction rights except for claims of ineffective assistance of counsel and prosecutorial misconduct.

The Petitioner's present claims of non-constitutional error, *i.e.*, that there was insufficient evidence to support the plea and that the Court did not hold the Government to its burden of proof regarding intent were waived by the knowing and voluntary guilty plea. Therefore, these claims are dismissed.[5]

The Petitioner further argues that the Court erred by refusing to consider evidence that the Petitioner attempted to present at the sentencing hearing. This appears to refer to Petitioner's allegation that other attorneys told her that the Court would punish her harshly if she attempted to withdraw her plea.[6] At the hearing, Petitioner offered the Court a printout of an attorney email stating that an attempt to withdraw the plea would be punished harshly. (CR Doc. No. 40 at 33) (Petitioner at the sentencing hearing stating, "I got it right here if you don't believe me…"). This claim was waived by Petitioner's knowing and voluntary waiver of her post-conviction rights, as it is not a claim of ineffective assistance of counsel or prosecutorial misconduct. Further, it is meritless. The Court considered Petitioner's argument, stated that it would never penalize someone from withdrawing a plea or attempting to do so, and acknowledged that there are "benefits that don't occur if someone doesn't plead guilty" such as acceptance of responsibility. (CR Doc. No.

---

[5] Petitioner's guilty plea, as supported by the Factual Basis, satisfied all the elements of the money laundering conspiracy, including the knowledge element. See Section (2), *infra*.

[6] To the extent that the Petitioner attempted to present evidence addressing the money laundering conspiracy charge, her knowing and voluntary guilty plea to that offense rendered such evidence moot.

40 at 26). An email from an attorney not involved in the Petitioner's case, opining about what the Court may do in reaction to a hypothetical motion to withdraw, was speculative and irrelevant to Petitioner's case. No error occurred when the Court declined to review it. Therefore, this claim would be denied even if it were not waived.

For the foregoing reasons, Petitioner's claims of trial court error are dismissed because they were waived by Petitioner's knowing and voluntary guilty plea and post-conviction waiver and, alternatively, are meritless.

**(2)** **<u>Ineffective Assistance of Counsel</u>**

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. <u>See</u> U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." <u>Id.</u> at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Harrington v. Richter</u>, 562 U.S. 86, 104 (2011) (quoting <u>Strickland</u>, 466 U.S. at 689).

The right to the assistance of counsel during criminal proceedings extends to the plea-bargaining process. <u>See</u> <u>Missouri v. Frye</u>, 566 U.S. 134 (2012). Thus, criminal defendants are "entitled to the effective assistance of competent counsel" during that process. <u>Lafler v. Cooper</u>, 566 U.S. 156, 162 (2012) (internal quotation marks omitted); <u>Merzbacher v. Shearin</u>, 706 F.3d 356, 363 (4th Cir. 2013). Where a defendant enters a plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was "within the range of

11

competence demanded by attorneys in criminal cases." Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)). To satisfy Strickland's prejudice prong, the defendant must show "there is a reasonable probability that, but for counsel's errors, [she] would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59; Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007).

First, Petitioner contends that counsel coerced her to plead guilty by telling her that she would go to prison unless she pleaded guilty. This claim was considered by the Fourth Circuit on direct appeal and it need not be reconsidered in the instant proceeding. United States v. Dyess, 730 F.3d 354, 360 (4th Cir. 2013) (a criminal defendant cannot "circumvent a proper ruling ... on direct appeal by re-raising the same challenge in a § 2255 motion.") (quoting United States v. Linder, 552 F.3d 391, 396 (4th Cir. 2009)); see also United States v. Roane, 378 F.3d 382, 396 n. 7 (4th Cir. 2004) (noting that, absent "any change in the law," defendants "cannot relitigate" previously decided issues in a § 2255 motion); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (holding criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]").

Each of Petitioner's remaining allegations of ineffective assistance of counsel is meritless. Petitioner complains that she did not know several "severe direct consequences" of the guilty plea and that she would have insisted on trial had she known that she would: lose her nursing license, be discharged from the military and lose her security clearance, be excluded from Medicaid, receive negative media coverage, and suffer negative community reaction. (Doc. No. 3 at 2). For a plea to be voluntary, "a defendant must be made aware of all of the direct but not the collateral consequences of a plea." United States v. Nicholson, 676 F.3d 376, 381 (4th Cir. 2012). A consequence is collateral if it is "uncertain or beyond the direct control of the court." Id. As

previously stated, Petitioner's guilty plea was knowing and voluntary. The Plea's impact on Petitioner's nursing license, military career, Medicaid exclusion, media coverage, and reputation in the community are collateral consequences that are beyond the direct control of the Court. Therefore, the Petitioner did not have to be informed of these consequences upon entering her guilty plea and the fact that they were not mentioned at the Rule 11 hearing had no bearing on the voluntariness of her plea.

Petitioner further contends that counsel affirmatively misadvised her that her military career and nursing license would not be affected by the guilty plea. (Doc. No. 3 at 4). This claim is refuted by Petitioner's statement under oath in open court that she was not made any promises other than those contained in the Plea Agreement. (CR Doc. No. 39 at 22-23). Her present unsupported contention that counsel promised her that the plea would not affect her nursing or military career is rejected. Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); see, e.g., United States v. Lemaster, 403 F.3d 216, 221–22 (4th Cir. 2005) (§ 2255 petitioner's sworn statements during the plea colloquy conclusively established that his plea agreement and waiver were knowing and voluntary).

Next, Petitioner argues that counsel was ineffective for failing to investigate the facts and law applicable to the case and for telling her that she was willfully blind and "should have known" that a crime was occurring. (Doc. No. 3 at 8). The elements of money laundering conspiracy under 18 U.S.C. § 1956(h) are: (1) an agreement to commit money laundering existed between one or more persons; (2) the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy.

13

United States v. Singh, 518 F.3d 236, 248 (4th Cir. 2008). The knowledge element can be proved by either subjective knowledge that the proceeds were derived from an unlawful source or, under a willful blindness theory, by evidence that she made herself "deliberately ignorant" of the fact. United States v. Farrell, 921 F.3d 116, 145 (4th Cir. 2019); United States v. Vinson, 852 F.3d 333, 357 (4th Cir. 2017) (willful blindness doctrine allows the prosecution to "prove knowledge by establishing that the defendant deliberately shielded himself from clear evidence of critical facts that are strongly suggested by the circumstances."); United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991) (explaining that the willful blindness doctrine allows the jury to use circumstantial evidence to 'impute the element of knowledge to the defendant if the evidence indicates that he purposefully closed his eyes to avoid knowing what was taking place.").

These elements are satisfied by Petitioner's admitted conduct as set forth in the Factual Basis, *i.e.*, that: she agreed to allow T.G.T. and J.T. to submit Medicaid using her NPI number as the billing provider; Medicaid wired at least $813,726 directly into Petitioner's bank account; Petitioner knew these funds were not derived from any legitimate services she had provided to Medicaid beneficiaries during the relevant time period and reasonably should have known the services were not provided by anyone else; Petitioner then arranged for the distribution of the Medicaid funds deposited in her account; and the amount of loss known to or reasonably foreseeable by her was $813,726. (CR Doc. No. 3 at 3-4). Counsel cannot be deemed ineffective for advising Petitioner that this admitted conduct satisfies the elements of money laundering conspiracy, including the knowledge element, because she should have known under the circumstances that a crime was occurring. Moreover, Petitioner admitted under oath that she understood the offense and its elements, as explained at the Rule 11 hearing, that she read, understood, and agreed with the Factual Basis, and that she is guilty of the charged offense of

money laundering conspiracy. Her present unsupported contentions to the contrary are rejected. See Blackledge, 431 U.S. at 74.

Petitioner also appears to suggest that counsel should have objected to the prosecutor's comments about willful blindness at the sentencing hearing, which amounted to a willful blindness instruction that risked confusing the requisite knowledge element with negligence. A willful blindness jury instruction is beside the point; Petitioner pleaded guilty and there was no jury that could have been confused about willful blindness. The discussion at the sentencing hearing was precipitated by the Petitioner's claim that she did not know she was doing anything wrong. The ensuing discussion, including the Government's references to willful blindness, addressed how the Petitioner's admitted conduct satisfied the knowledge element of money laundering conspiracy. There was no risk of confusion or error to which counsel should have objected under these circumstances.

Finally, Petitioner argues that counsel was ineffective for failing to file a motion to withdraw the guilty plea. Petitioner entered a knowing and voluntary guilty plea pursuant to Rule 11, then came to regret that decision and asked counsel about withdrawing her guilty plea. A motion to withdraw at that point had a low chance of success and risked: loss of the three-level reduction for acceptance of responsibility; the loss of a downward departure motion by the Government; a PSR enhancement for perjury; and reindictment on more serious charges. See (CR Doc. No. 40 at 17-18) (the prosecutor noted that "it was a gift in this case that the government charged and agreed to a money laundering charge and not a fraud charge."). Further, the Plea Agreement and Factual Basis could have been admitted at a subsequent trial and would have easily led to Petitioner's conviction. Counsel's advice that Petitioner should not attempt to withdraw her guilty plea under these circumstances was sound. See, e.g., United States v. Ram, 2013 WL

15

4648497, at *4 (E.D. Va. Aug. 29, 2013) (counsel was not deficient for advising defendant to withdraw his motion to withdraw the guilty plea due to the low chance of success, the risk of losing credit for acceptance of responsibility, and the ease of conviction at a subsequent trial). Further, counsel's advice that Petitioner should hire another lawyer if Petitioner no longer trusted counsel, was also sound and cannot be construed as coercive.

Petitioner has failed to demonstrate that counsel's performance was deficient in any way. Nor has she demonstrated prejudice, *i.e.*, a reasonable probability that a more favorable outcome would have resulted had counsel not performed deficiently. Accordingly, Petitioner's claims of ineffective assistance of counsel are denied.

**(3)** **Prosecutorial Misconduct**

In the Fourth Circuit, "[t]he test for reversible prosecutorial misconduct generally has two components: that '(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.'" United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993) (quoting United States v. Brockingham, 849 F.2d 872, 875 (4th Cir. 1988)) (internal citations omitted).

First, Petitioner contends that there was insufficient evidence to support the guilty plea, and that the Government's misstatement and misapplication of the law regarding money laundering conspiracy in a healthcare fraud scheme resulted in a wrongful conviction. This argument is premised on Petitioner's contention that she was unaware of the fraudulent scheme conducted by others. However, the conduct to which she admitted in the Factual Basis was sufficient to satisfy the elements of the offense as discussed in Section (2), *supra*. Her present unsupported contention that Government misstated the facts and the law is rejected.

Second, Petitioner contends that the Government falsely stated at the sentencing hearing that Petitioner reasonably should have known that the Medicaid services were not provided and that she was, at the very least, willfully blind. The prosecutor's reference to willful blindness was in response to Petitioner's contention that she lacked knowledge that a crime was occurring. The prosecutor appropriately argued that Petitioner's admitted conduct in the Factual Basis satisfied the willful blindness standard. <u>See</u> Section (2), *supra*. These comments did not misstate Petitioner's admitted conduct or the applicable law, and no misconduct occurred.

Third, Petitioner contends that the prosecutor improperly stated his personal opinion, repeatedly stating "I think" and "I believe" at the sentencing hearing, rather than producing evidence of Petitioner's guilt. This argument is misguided because Petitioner's knowing and voluntary guilty plea relieved the Government of its burden of proof; it was not required to come forward with evidence of her guilt at the sentencing hearing. Moreover, the Government was blindsided by Petitioner's claim of innocence at the sentencing hearing. The ensuing discussion including "I think" and "I believe" appropriately conveyed the Government's position in light of this new development in the case, and conveyed what its position would likely have been had Petitioner moved to withdraw her guilty plea prior to sentencing. Petitioner's attempt to equate this discussion with the Court to an improper closing argument before a jury is misguided. Moreover, Petitioner's contention that the prosecutor's statements at the sentencing hearing somehow prejudiced her is conclusory and speculative. Although the Government successfully petitioned the court not to grant the three-level reduction for acceptance of responsibility, this was supported by the Petitioner's change in position and refusal to acknowledge her guilt. However, the Court nevertheless imposed a downward variance sentence to just one year and one month in prison. Petitioner has failed to identify any misconduct or prejudice.

Next, Petitioner contends that the Government engaged in misconduct by slandering her in the media and failing to correct the erroneous press release. This appears to refer to the portion of a press release that was issued prior to Petitioner's sentencing, stating that Petitioner "admitted to falsifying patient records" that were used to submit fraudulent reimbursement claims to Medicaid. See (Doc. 3-1 at 119-20); see also (Doc. No. 3-1 at 121-22). Petitioner's claim of prosecutorial misconduct is insufficient because she fails to explain how the press release prejudiced her substantial rights in the criminal case. The press release was not considered at sentencing and did not otherwise affect Petitioner's substantive rights. Therefore, assuming *arguendo* that the press release contained inaccurate information, such provides no basis for § 2255 relief.

Finally, Petitioner cites statistics regarding guilty pleas, wrongful convictions, and prosecutorial misconduct in white-collar crime cases. Her supposition that prosecutorial misconduct must have occurred in the instant case is too vague, conclusory, and speculative to support relief. Dyess, 730 F.3d at 359 ("vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court.").

Petitioner has failed to demonstrate that any prosecutorial misconduct occurred and, therefore, these claims are denied.

## IV. CONCLUSION

In sum, Petitioner's § 2255 claims are vague and conclusory, waived, and meritless. For the foregoing reasons, the Amended § 2255 Motion to Vacate is dismissed with prejudice and denied.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Amended Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 3), is **DISMISSED** with prejudice and **DENIED**.

2. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

3. The Clerk is instructed to close this case.

Signed: May 24, 2021

Robert J. Conrad, Jr.
United States District Judge